# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| THG Holdings LLC, *et al.*, | Case No. 19-11689 (JTD) |
| Debtors.[1] | Joint Administration Requested |

## DECLARATION OF CHRISTIAN RICHARDS IN SUPPORT OF FIRST DAY RELIEF

I, Christian Richards, hereby declare as follows:

1.     I am the Chief Financial Officer of the above-captioned debtors and debtors in possession (the "Debtors").  I have served in this role since March 2015.  In connection with my role as Chief Financial Officer I have become familiar with the Debtors' businesses, day-to-day operations, financial affairs and books and records.  In addition, I have been substantially involved with the Debtors' relationship with the Centers for Medicare and Medicaid Services ("CMS") throughout my tenure as Chief Financial Officer.

2.     I submit this declaration to provide support for, and background concerning, the Debtors' history with CMS and the United States Department of Justice, and how that history has led the Debtors to seek chapter 11 protection.

3.     Except as otherwise indicated, the statements set forth in this declaration are based upon my personal knowledge of the Debtors' operations and financing, information learned from my review of relevant documents, information supplied to me from other members of the Debtors' management or the Debtors' advisors, or my opinion based on my knowledge,

---

[1]     The Debtors in these cases, along with the last four digits of each Debtors' federal EIN, are as follows: THG Holdings LLC (8292); True Health Group LLC (9158); True Health Clinical LLC (5272); True Health Diagnostics LLC (9452); True Health IP LLC (5427); Outreach Management Solutions LLC d/b/a True Health Outreach (9424); Health Core Financial LLC d/b/a True Health Financial (6614). The Debtors' mailing address is 737 N. 5th Street, Suite 500, Richmond, Virginia 23219.

experience and information concerning the Debtors' operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors.  If called to testify, I could and would testify competently to the matters set forth in this declaration.

4.      The Debtors'' business is conducted in large part through Debtor True Health Diagnostics, LLC ("True Health").  True Health is a laboratory provider of diagnostic and disease-management solutions based in Frisco, Texas.  True Health utilizes proprietary and innovative diagnostic technology to detect disease indicators that enable early stage diagnosis and monitoring for a variety of chronic diseases.  True Health employs approximately 320 individuals and serves approximately 1,400 patients per day and 335,000 patients annually, more than 65,000 of whom are Medicare beneficiaries.

5.      Medicare is a federally-administered and funded program that provides payment for the provision of healthcare services to millions of aged or disabled individuals, including the diagnostic laboratory services that True Health provides.

6.      On November 25, 2014, True Health executed a form CMS-460 application to participate in Medicare Part B as a provider (the "Application").  Following approval of the Application and agreement to follow appropriate CMS rules and regulations, True Health began accepting Medicare patients and seeking reimbursement through Medicare for the services provided to such Medicare patients.  Subsequently, True Health acquired the assets of Health Diagnostics Laboratories ("HDL") out of their bankruptcy on or about September 30, 2015 without any objection by the government.  In connection with that acquisition, True Health voluntarily assumed the obligations under HDL's corporate integrity agreement with the government on October 13, 2015.  Since then, all government audits of True Health's compliance with that agreement have resulted in compliance ratings have achieved 99% or

better.  Ultimately, Medicare patients and the reimbursements for the services provided to those patients grew to become approximately 30% of True Health's business and, importantly, revenue.

7.     Without any prior notice, on or around May 25, 2017, CMS instituted a 100 percent hold on all Medicare payments to True Health.  Given the current extremely low margins on which diagnostic labs operate, the loss of 30% of the business's revenue dramatically affected the viability and financial stability of True Health.

8.     The May 25, 2017 notice cited only eight specific claims submitted over a one-year period that allegedly did not comply with Medicare guidelines, which represents 0.008% of all claims submitted by True Health to Medicare during that time period (November 19, 2015 through November 4, 2016).  The claims at issue represented less than $3,000 of Medicare funds paid to True Health.

9.     True Health immediately provided a rebuttal statement to CMS on or around June 5, 2017, detailing the reasons why the suspension was not warranted and damaging to True Health's business.  That rebuttal statement provided documentary evidence that established that *all* the claimed discrepancies were not the fault of True Health, but in fact paperwork errors of the ordering provider.  That is, a clinical laboratory only performs test services at the direction of an ordering provider and the alleged discrepancies were due to documentation errors by those providers.  For example, True Health demonstrated to CMS that the claim regarding services ordered after a provider's death proved to be an error at the practice.  A living, practicing provider of the practice ordered a test via a paper order but a staff member inadvertently selected the deceased provider form a drop-down box in a piece of third-party

software.  The paper order showed the order had been signed by the living provider.  CMS has not disputed these facts.

10.    Approximately one month later, on or around June 23, 2017, CMS reduced its holdback from 100 percent to 35 percent of all Medicare payments.  Even with the reduced suspension, however, True Health and the other Debtors were unable to adequately fund their business.  They were forced to seek outside funding to sustain their operations.  Fortunately, existing stakeholders continued to support True Health, deferring substantial debt service and funding over $15 million with new capital to allow the business to continue to operate while the company responded to the unilateral CMS action.  Approximately $21 million in receivables have been held back by Medicare since May 2017.

11.    The company continually attempted to follow up with CMS on their findings and was directed to contact the United States Department of Justice ("DOJ") in late 2017.  True Health was thereby led to believe that DOJ was responsible for the suspension. Accordingly, True Health engaged expert legal and regulatory counsel, Mintz Levin and McDermott, Will and Emery, respectively.  The company also engaged Navigant Consulting, one of the most reputable healthcare advisory firms in the country.  Together, these legal and financial advisory firms worked tirelessly to investigate and resolve the CMS suspension.

12.    True Health spent countless man hours and millions of dollars trying to resolve any CMS and DOJ issues.  Through considerable efforts over that period, the Debtors examined and further refined their business practices and policies which had already achieved a 99% compliance score by an independent review officer under a voluntary Corporate Integrity Agreement.  The Debtors believed their business practices to be entirely compliant with

applicable healthcare law and regulations, but further refined them based on guidance provided by CMS and the DOJ.

13.    For example, True Health instituted daily PECOS checks of all its ordering providers whereas it had previously conducted monthly checks.  In addition, True Health required further documentation and information from any third party phlebotomy vendors that it contracted with for patient blood draws to help guard against any improper relationships between phlebotomy vendors and providers.

14.    Over the course of many months, True Health negotiated with DOJ to resolve the government's claims and concerns.  On December 21, 2018, the company and the DOJ had negotiated a comprehensive settlement agreement, including the terms of a new corporate integrity agreement, in what the company believed would finally and completely resolve all open issues with CMS and the DOJ.  Both agencies led the company to believe that these agreements would be signed imminently.

15.    However, on February 1, 2018 and thereafter, Debtors received notice from the DOJ that changes were being made to material terms of the settlement agreement. Nevertheless, the Debtors agreed to the material changes by the government and a final settlement agreement was again reached on or about June 6, 2019.  True Health received authority from its Board of Directors to sign the settlement agreement and the matter appeared finally resolved for a second time.

16.    Instead, on or about June 13, 2019, CMS (which had taken a backseat during the negotiations with DOJ since late 2017) reasserted itself in the process and imposed a new 100 percent suspension of all Medicare payments to True Health.  Although the June 13 suspension notice claimed to be predicated on new allegations of fraud, in truth, the five (5)

5

claims identified by CMS were based on the same facts and circumstances, and were part of the very same investigation that supported the 2017 suspension.   To the best of my knowledge, all of the claims and conduct complained of by CMS and DOJ date back to time periods from 2018 or before.

17.    This second suspension by CMS was devastating to the company, particularly in light of the fact that True Health has continued to participate in the Medicare program and has continued to serve Medicare patients -- without full compensation -- for more than two years while it worked feverishly to secure a settlement with the government.  Having been stretched to the breaking point financially over the preceding two years of suspension and fruitless negotiation with DOJ and CMS, True Health was unable to absorb further losses.

18.    Accordingly, True Health sought emergency injunctive relief against CMS in the United States District Court for the Eastern District of Texas.  True Health initially was successful in obtaining a temporary restraining order against CMS to preclude CMS from imposing the 100 percent holdback.  On July 10, 2019—two days after the TRO was entered but more than *two years* after CMS initiated its first 2017 suspension of Medicare payments against True Health—True Health received two separate letters from Qlarant, each dated July 5, 2019, notifying True Health that Qlarant had completed its review of services performed by True Health and determined that True Health had received Medicare overpayments.  The first notice stated that True Health had "received Medicare payment in error, which has resulted in an extrapolated overpayment of $19,759,699.00 for the universe of claims with process dates 10/01/2015 through 01/20/2017."  The second notice stated that True Health had "received Medicare payment in error, which has resulted in an extrapolated overpayment of $7,707,443.32

for the universe of claims with process dates 05/25/2017 through 10/06/2017."[1]   The overpayment determinations each included a "Sampling Methodology" report that described how the statistically valid random sample of claims was selected and how the estimated overpayment determinations were calculated.   Importantly, these reports reveal that Qlarant had completed its review and calculation of overpayments *well over a year* before they were sent to True Health.   The report calculating the $19,759,699.00 overpayment amount was dated September 26, 2017 and the report calculating the $7,707,443.32 overpayment amount was dated January 23, 2018.   CMS withheld these final overpayment determinations effectively depriving True Health of an opportunity to pursue an administrative appeal under the Medicare Act and allow CMS to continue to escrow millions of dollars in Medicare payments owed to True Health.

19.     On July 22, 2019 the District Court denied True Health a preliminary injunction and dismissed the action for lack of subject matter jurisdiction.   The continued suspension of all Medicare payments to True Health has resulted in irreparable damage to the Debtors' liquidity and their businesses.   Consequently, the Debtors were forced to file for Chapter 11 bankruptcy protection before this Court.

---

[1]     Initial overpayment determinations are calculated through a review of a statistically valid random sample of claims for a specified time period and then extrapolated out to arrive at a total amount of estimated overpayments.  These initial overpayment determinations are often challenged and reduced significantly through the administrative appeal process, which True Health intends to pursue.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


Dated: July 30, 2019
       Richmond, VA              /s/  Christian Richards
                                            Christian Richards

12994121.2