## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| THG Holdings LLC, *et al.*, | Case No. 19-11689 (JTD) |
| Debtors.[1] | Joint Administration Requested |

### DECLARATION OF CLIFFORD A. ZUCKER IN SUPPORT OF FIRST DAY RELIEF

I, Clifford A. Zucker, hereby declare as follows:

1.      I am the Chief Restructuring Officer of the above-captioned debtors and debtors in possession (the "Debtors").   I am a Senior Managing Director of FTI Consulting and through my and FTI's work with the Debtors have become familiar with the Debtors' businesses, day-to-day operations, financial affairs and books and records.

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in this Court.  The Debtors continue to operate their businesses and manage their affairs in the ordinary course of business as debtors in possession.   The Debtors have filed a number of motions identified herein requesting "first day" relief.  I submit this declaration in support of such first day relief, as well as to provide support for, and background concerning, the Debtors' chapter 11 cases and other pleadings filed or expected to be filed in the cases.

3.      Except as otherwise indicated, the statements set forth in this declaration are based upon my personal knowledge of the Debtors' operations and financing, information

---

[1]      The Debtors in these cases, along with the last four digits of each Debtors' federal EIN, are as follows: THG Holdings LLC (8292); True Health Group LLC (9158); True Health Clinical LLC (5272); True Health Diagnostics LLC (9452); True Health IP LLC (5427); Outreach Management Solutions LLC d/b/a True Health Outreach (9424); Health Core Financial LLC d/b/a True Health Financial (6614). The Debtors' mailing address is 737 N. 5th Street, Suite 500, Richmond, Virginia 23219.

learned from my review of relevant documents, information supplied to me from other members of the Debtors' management or the Debtors' advisors, or my opinion based on my knowledge, experience and information concerning the Debtors' operations and financial condition. I am authorized to submit this declaration on behalf of the Debtors. If called to testify, I could and would testify competently to the matters set forth in this declaration.

## I.   OVERVIEW OF THE DEBTORS' BUSINESS AND FINANCIAL AFFAIRS

### A.   The Debtors' Business

4.     Founded in 2014, the Debtors are one of the largest independent providers of laboratory management and diagnostic services in the United States. The Debtors operate accredited, full-service clinical laboratories that offer comprehensive testing for biomarkers that can indicate risk for cardiovascular disease, diabetes, autoimmune disorders, cancer, and other diseases and health testing services. By utilizing the Debtors' services, physicians can offer patients a personalized overview of risk factors and assistance from clinical health consultants to promote healthy, longer-lasting lifestyles.

5.     The Debtors offer what they believe may be the most comprehensive test of biomarkers for cardiovascular, diabetes, and related diseases currently available in the industry. The Debtors offer more than 400+ tests and have handled over 1,525,000 patient samples. The Debtors currently run about 1,370 samples daily through their two facilities. The Debtors' maintain state of the art laboratory facilities that are strategically located to allow for rapid turnaround times and strong customer base. The Debtors' primary operations are located in Richmond, Virginia, which includes a 109,000 square foot facility built in 2013 consisting of 52,000 square feet for testing plus offices for billing, research and development, and other administrative functions. The Debtors also maintain a second laboratory in Frisco, Texas, which

is a 7,000 square foot facility and includes 5,000 square feet for testing.  From these two facilities, the Debtors serve approximately 1,250 physician offices located in 46 states plus the District of Columbia.  The advanced testing offered by the Debtors provides a far broader and deeper picture of patient health than traditional testing.  In addition, the Debtors offer an online patient portal that provides interactive reports, live coaching help, patient engagement videos, and lifestyle tracking tools.

6.    The Debtors employ approximately 319 people in full-time and part-time positions. These employees include laboratory technicians, phlebotomists and other clinical professionals in addition to corporate support staff in finance, accounting, billing, human resources and information technology.  The Debtors also contract with approximately 450 phlebotomist vendors who service and collect samples from patients at their residences or other locations convenient to patients.

### B.    The Debtors' Corporate Structure

7.    The Debtors' current corporate organizational structure is depicted on the chart below. All of the Debtors are Delaware limited liability companies.  THG Holdings LLC serves as the ultimate parent entity of the Debtors through its 100 percent equity ownership of True Health Group LLC ("Holdings").  Holdings, in turn, owns 100 percent of True Health Diagnostics LLC ("THD"), Outreach Management Solutions, LLC ("OMS"), True Health Clinical LLC ("THC"), Health Core Financial LLC ("HCF") and True Health IP LLC ("TH-IP").  THD and OMS are the only operating entities.  Equity ownership of Holdings consists of Class A Shares held by Riverside Strategic Capital Fund I L.P., together with its affiliated funds, Monroe Capital Management Advisors, LLC, as administrative agent, and two of the Debtors' founding investors and Class B Shares held by approximately 40 private investors.



C.    **The Debtors' Capital Structure**

8.    As of the Petition Date, the Debtors' debt obligations totaled over $174 million including long-term debt of $150 million, a revolving line of credit of $2.5 million and an accounts payable balance of approximately $14 million.

9.    <u>Funded Debt Obligations</u>.  The Debtors, as borrowers, are party to that certain Credit Agreement dated as of January 26, 2017 (as amended, restated, supplemented, and otherwise modified from time to time, the "<u>Prepetition First Lien Credit Agreement</u>"), by and among True Health Diagnostics LLC, as a borrower, Holdings, the other subsidiaries of Holdings from time to time party thereto, the various financial institutions from time to time party thereto, as lenders, and Monroe Capital Management Advisors, LLC, as administrative agent (together with its permitted sub-agents, delegates, attorneys-in-fact, successors and assigns, including Monroe Capital LLC, the "<u>Prepetition First Lien Administrative Agent</u>") (and together with such lenders, the "<u>Prepetition Secured Parties</u>").  Pursuant to the Prepetition First Lien Credit Agreement, the Debtors obtained a senior secured financing facility as follows: (a) a revolving loan facility in an aggregate amount not to exceed $15,000,000 (the "<u>Revolver</u>") and (b) a term

loan facility in an aggregate principal amount not to exceed $110,000,000 (the "Term Loan" and, with the Revolver, the "Prepetition Credit Facilities").

10.    As security for the Debtors' repayment obligations under the Prepetition First Lien Credit Agreement, the Debtors granted the Prepetition First Lien Administrative Agent for the benefit of the Prepetition Secured Parties, first priority liens upon and senior security interests in (the "Prepetition Senior Liens") substantially all of the Debtors' property and assets (collectively, the "Prepetition Senior Collateral") as more particularly set forth in certain security documents and instruments, including but not limited to the (a) Guaranty and Collateral Agreement, dated as of January 26, 2017, by and among True Health Diagnostics LLC, and each other person signatory such agreement as a grantor, in favor of the Prepetition First Lien Administrative Agent; (b) Trademark Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (c) Patent Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (d) Copyright Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (e) Limited Guaranty and Pledge Agreement, dated as of May 18, 2018, by THG Holdings LLC in favor of the Prepetition First Lien Administrative Agent; and (f) each Control Agreement (as defined in the Prepetition First Lien Credit Agreement).  On May 18, 2018, the Prepetition Secured Parties agreed to subordinate, subject to certain conditions set forth in the Intercreditor Agreement (as defined below), $34,092,378.29 of the debt under the Prepetition Credit Facilities to be *pari passu* with Prepetition Second Lien Debt.

11.     As of the Petition Date, the principal amounts outstanding under the Revolver and Term Loan are $2,786,744.81 and $118,805,633.48, respectively.[2]   Moreover, there is approximately $24,471.51 and $1,043,407.24 in accrued and unpaid interest under the Revolver and Term Loan, respectively.[3]

12.     Additionally, True Health Diagnostics LLC and True Health Group LLC are borrowers, and Outreach Management Solutions LLC, Health Core Financial LLC, True Health Clinical LLC, and True Health IP LLC are guarantors to that certain Amended and Restated Second Lien Promissory Note, dated as of November 21, 2018 (the "Prepetition Second Lien Promissory Note") with the lenders party thereto (the "Prepetition Second Lien Lenders"), and Riverside Strategic Capital Funds I, L.P., as agent (the "Prepetition Second Lien Administrative Agent").  The Prepetition Second Lien Promissory Note initially comprised of a loans in the original principal amount of $18,800,000.  As described above, on May 18, 2018, the Prepetition Secured Parties agreed to subordinate, subject to certain conditions set forth in the Intercreditor Agreement (as defined below), $34,092,378.29 of the debt under the Prepetition Credit Facilities to be *pari passu* with Prepetition Second Lien Debt.  Between May 18, 2018 and the Petition Date, affiliates of the Prepetition Second Lien Administrative Agent funded an additional $15,530,000 to support the Debtors' operations.

13.     As security for the repayment obligations under the Prepetition Second Lien Promissory Note, the borrowers and guarantors thereto granted the Prepetition Second Lien Administrative Agent, for the benefit of itself and the Prepetition Second Lien Lenders, certain

---

[2]     Such amounts include payment-in-kind interest of $286,744.81 and $10,580,633.48 with respect to the Revolver and Term Loan, respectively, which pursuant to the Prepetition First Lien Credit Agreement is converted to principal.

[3]     Such amount does not include premiums, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and obligations owed by the Debtors due and payable under the Prepetition Credit Facility.

6

second priority liens (the "Prepetition Second Liens" and together with the Prepetition Senior Liens, the "Prepetition Liens") on certain collateral (the "Prepetition Second Lien Collateral" and together with the Prepetition Senior Collateral, the "Prepetition Collateral").

14.     Prepetition, the Debtors defaulted under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Promissory Note.  Following this default, the Debtors, the Prepetition Secured Parties, the Prepetition Second Lien Lenders and the Prepetition Second Lien Administrative Agent entered into two forbearance agreements and extensions to the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Promissory Note, including most recently that certain Fifth Extension of Second Forbearance Agreement dated as of May 10, 2019 (the "Forbearance Agreement"), which expired on May 31, 2019.

15.     Intercreditor Agreement.    The Debtors are party to that certain Intercreditor and Subordination Agreement, dated as of May 18, 2018, (as amended, restated, supplemented, or otherwise modified from time to time, the "Intercreditor Agreement") by and among the Debtors, Holdings, each of the entities listed as a guarantor thereto, Riverside Strategic Capital Fund I, L.P., and the Subordinated Creditors (as defined in the Intercreditor Agreement), and Monroe Capital Management Advisors, LLC. I am informed that the Intercreditor Agreement was the result of efforts to restructure or sell the Debtors' business in fall 2017. It is pursuant to the Intercreditor Agreement that the Prepetition Secured Parties agreed to subordinate, subject to certain conditions set forth therein, $34,092,378.29 of the debt under the Prepetition Credit Facilities to be *pari passu* with Prepetition Second Lien Debt.

16.     Other Trade and Miscellaneous Unsecured Debts.    The Debtors estimate that as of the Petition Date claims of other trade and miscellaneous unsecured creditors total approximately $14 million.

## II.    EVENTS LEADING TO FILING THE CHAPTER 11 CASES

17.    Several factors have negatively impacted the Debtors' financial position and liquidity constraints.  On or around May 25, 2017, the Centers for Medicare and Medicaid Services ("CMS") instituted a 100 percent hold on all Medicare payments to THD without notice, limiting the Debtors' ability to fund their retail lab business. Medicare payments account for a significant portion of the Debtors' total cash receipts. THD provided a rebuttal statement to CMS on or around June 5, 2017.

18.    Approximately one month later, on or around June 23, 2017, CMS reduced its holdback from 100 percent to 35 percent of all Medicare payments.  Even with the reduced suspension, however, the Debtors were forced to seek outside funding to sustain their operations. The Debtors estimate approximately $21 million in receivables have been held back by Medicare since May 2017.

19.    I understand that between June 23, 2017 and the end of May 2019, the Debtors took substantial steps to address the claims asserted and the concerns raised by CMS and the United States Department of Justice.  Among other things, the Debtors engaged expert regulatory counsel and financial advisors to cooperate and interact with CMS and DOJ.  Finally, the Debtors negotiated a comprehensive settlement with DOJ, including a new corporate integrity agreement.  I understand that the settlement was on the verge of being consummated when CMS and DOJ advised the Debtors of a second investigation.

20.    On or about June 13, 2019, CMS imposed a second 100 percent hold on all Medicare payments to THD. I am informed that the conduct complained of and the claims asserted by CMS and DOJ in support of this most recent suspension is based on facts that date

back to 2017 and before.  Indeed, the Debtors believe that this most recent suspension is based on the very same conduct that supported the 2017 suspension.

21.    The Debtors continue their participation in Medicare, perform current medically essential services for Medicare patients, and timely submit claims for reimbursement. CMS is withholding all reimbursement payments to the Debtors, however, as a result of alleged overpayments it made to the Debtors dating back to 2015.

22.    In response to the June 13, 2019 suspension, THD sought emergency injunctive relief against CMS in the United States District Court for the Eastern District of Texas.  Although THD initially was successful in obtaining a temporary restraining order against CMS to preclude CMS from imposing the 100 percent holdback, on July 22, 2019 the District Court denied THD a preliminary injunction and dismissed the action for lack of subject matter jurisdiction.  The continued suspension of all Medicare payments to THD has resulted in irreparable damage to the Debtors' liquidity and their businesses.  Consequently, the Debtors were forced to file for Chapter 11 bankruptcy protection before this Court.

23.    In light of the severe liquidity constraints imposed by the CMS suspensions on Medicare payments, the Debtors began to explore options for a debtor-in-possession financing facility.  However, given the Debtors' financial condition, existing financing arrangements and capital structure, as well as the Prepetition Secured Lenders' unwillingness to allow for a post-petition loan from a third party to prime their liens and claims, the Debtors' only viable option for a debtor-in-possession financing was with the Prepetition Secured Lenders.

24.    Following extensive good faith, arms' length negotiations, the Debtors entered into that certain Debtor-in-Possession Financing Term Sheet with the Prepetition

Secured Parties, dated as of July 30, 2019 (the "<u>DIP Term Sheet</u>") which will provide up to $3,574,000 of new money on an interim basis, and pursuant to final documentation, up to $7,847,000 of new money on a final basis, each subject to the terms of the DIP Orders.  The DIP Facility, among other things, will be secured by superpriority liens and claims that will prime the existing Prepetition Senior Liens under the Prepetition First Lien Credit Agreement.

25.     In my view, commencing these Chapter 11 cases and entering into the DIP Term Sheet are the best available options to preserve and maximize value for the Debtors' stakeholders.  The DIP Facility in particular provides the Debtors with the necessary liquidity to conduct an expedited but thorough sale process in these chapter 11 cases while maintaining the Debtors' going concern value.  Accordingly, I believe that these chapter 11 cases are in the best interests of the Debtors' estates and will maximize value for all parties in interest.

## III.     FIRST DAY MOTIONS

26.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of motions identified herein requesting "first day" relief (the "<u>First Day Motions</u>").  The Debtors request that the Court grant the First Day Motions as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of, these chapter 11 cases.  I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information and belief with appropriate reliance on the Debtors' personnel and advisors.

### A.     Motion for Joint Administration

27.     The Debtors are requesting the entry of an order directing joint administration of their related chapter 11 cases for procedural purposes only.  The Debtors

request that (a) the Court maintain one file and one docket for the jointly-administered Chapter 11 Cases under the case number assigned to THG Holdings LLC, (b) the Chapter 11 Cases be administered under a consolidated caption, and (c) the Court grant related relief.

28.     I am informed and believe that joint administration obviates the need for multiple and duplicative notices, motions, applications, and orders, which saves the Debtors, the Court and parties in interest time and expense.  The Debtors intend to consolidate their cases for procedural and administrative purposes only.  Accordingly, I am informed and believe that creditors will not be adversely affected as the Debtors request only administrative, and not substantive, consolidation of their estates.

**B.     Motion to Appoint Claims and Noticing Agent**

29.     It is my understanding that the Debtors are applying ("Section 156(c) Application") for entry of an order appoint Epiq Corporate Restructuring, LLC ("Epiq") as claims and noticing agent in these chapter 11 cases.  I understand that such appointment is required by the rules of this Court.  Moreover, I believe that such relief is prudent in light of the thousands of creditors, potential creditors and parties in interest to whom certain notices will be sent.

30.     I believe that Epiq's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the chapter 11 cases and of other developments in these cases.  Moreover, I am informed that Epiq has acted as the claims and noticing agent in numerous cases of comparable size, including several large bankruptcy cases pending in both this District and other districts.  Moreover, in compliance with the Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c) of the United States Bankruptcy Court for the District of Delaware, the Debtors obtained and reviewed engagement

protocols from three other Court-approved claims and noticing agents to ensure selection through a competitive process.

31.     As more fully detailed in the Section 156(c) Application, I understand that Epiq will engage in certain Claims and Noticing Services, including, but not limited to, transmitting, receiving, docketing and maintaining proofs of claim filed in connection with these chapter 11 cases.   Epiq will also work with the office of the Clerk of the United States Bankruptcy Court for the District of Delaware to ensure that its methodology conforms with all of the Court's procedures, the Local Bankruptcy Rules and the provisions of any order entered by this Court.   Moreover, I am informed that the Section 156(c) Application pertains only to the work to be performed by Epiq under the Clerk of the United States Bankruptcy Court for the District of Delaware delegation of duties permitted by 28 U.S.C. § 156(c) and Local Bankruptcy Rule 200-1(f).[4]

32.     Accordingly, I believe that retention of Epiq, an independent third party with significant experience in this role, to act as an agent of the Court, is in the best interests of the Debtors, their estates and their creditors.

## C.    Employee Wages Motion

33.     To preserve the value of the Debtors' business as well as to prevent the disruption that the businesses will suffer if prepetition employment-related obligations are not paid when due or as expected, as well as to maintain morale of the Debtors' workforce during this critical time, the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to (a) pay all prepetition employee-related claims and obligations in the ordinary course of business; (b) continue to offer, honor, and facilitate all employee obligations and programs in

---

[4]     The Debtors may file an application to retain Epiq to perform certain administrative services pursuant to Bankruptcy Code section 327.

the ordinary course of business during the pendency of these Chapter 11 Cases; (ii) authorizing, but not directing, the Debtors to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for such payments where such method of payment has been dishonored postpetition; (iii) directing all banks to honor the Debtors' prepetition and postpetition checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for payment of the employee-related obligations; and (iv) granting related relief.

<u>Employee Obligations</u>

34.     As of the Petition Date, the Debtors employ approximately 319 people (collectively, the "<u>Employees</u>"), all of whom are located in the United States.  Of this amount, 272 Employees are employed on a full-time basis and 47 Employees are employed on a part-time basis.  Approximately 227 Employees are paid on an hourly basis, 92 Employees are paid a salary and 20 Employees are sales representatives who receive commissions in addition to their base salaries.  None of the Employees are unionized or party to collective bargaining agreements or similar labor arrangements.

**(i)**     *Employee Wages*

35.     In the ordinary course of business, the Debtors pay most Employees on a bi-weekly basis, with payroll being disbursed every other Friday, one week in arrears.  Three executive team members receive monthly payroll disbursements paid in advance, on or around the first of each month.  Employees who earn commissions are paid such commissions monthly for the preceding month, one month in arrears.  On average each month, the Debtors will pay approximately $765,000 in base wages and salary, plus an average of $175,000 in commissions to sales representatives.

36.     The Debtors' payroll is distributed predominately by direct deposit into the Employees' personal bank accounts. Only about 20 payroll checks are distributed per pay period. The Debtors believe that the amount of uncashed checks issued to current and former Employees (the "Uncashed Employee Paychecks") that may be outstanding as of the Petition Date is approximately $30,000 for wages or salary earned within 180 days of the Petition Date, and request authority to honor such amounts owed to the Employees. To maintain Employee morale and dedication, and demonstrate their ongoing commitment to honor obligations to Employees (current and former), the Debtors believe it is important to honor such Uncashed Employee Paychecks.

37.     The Debtors estimate that approximately $110,000 in gross prepetition wages and salaries are owed to Employees (collectively, the "Unpaid Employee Wages").  The Debtors seek authorization, but not direction, to pay and honor or reissue in the ordinary course of business the Unpaid Employee Wages and Uncashed Employee Paychecks, and continue to honor Employee wages after the Petition Date in the ordinary course.

38.     Moreover, the Debtors estimate that approximately $175,000 in prepetition commissions is owed to sales representatives (collectively, the "Unpaid Sales Commissions").  The Debtors seek authorization, but not direction, to pay in the ordinary course of business the Unpaid Sales Commissions.  The Debtors believe that the portion of Uncashed Employee Paychecks, Unpaid Employee Wages and Unpaid Sales Commissions allocable to them does not exceed $13,650 per Employee.  To the extent that any Employee is owed more than $13,650 in such amounts, the Debtors respectfully request that the Court permit the Debtors to pay any excess.

**(ii)**    *Payroll Taxes and Withholding Obligations*

39.    Each pay period, the Debtors deduct certain amounts directly from Employees' pay, including, but not limited to: (i) garnishments, child support, service charges and other similar deductions as applicable; and (ii) other pre- and after-tax deductions payable pursuant to certain of the Employees Obligations, legally-ordered deductions and other miscellaneous deductions (collectively, the "Deductions").

40.    Based upon the Employees' salaries and wages, the Debtors also are required by law to withhold amounts related to federal, state and local income taxes, as well as Social Security and Medicare, and to remit such withholdings to the applicable authorities.  The Debtors are additionally required to make matching payments from their own funds for Social Security and Medicare and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, employment training taxes and state disability insurance contributions (all of the foregoing, collectively, the "Payroll Tax Obligations").  Each pay cycle, the Debtors withhold applicable Payroll Tax Obligations from Employees' wages, and remit such amounts to the applicable authorities.

41.    On average each month, the Debtors withhold approximately $250,000 in Payroll Tax Obligations and approximately $185,000 in Deductions.  The Debtors estimate that, as of the Petition Date, they have withheld approximately $200,000 in prepetition Deductions and Payroll Tax Obligations (collectively, the "Withholding Obligations") to be remitted to the appropriate third-party recipients, all of which must be paid or remitted within 21 days of the Petition Date.   The Debtors seek authorization, but not direction, to pay and remit the Withholding Obligations to the appropriate authorities consistent with the Debtors' prepetition practices.

    **(iii)**    *Accrued Vacation*

    42.    In the ordinary course of business, the Debtors provide eligible Employees with paid vacation time ("PTO").  The PTO benefit year runs from January 1 to December 31. Depending on tenure and other factors, Employees accrue between 12 and 21 days of PTO annually (as accrued and unused "Accrued Vacation").  The Debtors permit PTO carryover of up to forty hours, but any unused PTO over forty hours, not taken within the calendar year, is forfeited.  The Debtors seek authority to continue their PTO policy in the ordinary course of business on a postpetition basis.

    43.    As of the Petition Date, the Debtors estimate that, in total, the value of all accrued and unpaid prepetition Accrued Vacation is approximately $389,000.  The Debtors request authority to honor all prepetition Accrued Vacation and continue to honor all postpetition Accrued Vacation as it comes due in the ordinary course.

Employee Benefits

    **(i)**    *Medical and other Health Plans*

    44.    The Debtors have a self-funded medical plan for eligible Employees, administered by Group & Pension Administrators Inc.  Additionally, the Debtors provide eligible Employees with access to dental and vision coverage through Delta Dental and VSP Vision Care, respectively (collectively, the "Benefit Plans").  The Debtors contribute a portion of the monthly premiums on the Employees' behalf for the Benefit Plans.  The Debtors estimate that the total monthly payments for medical benefit claims is approximately $200,000.  In addition, monthly premiums paid for benefit plans are $2,600 for medical, $18,000 for dental and $2,500 for vision.  As of the Petition Date, the Debtors believe they owe $18,000 for pre-petition dental plan fees, and they do not believe they owe any amounts for the vision plan for the prepetition

period, but out of an abundance of caution, the Debtors seek authority, but not direction, to honor all Medical Benefit Plan contributions that arose prepetition, and honor any amounts that become due in the ordinary course.

**(ii)** *Life Insurance*

45.     The Debtors also provide basic life insurance ("Life Insurance") for eligible Employees. Life Insurance is administered by Lincoln Financial Group.  The Debtors' total monthly cost in connection with Life Insurance is approximately $1,261.  As of the Petition Date, the Debtors believe that no amounts are outstanding for Life Insurance premiums attributable to the prepetition period.

**(iii)** *Corporate Credit Cards*

46.     The Debtors currently have corporate credit cards issued by American Express (the "Corporate Credit Cards") that certain Employees use for business expenses such as travel, hotels and meals. The Corporate Credit Cards ensure that the Employees are able to fulfill financial obligations of the Debtors that arise in the ordinary course of business.  In the ordinary course, obligations arising from the use of the Corporate Credit Card are paid directly by the Debtors. On average, the Debtors accrue approximately $150,000 of charges each month. As of the Petition Date, the Debtors estimate that $145,000 due and owing under the Corporate Credit Cards.

**(iv)** *Miscellaneous Benefits*

47.     The Debtors also offer several other miscellaneous benefits to certain eligible Employees.  These miscellaneous benefits include, but are not limited to (a) a short-term disability program,[5] (b) an employee assistance program, (c) accident, critical illness and hospital

---

[5]     The Debtors fund short-term disability obligations.  Short-term disability obligations are funded with ordinary payroll, and any amounts due as of the Petition Date are subsumed within the Unpaid Wages

indemnity insurance, (d) pet insurance and (e) legal assistance. The Debtors believe that honoring these miscellaneous benefits will help boost Employee morale and confidence in Debtors, and maintain the current workforce. The obligations owed to the Employees with respect to these miscellaneous benefits are *de minimis*, and the Debtors request authority to continue to honor these miscellaneous benefits in the ordinary course.

### Independent Contractors

48.     In addition to the Employees, the Debtors also rely on the services of independent contractors (the "Independent Contractors") in operating their business. Almost all of the Independent Contractors are phlebotomists, but not all of the phlebotomists are active each month. As of the Petition Date, approximately 450 Independent Contractors provide services to the Debtors. On average, the Debtors pay the Independent Contractors approximately $210,000 in the aggregate per month. As of the Petition Date, approximately $215,000 in prepetition amounts owed to the Independent Contractors remained outstanding (the "Unpaid Independent Contractor Wages" and, together with the Unpaid Employee Wages, the "Unpaid Wages").

49.     The Debtors believe that the amount of uncashed checks issued to Independent Contractors (the "Uncashed Independent Contractor Paychecks" and, together with the Uncashed Employee Paychecks, the "Uncashed Paychecks") that may be outstanding as of the Petition Date is approximately $85,000 for amounts earned within 180 days of the Petition Date, and request authority to honor such amounts owed to the Independent Contractors.

---

described above. At present, there are approximately three Employees on short-term disability. The Debtors request authority to honor all short-term disability obligations in the ordinary course of business, regardless as to whether such obligations arose before, on or after the Petition Date.

50.     To the best of the Debtors' knowledge, no Independent Contractor is owed more than $13,650 in Unpaid Independent Contractor Wages or Uncashed Independent Contractor Paychecks.  To the extent that any Independent Contract is owed more than $13,650 in such amounts, the Debtors respectfully request that the Court permit the Debtors to pay any excess.

**D.     Refund Motion**

51.     The Debtors are requesting the entry of an order authorizing, but not directing, the Debtors to continue their refund programs in the ordinary course of business, and granting related relief.  In addition, if the Court grants the relief sought, the Debtors request that all applicable banks and other financial institutions be authorized, when requested by the Debtors in their discretion, without any duty of inquiry or liability to any party for following the Debtors' instructions, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts to pay amounts owed pursuant to the Debtors' refund programs, whether those checks are presented prior to or after the Petition Date, and to make other transfers, provided that sufficient funds are available in the applicable accounts to make the payments.

52.     Various state and federal laws require the Debtors to refund patients and third-party payors, including healthcare insurers, managed care organizations, workers' compensation programs, contract management services, private pay sources, Medicare, and Medicaid (collectively, "Third-Party Payors"), when overpayments are identified.  In the ordinary course of business, the Debtors routinely issue refunds or are subject to offsets for reimbursement of overpayments made by or on behalf of patients resulting from the interaction between the Debtors' billing procedures, patient medical insurance deductibles, and third-party payments (the "Refund Program").

53.    The case-by-case nature of the Debtors' medical services makes the process of determining each patient's insurance coverage particularly complex.  As a result, whether due to data input errors during claims processing, or overpayments arising from coordination-of-benefits issues among multiple insurers, patient accounts—once fully processed—may contain credit balances.  Once the Debtors receive payments from patients or insurers, the Debtors review accounts that have credit balances and refund any surplus to the patient or are subject to an offset to the Third-Party Payor's receivable balance based on an overpayment.

54.    When the Debtors discover and verify an overpayment from a patient or Third Party Payor, the amount of the overpayment is reviewed in the Debtors' billing system, which then administers refunds to the patient as appropriate.  Offsets by Third-Party Payors are reconciled by the Debtors after the offset occurs.  There is typically a significant lag between when the patient is treated, when the overpayment is recognized or determined, and when the overpayment is reviewed in the Debtors' billing system.  After the overpayment amount is determined, either the Debtors issue a check or other form of payment to the patient or the Third Party Payor offsets future receivables in the amount of the overpayment.

55.    At any given time, it is difficult to determine the amount of outstanding overpayments that have been made and identified, but for which a refund check or offset has not yet been issued.  Moreover, some refund checks issued to patients before the petition date may not have been presented for payment or may not have cleared the Debtors' banking system or accounting system and, accordingly, have not been honored and paid as of the petition date. Nonetheless, the Debtors are required, under the laws of various states, to reimburse patients and Third-Party Payors as overpayments are identified.  The Debtors estimate that approximately

$100,000 in refunds to patients or Third-Party Payor offsets are processed in a given month, although larger amounts of refunds may be due and owing at any given time.

56.     As of the Petition Date, the Debtors estimate that approximately $16,500 in refunds are due and owing under the Refund Program, all of could become due and owing during the first 21 days of these chapter 11 cases.  Due to the nature of Refunds and Offsets, the Debtors cannot be certain as to the entire amount of refunds and offsets could be owed during this period.  As such, the Debtors request authority to pay and allow offsets up to $116,500 in Refund Program Obligations, in the ordinary course of business on an interim basis, pending entry of the Final Order, and to continue to issue and pay and allow offsets for the Refund Program Obligations to patients and Third-Party Payors, including refunds for overpayments made prepetition or resulting from prepetition services in the ordinary course of business, on a post-petition basis. [6]

**E.     Utilities Motion**

57.     The Debtors seek entry of an order that prohibits utility providers from altering, refusing, or discontinuing services or discriminating against the Debtors solely on the basis of the commencement of these chapter 11 cases or that the Debtors did not pay a debt when due prepetition.  The Debtors also seek authority to provide adequate assurance of payment to their utility providers and establish procedures for resolving requests by any utility provider for additional adequate assurance of payment.

58.     In the ordinary course of business, the Debtors obtain telephone, internet, gas, electric, water and other utility services (the "Utility Services") from several utility

---

[6]     As noted above, the Debtors are involved in an ongoing dispute with the United States Department of Health and Human Services ("HHS") and CMS regarding the decision of HHS and CMS to withhold one-hundred percent of payments to the Debtors.  The dispute is the subject of the adversary proceeding (the "Adversary Proceeding") the Debtors commenced concurrently with the filing of these chapter 11 cases.

providers (collectively, the "Utility Providers").  The Debtors estimate that, as of the Petition Date, approximately six Utility Providers provide Utility Services to the Debtors.   Attached as Exhibit C to the motion is a comprehensive list of the Utility Providers, inclusive of the utility type, account number and adequate assurance.

59.   The Debtors cannot operate their business without Utility Services.  Even a temporary interruption of such services would cause significant disruption to the Debtors' day-to-day operations that could impair the Debtors' goodwill and thereby negatively impact the Debtors' efforts to maximize the value of their estates.  Accordingly, it is critical that the Debtors have uninterrupted Utility Services.

60.    In general, the Debtors have established a good payment history with their Utility Providers, making regular, timely payments.  Over the past year, the Debtors have paid an average of approximately $93,307.67 per month on account of all Utility Services.  To the best of the Debtors' knowledge, there are generally no material defaults or arrearages of any significance with respect to undisputed invoices for the Utility Services provided to the Debtors as of the Petition Date.

**F.     Insurance Motion**

61.   The Debtors seek authority, but not direction, to continue their existing insurance policies, including by renewing or replacing insurance arrangements in the ordinary course of business without further order of the Court.  The Debtors also request permission to make all payments required to continue their insurance policies, including payment of any prepetition premiums, brokerage fees, deductibles, or other obligations under their policies and, to continue to honor their obligations pursuant to their premium financing agreement.

62. Further, if the Court grants the relief sought, the Debtors request that all applicable banks and other financial institutions be authorized, when requested by the Debtors in their discretion, without any duty of inquiry or liability to any party for following the Debtors' instructions, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts to pay amounts owed under the insurance policies and premium financing agreement, whether those checks are presented prior to or after the Petition Date, and to make other transfers, provided that sufficient funds are available in the applicable accounts to make the payments.

Insurance Policies

63. In the ordinary course of their business operations, the Debtors maintain insurance policies providing coverage for general liability, workers' compensation liability, automobile liability, management liability, directors and officers, employment practices liability, professional liability, and cyber liability (collectively, the "Insurance Policies"). For the policy period of 2019 to 2020 the total annual premiums under the Insurance Policies are approximately $700,000. Attached as Exhibit C to the motion is a comprehensive list of the Insurance Policies, including the type of coverage, policy carrier, current policy period, policy number and the policy premium.

64. Adequate insurance coverage is essential to operating the Debtors' business, maintaining and protecting the value of its assets for the benefit of creditors, and guarding against risk of loss. Moreover, in many cases, the coverage provided by the Insurance Policies is required by regulations, laws, or contracts that govern the conduct of the Debtors' business under applicable nonbankruptcy law. Likewise, the U.S. Trustee Guidelines for debtors in possession operating in chapter 11 cases in this Bankruptcy Court require the Debtors to

maintain adequate insurance coverage. This coverage could not be provided without continuing the Insurance Policies.

Brokerage Fees

65.      HUB International Texas, Inc. ("HUB") serves as the Debtors' insurance broker.  HUB aids the Debtors in negotiations with the Debtors' insurers and assists the Debtors in pricing and obtaining the insurance coverage necessary to operate their business in a responsible and prudent manner and in accordance with applicable legal requirements, while optimizing pricing and savings in procuring the policies.  The Debtors believe that it is in the best interests of their creditors and estates to continue their relationship with HUB.

66.      The Debtors pay brokerage fees to HUB (the "Brokerage Fees") upon the signing or renewal of certain policies.  The Brokerage Fees are bundled into the premium costs for each insurance policy the Debtors maintain, and generally are not paid or identified separately.  The Debtors owe approximately $45,000 in Brokerage Fees as of the Petition Date. The Debtors request authority to pay, in their discretion, any Brokerage Fees or other amounts owing to HUB for periods prior to the Petition Date, as the Debtors' failure to pay such amounts could result in a loss of HUB's assistance in maintaining the Debtors' beneficial business relationships with their insurance carriers.

Premium Financing Obligations

67.      Approximately $652,211.94 of the annual premiums due under the Insurance Policies is financed through IPFS Corporation ("IPFS") pursuant to a premium financing agreement (the "PFA").  Under the PFA, the Debtors were required to and did make a cash down payment of $94,784.77, and are required to make two monthly payments of $34,221.73, followed by an additional eight monthly payments of $48,056.63, with the next

24

payment due on August 7, 2019, and the final payment due on February 7, 2020 (collectively, the "Premium Finance Obligations"), on account of policy premiums and finance charges.  As of the Petition Date, the Debtors believe that they are current on all Premium Financing Obligations. The Debtors request authority, in their discretion, to continue to perform under the PFA and meet all of their Premium Financing Obligations—including, without limitation, making monthly payments due under the PFA—regardless as to whether such Premium Financing Obligations relate to pre- or postpetition periods.

68.     If the Debtors are unable to continue making payments due under the PFA, then IPFS could assert that it is entitled to terminate the Insurance Policies that are financed through the PFA.  This would cause significant disruption and distraction, and could injure the Debtors' efforts to preserve and maximize the value of their estates.  Furthermore, if IPFS were successful in terminating the Insurance Policies, then the Debtors would be required to obtain replacement insurance on an expedited basis and likely at increased cost to their estates, including through a potential lump sum advance payment of policy premiums that would strain the Debtors' liquidity.

69.     In light of the importance of maintaining adequate insurance coverage and preserving liquidity by financing insurance premiums, the Debtors believe it is in the best interest of their estates to receive Court approval to honor their Premium Financing Obligations and, as necessary, renew or enter into new premium financing arrangements.

## G.     Taxes Motion

70.     The Debtors seek entry of an order authorizing but not directing the Debtors to pay taxes and fees in the ordinary course of business that accrued or arose before the Petition Date in an aggregate amount not to exceed $20,000.

71.     Additionally, to the extent that any check has been issued or electronic transfer initiated prior to the Petition Date to satisfy any prepetition obligation on account of taxes or fees, and such payment has not cleared the Debtors' bank accounts as of the Petition Date, the Debtors request the Court to authorize the Debtors' banks, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay such checks or electronic transfers initiated prior to the Petition Date.   The Debtors also seek authority to issue replacement checks, or to provide for other means of payment to application authorities, to the extent necessary to pay such taxes and fees.

72.     In the ordinary course of business, the Debtors incur or collect and remit certain sales taxes, use taxes, corporate income taxes, property taxes and business license and regulatory fees required to operate the Debtors' business (collectively, the "Taxes and Fees"). The Debtors remit the Taxes and Fees to various federal, state and local governments, including taxing authorities (collectively, the "Authorities").

73.     The Debtors incur or collect from customers certain state and local sales use taxes (the "Use Taxes") on account of the purchase of various materials and services from third parties who are not registered to collect sales taxes for the state where the property is delivered or the services are provided, or who otherwise fail to collect such taxes.  The Debtors remit Use Taxes to the applicable Authorities on a monthly basis. The Debtors continually accrue Use Taxes in operating their business, and it is unclear at this time the amount of Use Taxes accrued as of the Petition Date. Nonetheless, a portion of the Debtors' accrued Use Taxes may need to be paid within the first 21 days of these chapter 11 cases.

74.     The Debtors also own or lease real and personal property that are subject to state property taxes (the "Property Taxes"). The Debtors remit Property Taxes to the

applicable Authorities on an annual basis. The Debtors estimate that approximately $690,000 in unpaid Property Taxes is outstanding as of the Petition Date.  By this Motion, the Debtors do not seek the ability to pay the Property Taxes at this time.

       **H.**    **Critical Vendor Motion**

       75.    To operate their businesses, the Debtors depend on certain vendors, suppliers and service providers that are critical to their ongoing operations (the "Critical Vendors").  The Critical Vendors are essential to the Debtors' business, and the lack of each of their particular services, even for a short duration, will likely cause harm to the Debtors' valuable business relationships, revenue, and goodwill. Specifically, any disruption in the ability to receive samples and deliver test results would almost assuredly cause the collapse of the Debtors' entire business operations and would directly affect the continuity of patient care which could result in serious harm to patients including even death.  This harm and disruption would far outweigh the cost of payment of prepetition claims owed to Critical Vendors (the "Critical Vendor Claims").

       76.    Accordingly, the Debtors seek authority, but not direction, to (a) make payments on account of prepetition Critical Vendor Claims, and (b) undertake appropriate efforts to enter into Trade Agreements with the Critical Vendors if the Debtors determine, in their discretion, that such an agreement is necessary to their postpetition operations.

       77.    In addition, if the Court grants the relief sought, the Debtors request that all applicable banks and other financial institutions be authorized, when requested by the Debtors in their discretion, without any duty of inquiry or liability to any party for following the Debtors' instructions, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts to pay amounts owed on account of the Critical Vendor Claims, whether those checks

are presented prior to or after the Petition Date, and to make other transfers, provided that sufficient funds are available in the applicable accounts to make the payments.

78.    Prior to the Petition Date, the Debtors and their advisors engaged in a process to (a) identify those trade vendors, suppliers, and/or service-providers that are most "critical" to the Debtors' business and (b) estimate the aggregate amounts owed to such vendors as of the Petition Date.

79.    More specifically, the Debtors and their advisors spent significant time and effort reviewing and analyzing the Debtors' books and records, consulting operations management, and analyzing historical practices to identify business relationships which, if lost, could materially harm the Debtors' business, result in harm to patients, reduce their enterprise value, and/or affect their reorganization strategy. In this process, the Debtors and their advisors considered a variety of factors, including the following:

- General:

    o   the goods or services provided;

    o   general terms of vendor performance within the year; and

    o   the Debtors' business needs for the goods or services provided.

- Consequences of Non-Payment:

    o   whether goods or services are provided pursuant to a contract or on a purchase order basis;

    o   whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or provide critical services on a post-petition basis; and

    o   whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

- Potential to Move to an Alternative Vendor:

o   whether alternative vendors are available that could provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

o   the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) would exceed the amount of vendor's prepetition claim; and

o   whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor.

80.     Based on their consideration of the above factors, the Debtors anticipate that the Critical Vendors will be across several categories of service and will constitute those that (i) do not have a contractual relationship with the Debtors and (ii) are either (a) sole-source providers or (b) cannot be replaced in a cost-efficient manner or without causing irreparable harm to the Debtors' operations.

81.     To preserve liquidity during the chapter 11 cases and ensure that the Debtors continue to receive vital goods and services, the Debtors propose to condition any payment on account of Critical Vendor Claims on entry into an agreement between the Debtors and the individual Critical Vendor, under which such Critical Vendor shall continue supplying goods and services to the Debtors on terms that are consistent with the historical trade terms between the parties (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs), which were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis for the period within one hundred eighty (180) days of the Petition Date (the "Customary Trade Terms").  The Debtors, however, reserve the right to negotiate different trade terms with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, whether or not memorialized by a Trade Agreement (as defined herein),

to the extent the Debtors determine that such trade terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estate.

82.     The Debtors further propose that in the event the Debtors are making a payment pursuant to this Motion, the Debtors will send a letter, substantially in the form attached as Exhibit C to the motion, to each of the Critical Vendors to which it is making such payment, along with a copy of the order granting the motion.  Such a letter, once agreed to and accepted by a Critical Vendor, shall be the agreement between the parties that governs their postpetition trade relationship, whether on Customary Trade Terms or on terms different from their Customary Trade Terms (the "Trade Agreement").

83.     If a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any postpetition payment toward its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors seek authority, in their discretion and without further order of the Court but with notice to the affected Critical Vendor (i) to declare such Trade Agreement immediately terminated (if applicable) and (ii) to declare any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor without further order of the Court.

84.     In the event that the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Critical Vendor against which the Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Critical Vendor, without giving effect to any rights of setoff or reclamation.  In essence, the Debtors seek to return the parties to their respective positions

30

immediately prior to entry of the Order in the event a Trade Agreement is terminated or a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any payment toward its Critical Vendor Claim.

85.     I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interests and constitutes a necessary element in achieving a successful and smooth transition to chapter 11. The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date to afford the Debtors, their attorneys and financial advisors, and other professionals the opportunity to stabilize the businesses in chapter 11.  In light of the foregoing, I believe that payment of Critical Vendor Claims will be necessary to preserve operations, reduce the financial burden on the Debtors' estates, maintain goodwill and positive relationships with all Critical Vendors, and maximize the value of the Debtors' assets for the benefit of all stakeholders. Accordingly, on behalf of each the Debtors, I respectfully submit that the relief requested in the Critical Vendors Motion should be granted.

## I.     Cash Management Motion

86.     The Debtors seek entry of an order, authorizing, but not directing, the Debtors to continue to operate their existing cash management system in the day-to-day operation of their businesses, and to honor certain prepetition obligations in accordance with the operation of the cash management system.  Specifically, the Debtors request authority to: (a) continue to use, with the same account numbers, each of their existing bank accounts; (b) treat the bank accounts for all purposes as accounts of the Debtors as debtors in possession; and (c) conduct banking transactions by all usual means and debit the bank accounts on account of all usual items and payment instructions.

87.     Additionally, the Debtors seek authority to: (a) use, in their present form, all business forms (including check stock, letterhead, purchase orders, and invoices) and other correspondence and documents related to their bank accounts, without reference to the Debtors' status as debtors in possession; and (b) continue intercompany transactions between and among the Debtors in the ordinary course of business and in accordance with historical practices.  The Debtors further request authority for their banks to: (i) continue to maintain, service, and administer their bank accounts; (ii) debit their bank accounts in the ordinary course of business on account of (a) all checks drawn on their bank accounts that are cashed at their banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (b) all checks or other items deposited in one of the bank accounts at the banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any bank as fees or service charges for the maintenance of any aspect of the applicable cash management system.

88.     Further, the Debtors request that the Court extend the Debtors' time to comply with the requirements of section 345(b) of the Bankruptcy Code. The Debtors also request that, upon entry of the interim order, the Court schedule a final hearing on the motion to consider the relief requested on a final basis.

### The Cash Management System

89.     The Debtors maintain an integrated, centralized cash management system (the "Cash Management System") to collect, transfer, manage and disburse funds generated and used in their operations.  The Cash Management System facilitates cash monitoring, forecasting and reporting and enables the Debtors to administer the ten bank accounts owned by the Debtors

32

(collectively, along with any bank accounts the Debtors may open in the ordinary course of business, the "Bank Accounts"), which are maintained at Wells Fargo, N.A. (the "Bank").  The Debtors' treasury team, located at the Debtors' headquarters in Frisco, Texas, maintains daily oversight and control of the Cash Management System and implements controls for collecting, concentrating and disbursing funds.

90.     The two operating Debtors are True Health Diagnostics LLC ("THD") and Outreach Management Solutions LLC ("OMS"). THD generates revenue primarily through its diagnostic testing services. When the testing process is complete and test results are reported to an order physician, THD collects its revenues. Specifically, revenues are billed and collected typically from, patients and third-party payors, such as health insurance companies, Medicare and Medicaid, which are deposited into its Receivables Lockbox Accounts.

91.     OMS currently does not generate revenue. Operations primarily consist of activities related to the build-out and launch of an independent lab to service a large physician group based in the northeast.

92.     The True Health Group LLC ("THG") account is used only to disburse payroll and commissions during each pay period.

93.     The cash in the Operating Accounts is transferred to the Controlled Disbursement Accounts and Payroll Accounts through a ZBA structure. The True Health Diagnostic account ending in 0353 typically maintains most, if not all, of the cash balance held by the Debtors. The operating accounts are used, rent payments to landlords, payments to vendors, taxes, insurance premiums and related payments.  The funds held in the Payroll Accounts, on the other hand, are used to fund the employees' wages, benefits, and commissions.

<u>The Bank Accounts</u>

94.     The Debtors' only Bank in the Cash Management System is Wells Fargo, N.A.,[7] where the Debtors maintain ten Bank Accounts. Each Bank Account is held by THG, OMS or THD.  Each of these Debtors maintains an operating account, and OMS and THD also maintain Controlled Disbursement Accounts, Payroll Accounts and Receivables Lockbox Accounts. A schedule of the Bank Accounts, including the last four digits of each Bank Account number, the name of the Debtor that holds the account, and the Bank at which the account is held, is attached as Exhibit 1 to the proposed forms of order for the Cash Management Motion.

95.     <u>Operating Accounts</u>.  THD and OMS use their Operating Accounts to fund their respective Disbursement and Payroll Accounts through a zero balance account mechanism. The Disbursement and Payroll Accounts fund business operations and payroll expenses, respectively.  THD's Operating Account also transfers funds to the OMS and THG Operating Accounts.  THG's Operating Account is its only Bank Account, which it uses to primarily fund executive payroll.

96.     <u>Controlled Disbursement Accounts</u>.   Both THD and OMS maintain controlled disbursement accounts (the "<u>Controlled Disbursement Accounts</u>"). THD and OMS fund their Controlled Disbursement Accounts through a zero balance account mechanism in order to fund their daily business operations and ordinary course payments.

97.     <u>Payroll Accounts</u>.   Both THD and OMS maintain separate payroll accounts (the "<u>Payroll Accounts</u>"). THD and OMS fund their Payroll Accounts through a zero balance account mechanism in order to fund payroll expenses. ADP, as the third party

---

[7]     Wells Fargo, N.A. is included on the list of authorized depositories maintained by the Office of the United States Trustee for the District of Delaware

administrator for the Debtors' payroll, draws funds from the THD and OMS Payroll Accounts in order to disburse payroll and commissions during each pay period.

98.     <u>Receivables Lockbox Accounts</u>.  Both THD and OMS maintain certain lockbox accounts (the "<u>Receivables Lockbox Accounts</u>") that collect receivables generated from their respective businesses. Specifically, the Receivables Lockbox Accounts include the amounts that THD and OMS receive from commercial payors, Medicare and Medicaid, and patients. The amounts automatically transfer to THG and OMS's Operating Accounts through a zero balance account mechanism.

Bank Fees and Credit Card Processing Fees

99.     In the ordinary course of business, the Bank charges, and the Debtors pay, honor or allow deduction from the appropriate account, certain service charges, fees and other costs and expenses associated with maintaining the accounts in accordance with the applicable agreements or schedules of fees governing the Bank Accounts (collectively, the "<u>Bank Fees</u>"). On average, the Debtors incur approximately $21,000 per month in Bank Fees.

100.     Similarly, the Debtors' credit card processors (the "<u>Credit Card Processors</u>") deduct service fees before transferring the Debtors' credit card and debit card receivables (such fees, the "<u>Credit Card Fees</u>" and, together with the Bank Fees, the "<u>Service Charges</u>").  The Debtors derive a substantial majority of their sales from credit and debit card transactions.  If the Debtors failed to pay the Credit Card Fees, and, as a result, the Credit Card Processors held back some or all of the Debtors' credit card receipts or refused to continue to work with the Debtors, the Debtors would be immediately and likely irreparably damaged. Therefore, the ability to continue to accept credit cards and receive payment from the Credit Card Processors, net of Credit Card Fees per the applicable arrangements, on an uninterrupted

basis is essential to maintaining the Debtors' cash flows and business operations generally. On average, the Debtors incur approximately $14,000 per month in Credit Card Fees.

### Intercompany Transactions

101.     The Debtors engage in intercompany transactions in the ordinary course of their business (the "Intercompany Transactions").  Specifically, as described above, a portion of the money THD receives from CMS, insurers and patients in its Receivables Lockbox Accounts is transferred to the OMS and THG Operating Accounts. These transfers from the THD Operating Account create intercompany receivables and payables (the "Intercompany Claims").

### Business Forms

102.     The Debtors use a variety of business forms in the ordinary course of business, including, among others, checks, invoices and letterhead (the "Business Forms").  To minimize expenses and disruption, the Debtors seek authority to continue to use all Business Forms in substantially the form used immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  The Debtors will communicate with the various vendors and counterparties with whom the Debtors conduct business to notify them of the commencement of these cases, which the Debtors believe will provide adequate notice of the Debtors' status as debtors in possession.  In accordance with Local Rule 2015-2(a), to the extent the Debtors exhaust their existing supply of checks during these cases and require new checks, the Debtors will order checks with a notation indicating the designation "debtor in possession" and the lead case number of these cases.

**J.     Possessory Claimants Motion**

103.     The Debtors request authority, but not direction, to pay as they deem in their business judgment to be necessary and appropriate, (a) any prepetition Transporter Claims

36

(as defined below), (b) any prepetition Warehousemen Claims (as defined below), and (c) and prepetition Lien Claims (as defined below).  Moreover, if the Court grants the relief sought, the Debtors request that all applicable banks and other financial institutions be authorized, when requested by the Debtors in their discretion, without any duty of inquiry or liability to any party for following the Debtors' instructions, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts to pay amounts owed on account of the Transporter Claims, Warehousemen Claims and Lien Claims, whether those checks are presented prior to or after the Petition Date, and to make other transfers, provided that sufficient funds are available in the applicable accounts to make the payments.

Shippers

104.    In the ordinary course of business, the Debtors depend on third party shipping vendors to transport patient samples from clients to laboratories and distribute reports to those same clients.  The Debtors accordingly engage the use of reputable common carriers, dedicated carriers, consolidators and parcel carriers (collectively, the "Shippers") for moving their samples.

105.    Failure to pay the Shippers could result in costly delays and disruption to the Debtors' businesses and otherwise diminish the value of the Debtors' estates.  If the Debtors fail to pay the Shippers for charges incurred in connection with the transportation of the samples on a timely basis, the Shippers may refuse to deliver or release the samples that are in their possession until their invoices are paid.  In addition, shipments may be stopped in transit if customs duties are not timely paid by the Debtors or their customs agents.  Failure to deliver or release the samples has the potential to severely disrupt the Debtors' businesses to the detriment of the Debtors, their estates and their stakeholders.  Specifically, the Debtors will be unable to

37

meet their clients' expectations of timely and dependable services that will lead to irreparable harm to the Debtors' businesses and revenue.  Thus, the Debtors seek authority to pay Shippers for claims related to the transportation of the samples as set forth below.

106.    As of the Petition Date, the Debtors estimate that approximately $600,000 is owed in the aggregate on account of prepetition claims for shipping, freight forwarding, consolidating and customs duties (collectively, the "Transporter Claims").    These amounts include both invoices that the Debtors have received, as well as amounts that the Debtors have not yet received, but are believed to have been incurred as of the Petition Date based on historical practice.  Payment of the Transporter Claims will avoid disruption in the Debtors' business and prevent the Shippers from negatively impacting the Debtors' client relations by refusing to deliver or release samples.

### Warehousemen

107.    The Debtors rely on the warehousemen (the "Warehousemen") to store various testing equipment, paper records and other lab equipment that is not currently being used or would otherwise be difficult or prohibitively costly to obtain on a purchase order or as-needed basis.  As of the Petition Date, the Debtors estimate that property valued at $300,000 is being held by the Warehousemen.   In addition, the Debtors estimate that $2,564 is owed to the Warehousemen as of the Petition Date (the "Warehousemen Claims").  As a result, certain of the Warehousemen may have a right to assert possessory and other liens on the Debtors' property in their possession, and refuse to release such property or block the Debtors' access to such property unless the Warehousemen Claims are satisfied and their liens, if any, are redeemed.  *See* U.C.C. § 7-209(a).  Again, in either circumstance, the Debtors' operations may be disrupted to the detriment of the Debtors and their stakeholders.  Further, because the value of the Debtors'

property being held by the Warehousemen exceeds the value of the Warehousemen Claims, any acts by the Warehousemen to exercise possessory rights over such property may erode the value of the Debtors' estates. Accordingly, the Debtors request authority to pay the Warehousemen Claims.

Potential Lien Claimants

108. As of the Petition Date, the Debtors are not aware of any other third parties ("Potential Lien Claimants") who, under applicable non-bankruptcy law, have the potential to assert liens against the Debtors and their property if the Debtors fail to pay for goods or services rendered prior to the Petition Date ("Statutory Liens"). However, out of an abundance of caution, the Debtors request authority to pay Potential Lien Claimants to the extent that the Debtors become aware of any Potential Lien Claimant with an outstanding invoice.

**K.    DIP Financing Motion[8]**

109. The Debtors request the entry of interim and final orders to, among other things, authorize the Debtors to (a) obtain secured postpetition financing on a superpriority basis in the aggregate principal amount of up to $7,847,000 (the "DIP Facility"), (b) use cash collateral, and (c) grant adequate protection to the Prepetition Secured Parties and the Prepetition Second Lien Lenders (as defined in the motion), pursuant to the terms and conditions of that certain Debtor-in-Possession Financing Term Sheet, dated as of July 30, 2019 (the "Term Sheet"). For the reasons stated in the DIP Financing Motion and those that follow, it is my belief that the relief requested by the DIP Financing Motion is in the best interests of the Debtors, their estates and creditors.

---

[8]    Undefined terms used in the following section shall have the meanings ascribed to them in the DIP Financing Motion.

<u>The Debtors' Urgent Need for Postpetition Financing</u>

110.    As a consequence of the factors described herein, the Debtors have insufficient cash to continue to finance their operations, maintain business relationships with their vendors, suppliers, and customers, and to pay their employees.  In order to complete their orderly sale process and maximize the value of their assets for the benefit of their creditors and estates, the Debtors have an immediate need for the financing described in the Term Sheet and proposed interim order. In the absence of the DIP Facility and the use of cash collateral, the orderly sale of the Debtors' business and assets would not be possible, and would cause serious and irreparable harm to the Debtors and their estates.

111.    Accordingly, the Debtors require the availability of working capital from the DIP Facility and the use of cash collateral.  The DIP Facility will provide more than just the ability for the Debtors to operate their business; the facility will instill a sense of confidence in the Debtors' employees, customers, vendors, and other important stakeholders.  The Debtors critically need the support of these stakeholders at this time, as the loss of their support could severely impair the Debtors' ability to maximize the value of their estates.

112.    In sum, I believe that the terms of the DIP Facility are in the best interests of the Debtors' estates.  Without the immediate access to the DIP Facility, the Debtors could suffer a cash shortage that would immediately and irreparably harm their estates and creditors. Furthermore, the Debtors will lack sufficient liquidity to meet expenses necessary for the continued operation of their business before the Final Hearing on this Motion can be held, and, therefore, it is essential that the Debtors obtain the proposed interim financing from the DIP Lenders.  The Debtors' ability to preserve the value of the Debtors' estates for the benefit of their creditors depends upon the interim and final relief requested in the motion.

<u>The Debtors' Financing is the Best Option</u>

113.     Other than the DIP Facility, there are no superior financing alternatives available to the Debtors under the circumstances.  The Debtors are unable to obtain sufficient financing on more favorable terms than those set forth in the DIP Loan Documents to address their urgent liquidity needs based on the totality of the circumstances, including the current state of the financial markets, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the DIP Lenders on the Prepetition Collateral. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time.

114.     Indeed, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the Prepetition Lenders.  Thus, even if alternative debtor in possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the DIP Lenders, the results of which could not be predicted with certainty.  Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, jeopardizing these cases.  Absent immediate availability of new credit, the Debtors will be forced to cease operations and the going-concern value of their business will be lost.

115.     Accordingly, the Debtors have concluded that financing comparable to that provided by the DIP Lenders under the DIP Facility is currently unobtainable without the priming of the Prepetition Liens. Further, it should be noted that the only liens that are being primed are the prepetition liens of the Prepetition Lenders and Prepetition Second Lien Lenders,

who consent to the priming of such liens.  In these circumstances, the Debtors, in the exercise of their considered business judgment and in consultation with their professional advisors, have determined that the financing provided by the DIP Facility is the most favorable under the circumstances and provides the Debtors necessary liquidity to maintain the going concern value of their business pending the conclusion of the Debtors' proposed sale process.

The Debtors Use of Cash Collateral and Proposed<br>Adequate Protection Are Fair and Reasonable

116.    The Debtors will require the ability to use cash and the proceeds of existing accounts receivable and inventory to maintain the operation of their business and preserve their value as going concerns.  The Debtors' use of the Cash Collateral is appropriate and necessary here, as the Prepetition Lenders and Prepetition Second Lien Lenders have consented to the Debtors' use of the Cash Collateral, and such use is essential to the preservation of the Debtors' estates. Further, the priming of the Prepetition Liens is essential for the Debtors to obtain postpetition financing offered by the DIP Facility. Accordingly, for the foregoing reasons and the reasons provided in the DIP Financing Motion, it is my belief that the adequate protection proposed therein is fair and reasonable and should be approved by the Court.

The DIP Facility Was Negotiated in Good Faith

117.    The Debtors and the DIP Agent negotiated the terms and conditions of the DIP Facility and the use of Cash Collateral in good faith and at arm's length.  Moreover, the Debtors' decision to enter into the DIP Facility was an exercise of the Debtors' prudent business judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: July 30, 2019
      Richmond, VA                    _____*/s/ Clifford A. Zucker*_____
                                           Clifford A. Zucker

12989875.8