# Exhibit A

## Combined Plan and Disclosure Statement

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| THG Holdings LLC, *et al.*, | Case No. 19-11689 (JTD) |
| Debtors.[1] | Jointly Administered |

## COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11
## PLAN OF LIQUIDATION PROPOSED BY THE DEBTORS, DIP AGENT
## AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Tamara K. Mann (No. 5643)
Matthew O. Talmo (No. 6333)
Paige N. Topper (No. 6470)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
dabbott@mnat.com
cmiller@mnat.com
dbutz@mnat.com
tmann@mnat.com
mtalmo@mnat.com
ptopper@mnat.com
*Counsel to the Debtors and Debtors in Possession*

October 11, 2019

---

[1]     The Debtors in these cases, along with the last four digits of each Debtors' federal EIN, are as follows: THG Holdings LLC (8292); True Health Group LLC (9158); True Health Clinical LLC (5272); True Health Diagnostics LLC (9452); True Health IP LLC (5427); Outreach Management Solutions LLC d/b/a True Health Outreach (9424); Health Core Financial LLC d/b/a True Health Financial (6614). The Debtors' mailing address is 3803 Parkwood Blvd, Suite 400, Frisco, Texas 75034.

## TABLE OF CONTENTS

**Page**

DISCLAIMER ...................................................................................................................1

INTRODUCTION ............................................................................................................2

**ARTICLE I**      DEFINED TERMS AND RULES OF INTERPRETATION............................3

**ARTICLE II**     CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES ..........................................................................3

    **2.1**    General Rules of Classification ............................................................20

    **2.2**    Unimpaired Class of Claims .................................................................22

    **2.3**    Impaired Classes of Claims ..................................................................22

    **2.4**    Impaired Class of Equity Interests .......................................................23

**ARTICLE III**    BACKGROUND AND DISCLOSURES........................................................23

    **3.1**    General Background ..............................................................................23

    **3.2**    Events Leading to Chapter 11 ...............................................................26

    **3.3**    The Chapter 11 Cases ...........................................................................26

**ARTICLE IV**    CONFIRMATION AND VOTING PROCEDURES....................................31

    **4.1**    Confirmation Procedure........................................................................31

    **4.2**    Procedure for Objections ......................................................................32

    **4.3**    Requirements for Confirmation ............................................................32

    **4.4**    Classification of Claims and Interests..................................................32

    **4.5**    Impaired Claims or Interests ................................................................34

    **4.6**    Confirmation Without Necessary Acceptances; Cramdown .................34

    **4.7**    Feasibility.............................................................................................35

    **4.8**    Best Interests Test and Liquidation Analysis.......................................35

    **4.9**    Acceptance of the Plan..........................................................................37

**ARTICLE V**        CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR
            TO VOTING ................................................................................37

    **5.1**    The Plan May Not Be Accepted ...........................................................37

    **5.2**    The Plan May Not Be Confirmed .........................................................37

    **5.3**    Distributions to Holders of Allowed Claims under the Plan May Be
        Inconsistent with Projections ...............................................................38

    **5.4**    Objections to Classification of Claims .................................................38

    **5.5**    Failure to Consummate the Plan ..........................................................39

    **5.6**    Allowance of Claims May Substantially Dilute the Recovery to
        Holders of Claims under the Plan ........................................................39

    **5.7**    Plan Releases May Not Be Approved ...................................................39

    **5.8**    Certain Tax Considerations ..................................................................39

**ARTICLE VI**        TREATMENT OF UNCLASSIFIED CLAIMS ............................40

    **6.1**    DIP Facility Claims ..............................................................................40

    **6.2**    Administrative Claims ..........................................................................40

    **6.3**    Fee Claims ............................................................................................41

    **6.4**    Tax Claims ...........................................................................................41

**ARTICLE VII**        TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...................42

    **7.1**    Class 1: Other Priority Claims .............................................................42

    **7.2**    Class 2: Other Secured Claims ............................................................42

    **7.3**    Class 3: Prepetition Senior Obligation Claim ......................................42

    **7.4**    Class 4: Second Lien Claim .................................................................42

    **7.5**    Class 5: General Unsecured Claims ......................................................43

    **7.6**    Class 6: Subordinated Claims ..............................................................43

    **7.7**    Class 7: Equity Interests ......................................................................43

    **7.8**    Reservation of Rights Regarding Claims and Interests ........................43

**ARTICLE VIII**  ACCEPTANCE OR REJECTION OF THE PLAN ........................................43

    **8.1**    Class Entitled to Vote ........................................................................43

    **8.2**    Acceptance by Impaired Classes of Claims or Interests ....................43

    **8.3**    Presumed Acceptance by Unimpaired Classes ....................................44

    **8.4**    Presumed Rejections by Impaired Classes ..........................................44

    **8.5**    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ....................44

    **8.6**    Controversy Concerning Impairment ..................................................44

    **8.7**    Elimination of Vacant Classes ............................................................44

**ARTICLE IX**      MEANS OF IMPLEMENTING THE PLAN ................................................44

    **9.1**    Corporate Action................................................................................44

    **9.2**    Reserves ..............................................................................................46

    **9.3**    Liquidating Trust ................................................................................48

    **9.4**    Liquidating Trustee............................................................................49

    **9.5**    Fees and Expenses ..............................................................................53

    **9.6**    Liquidating Trustee as Estate Representative and Successor ................53

    **9.7**    Investment Powers..............................................................................53

    **9.8**    Distributions........................................................................................54

    **9.9**    Vesting of Assets ................................................................................54

    **9.10**    Tax Treatment of Holders of Liquidating Trust Interests ....................54

    **9.11**    Nature of Liquidating Trust Interests..................................................55

    **9.12**    Treatment of Reserves ........................................................................55

    **9.13**    No Revesting of Assets ........................................................................55

    **9.14**    Creditors' Committee..........................................................................55

    **9.15**    Release of Liens..................................................................................55

    **9.16**    Exemption from Certain Transfer Taxes ............................................56

**9.17**   Preservation of Litigation Assets ..............................................................56

**9.18**   Setoffs ..........................................................................................................56

**9.19**   Withdrawal of Plan .....................................................................................57

**9.20**   D&O Claims .................................................................................................57

**9.21**   Insurance Preservation ................................................................................57

**9.22**   Assignment of Creditor Causes of Action ..................................................58

**ARTICLE X**      EFFECT OF PLAN ON CLAIMS AND INTERESTS ...................58

**10.1**   Binding Effect ..............................................................................................58

**10.2**   Compromise and Settlement ........................................................................58

**10.3**   No Discharge of the Debtors ........................................................................59

**10.4**   Injunction .....................................................................................................59

**10.5**   Exculpation ..................................................................................................60

**10.6**   Releases by the Debtors ...............................................................................60

**10.7**   Extinguishment of Intercompany Claims ....................................................61

**10.8**   Extinguishment of Preferential Transfer Claims ........................................61

**10.9**   Indemnification Obligations ........................................................................61

**10.10**  Terms of Injunctions or Stays .....................................................................61

**ARTICLE XI**     EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......61

**11.1**   Rejection of Executory Contracts and Unexpired Leases ............................61

**11.2**   Supplemental Bar Date for Rejection Damages ..........................................62

**ARTICLE XII**    DISTRIBUTIONS ......................................................................62

**12.1**   Distributions for Claims Allowed as of the Effective Date .........................62

**12.2**   No Distributions on Disputed Claims ..........................................................62

**12.3**   Distributions on Claims Allowed After the Effective Date .........................62

**12.4**   Objections to and Estimation of Claims ......................................................63

**12.5**  Delivery of Distributions and Undeliverable or Unclaimed Distributions.................................................................................64

**12.6**  Interest on Claims ......................................................................65

**12.7**  Withholding and Reporting Requirements ...........................................65

**12.8**  Miscellaneous Distribution Provisions ................................................65

**12.9**  *De Minimis* Distribution Provisions ...................................................66

**12.10**  Distribution Record Date ...............................................................66

**ARTICLE XIII**    CONFIRMATION AND CONSUMMATION OF THE PLAN....................66

**13.1**  Conditions to Confirmation ............................................................66

**13.2**  Conditions to Effective Date............................................................67

**13.3**  Consequence of Non-Occurrence of Effective Date...............................67

**ARTICLE XIV**    ADMINISTRATIVE PROVISIONS.........................................................67

**14.1**  Retention of Jurisdiction ................................................................68

**14.2**  Amendments ..............................................................................70

**14.3**  Successors and Assigns.................................................................70

**14.4**  Governing Law ...........................................................................70

**14.5**  Corporate Action.........................................................................71

**14.6**  Effectuating Documents and Further Transactions.................................71

**14.7**  Confirmation Order and Plan Control.................................................71

**14.8**  Rules of Construction ...................................................................71

**14.9**  Notices ....................................................................................71

**14.10**  No Admissions or Waiver..............................................................73

## DISCLAIMER

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.    THE STATEMENTS CONTAINED HEREIN ARE MADE BY THE DEBTORS AND MAY NOT BE ATTRIBUTED TO THE DIP AGENT OR THE CREDITORS' COMMITTEE, UNLESS EXPRESSLY STATED OTHERWISE

THE PLAN CONTEMPLATES THE CONTINUING LIQUIDATION OF THE DEBTORS, PAYMENTS TO CERTAIN CREDITORS AND THE ESTABLISHMENT OF A LIQUIDATING TRUST GOVERNED BY THIS PLAN AND THE LIQUIDATING TRUST AGREEMENT. THE LIQUIDATING TRUST AGREEMENT WILL SET FORTH THE RIGHTS, POWERS, DUTIES AND RESPONSIBILITIES OF THE LIQUIDATING TRUSTEE AND THE LIQUIDATING TRUST OVERSIGHT BOARD, AS SUPPLEMENTED BY THE PROVISIONS OF THIS PLAN.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN WHAT IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS, OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET

FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(b), AND LOCAL RULE 3017-2, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE V OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## INTRODUCTION

THG Holdings LLC; True Health Group LLC; True Health Clinical LLC; True Health Diagnostics LLC; True Health IP LLC; Outreach Management Solutions LLC d/b/a True Health Outreach; and Health Core Financial LLC d/b/a True Health Financial, the debtors and debtors in possession in these Chapter 11 Cases, hereby jointly propose the following combined Disclosure Statement and Plan for the liquidation of the Debtors' remaining assets and distribution of the proceeds of the Estates' assets to the Holders of Allowed Claims against the Debtors as set forth herein. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

This combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of this Plan, and certain other related matters.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

ARTICLE I
**DEFINED TERMS AND RULES OF INTERPRETATION**

**Defined Terms**

1.1     "503(b)(9) Claims Bar Date" shall have the meaning ascribed to it in section 3.3(f).

1.2     "Administrative Claim" shall mean an unsecured Claim, including a Fee Claim and United States Trustee Fees, for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code, including the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the business of the Debtors (such as wages, salaries, or commissions for services rendered).

1.3     "Administrative Claims Estimate" shall mean a good faith estimate by the Debtors of the Total Amount of Administrative, Tax and Other Priority Claims that may be Allowed against the Debtors, unless by the applicable Bar Date, any of such claims are fixed, in which case, the estimate shall include such fixed amount, subject to the Bankruptcy Court ordering otherwise.

1.4     "Administrative and Priority Claims Reserve" shall mean the reserve established by this Plan and maintained by the Liquidating Trustee pursuant to Article IX hereof for purposes of satisfying Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims.  The Administrative and Priority Claims Reserve shall not exceed [$XXX,000].

1.5     "Affiliate" shall mean "affiliate" as defined in section 101(2) of the Bankruptcy Code.

1.6     "Allowed Claim" shall mean a Claim to the extent such Claim is:  (a) either (i) scheduled by the Debtors in their Schedules of Assets and Liabilities in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined or disputed; or (ii) asserted in the Case by a proof of claim which has been timely filed, or deemed timely filed with the Court pursuant to the Bankruptcy Code, the Bankruptcy Rules and/or any applicable orders of the Court, or late filed with leave of Court; and (b) either (i) not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules and/or applicable orders of the Court; or (ii) that has otherwise been allowed by a Final Order or pursuant to this Plan.  An Allowed Claim: (y) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed when the context so requires; and (z) shall be net of any valid setoff amount, which amount shall be deemed to have been set off in accordance with the provisions of this Plan.

1.7     "Allowed _____ Claim" shall mean an Allowed Claim in the specified Class or an Allowed Claim for DIP Facility Claims, Administrative Claims, Tax Claims, or Fee Claims, as applicable.  For example, an Allowed General Unsecured Claim against the Debtors is an Allowed Claim in Class 5.

3

1.8     "Amended Schedules Bar Date" shall have the meaning ascribed to it in section 3.3(f).

1.9     "Assigning Creditor" shall mean a Holder of a Claim who owns one or more Creditor Causes of Action and who (i) on its Ballot affirmatively elects to assign or transfer such Creditor Causes of Action to the Liquidating Trust, and/or (ii) within sixty (60) days after the Effective Date, or within such longer time period as may be approved by the Liquidating Trustee, executes an assignment agreement, in form and substance satisfactory to the Liquidating Trustee, assigning such Creditor Causes of Action to the Liquidating Trust.

1.10     "Ballot" shall mean the form approved by the Court and distributed to Holders of Claims entitled to vote on this Plan on which is to be indicated an acceptance or rejection of this Plan and the election described in Section 9.22 hereof.

1.11     "Bankruptcy Code" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these Chapter 11 Cases.

1.12     "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

1.13     "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms or the Local Rules of the Bankruptcy Court, and as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these Chapter 11 Cases.

1.14     "Bar Date" shall mean, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for filing a proof of claim or a request for allowance of an Administrative Claim or a proof of interest, against the Debtors in these Chapter 11Cases for that specific Claim or Interest.

1.15     "Bar Date Motion" shall mean Debtors' Motion for Entry of an Order (I) Establishing Certain Bar Dates for Filing Prepetition Claims and Administrative Expense Claims, (II) Approving the From and Manner for Filing Proofs of Claim, (III) Approving the Proposed Notice of Bar Dates and (IV) Granting Related Relief  [D.I. ].

1.16     "Bar Date Order" shall mean Order (I) Establishing Certain Bar Dates for Filing Prepetition Claims and Administrative Expense Claims, (II) Approving the From and Manner for Filing Proofs of Claim, (III) Approving the Proposed Notice of Bar Dates and (IV) Granting Related Relief  [D.I. ].

1.17     "Business Day" shall mean any day, other than a Saturday, Sunday or a legal holiday (as used in Bankruptcy Rule 9006(a)).

1.18     "Cash" shall mean legal tender of the United States of America or its equivalents, including but not limited to bank deposits, checks, and other similar items.

1.19    "Causes of Action" shall mean any and all actions, suits, claims for relief, causes of action, Chapter 5 Causes of Action, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, whether arising prior to or after the Petition Date, and expressly including (a) any defenses or equitable remedies necessary for the adjudication of such Causes of Action, and (b) the Medicare Administrative Appeal.

1.20    "Chapter 5 Causes of Action" shall mean any and all actual or potential claims and causes of action arising under Chapter 5 of the Bankruptcy Code, including claims, rights and causes of action arising under Sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code, including but not limited to, the recovery of preferences and fraudulent transfers from any entity that received cash or any other interest in property from any Debtor.

1.21    "Chapter 11 Cases" shall mean these Chapter 11 Cases commenced by the Debtors and jointly administered under case number 19-11689 (JTD) in the Bankruptcy Court.

1.22    "Claim" shall mean a claim against any Debtor or Debtors, as such term is defined in section 101(5) of the Bankruptcy Code.

1.23    "Claims Agent" shall mean the Debtors' claims agent, Epiq Corporate Restructuring, LLC.

1.24    "Claims Objection Deadline" shall mean the last day to file objections to Claims, other than Administrative Claims or Fee Claims, and the last day for seeking to subordinate Claims, which day shall be the later of: (a) with respect to the applicable Class of Claims, one hundred eighty (180) days after the filing of a Notice of Availability of Funds for a particular Class of Claims in the Chapter 11 Cases by the Liquidating Trustee; or (b) such other date as the Court may order.  The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion; provided that any hearing on said motion is held on or before the date that is no more than thirty (30) days after the Claims Objection Deadline.  In the event that such motion to extend the Claims Objection Deadline is denied, the Claims Objection Deadline shall be the later of the current Claims Objection Deadline (as previously extended, if applicable) or thirty (30) days after the Court's entry of an order denying the motion to extend the Claims Objection Deadline.

1.25    "Class" shall mean a group of Claims or Interests described in Article III of this Plan.

1.26    "CMS" shall mean the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

1.27    "Confirmation Date" shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

1.28    "Confirmation Hearing" shall mean the first hearing held by the Bankruptcy Court to consider confirmation of the Plan.

1.29    "Confirmation Order" shall mean the order of the Bankruptcy Court confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

1.30    "Court" shall mean the United States Bankruptcy Court for the District of Delaware.

1.31    "Creditor Causes of Action" shall mean any Causes of Action which may be asserted by or on behalf of a Holder of a Claim arising from or related to the Debtors or their business practices, whether arising prior to or after the Petition Date.  Notwithstanding the foregoing and for the avoidance of doubt, Causes of Action shall not include any Cause of Action that is property of the Debtors, or their Estates.

1.32    "Creditors' Committee" shall mean the Official Committee of Unsecured Creditors in the Case, as appointed by the United States Trustee and as may be reconstituted from time to time.

1.33    "D&O" shall mean any current or former officer, director, or manager of any of the Debtors, solely in his or her capacity as such.

1.34    "D&O Claim" shall mean the Claim of any D&O, but only to the extent such Claim is for indemnification, contribution or reimbursement.

1.35    "Debtors" shall mean THG Holdings LLC; True Health Group LLC; True Health Clinical LLC; True Health Diagnostics LLC; True Health IP LLC; Outreach Management Solutions LLC d/b/a True Health Outreach; and Health Core Financial LLC d/b/a True Health Financial.

1.36    "DIP Agent" shall mean Monroe Capital Management Advisors, LLC in its capacity as administrative agent for the DIP Lenders (together with its permitted sub-agents, delegates, attorneys-in-fact, successors and assigns).

1.37    "DIP Credit Agreement" shall mean that certain Secured Superpriority Debtor-In-Possession Credit Agreement, dated as of September 11, 2019 (attached to the DIP Order as Exhibit A thereto)

1.38    "DIP Facility" shall mean secured postpetition financing on a superpriority basis pursuant to the terms and conditions of the DIP Order and the DIP Credit Agreement.

1.39    "DIP Facility Claim" shall mean a Claim on account of the DIP Obligations of the Debtors under the DIP Facility.

6

1.40    "DIP Lenders" shall mean the various financial institutions from time to time party to the DIP Facility as lenders.

1.41    "DIP Liens" shall have the meaning ascribed in the DIP Order.

1.42    "DIP Obligations" shall mean the DIP Facility and all obligations owing and outstanding thereunder and under any other documents, agreements, and instruments delivered pursuant thereto or executed or filed in connection therewith.

1.43    "DIP Order" shall mean *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(3), 364(d)(1), and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364* [ECF No. 233], entered on September 10, 2019 in the Case, as may be subsequently amended as provided for therein or any subsequent order of the Bankruptcy Court.

1.44    "Disallowed" shall mean with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtor which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the Debtors or Liquidating Trustee in whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, Contingent, partially liquidated or unliquidated and in respect of which a proof of Claim or a proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest; (vi) is evidenced by a proof of Claim or a proof of Interest which has been Filed, or which has been deemed to be Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly Filed; (vii) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; and (viii) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

1.45    "Disclosure Statement" shall mean the disclosure statement, as amended, supplemented or modified from time to time, that is embodied within this combined Disclosure Statement and Plan and distributed in accordance with, among others, sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, Local Rule 3017-1 and other applicable law.

1.46    "Disputed Claim" shall mean that portion (including, when appropriate, the whole) of a Claim, if any, that is not an Allowed Claim.  For the purposes of this

Plan, a Claim shall be considered a Disputed Claim in its entirety before the time that an objection has been or may be filed if: (a) the amount or classification of the Claim specified in a relevant proof of claim exceeds the amount or classification of any corresponding Claim scheduled by the Debtors in their Schedules of Assets and Liabilities; (b) any corresponding Claim scheduled by the Debtors has been scheduled as disputed, contingent or unliquidated; or (c) no corresponding Claim has been scheduled by the Debtors in their Schedules of Assets and Liabilities.

   1.47 "Distribution" shall mean the distribution of Cash or other property, as the case may be, in accordance with this Plan.

   1.48 "Distribution Address" shall mean the address for a Holder set forth in a proof of claim, as amended or supplemented.  If no proof of claim is filed with respect to a particular Claim, such defined term means the address for the Holder set forth in the Debtors' Schedules of Assets and Liabilities.

   1.49 "Distribution Date" shall mean the date determined by the Liquidating Trustee when Distributions shall be made under the Plan.

   1.50 "Distribution Record Date" shall mean the record date for purposes of making Distributions under this Plan on account of Allowed Claims.

   1.51 "Effective Date" shall mean the first date on which all of the conditions of section 13.2 of the Plan have been satisfied or have been waived in writing.

   1.52 "Entity" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

   1.53 "Estate" shall mean the estate of each Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases on the Petition Date.

   1.54 "Estimation Order" shall mean an order or orders of the Court estimating for voting and/or distribution purposes (under Bankruptcy Code section 502(c)) the amount of any Claim, or the aggregate (and if applicable, individual) Face Amount of Disputed Claims in each relevant Class.  The defined term Estimation Order includes the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

   1.55 "Exculpated Parties" shall mean, collectively, (a) the D&Os; and (b) the members of the Creditors' Committee, solely in their capacity as such; and (c) the following Professionals: (1) Morris, Nichols, Arsht & Tunnell LLP, (2) Perkins Coie LLP, (3) Greenberg Traurig, LLP, (4) FTI Consulting, Inc., (5) Clifford A. Zucker, solely in his capacity as Chief Restructuring Officer of the Debtors, (6) SSG Advisors, LLC, (7) Cooley LLP, (8) Elliott Greenleaf, P.C., and (9) GlassRatner Advisory & Capital Group LLC.

   1.56 "Executory Contract" shall mean a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.57     "Face Amount" shall mean (a) with respect to any Claim for which a proof of claim is filed, an amount equal to: (i) the liquidated amount, if any, set forth therein, or (ii) any other amount set forth in an Estimation Order, or (b) with respect to any Claim scheduled in the relevant Debtor's Schedules of Assets and Liabilities, but for which no proof of claim is timely filed, the amount of the Claim scheduled as undisputed, noncontingent and liquidated.

1.58     "Fee Claim" shall mean a Claim for compensation or reimbursement of expenses of a Professional pursuant to section 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with the Case.  "Fee Claim" does not include any Claim for compensation or reimbursement of expenses related to services rendered after the Effective Date by the Liquidating Trustee Professionals.

1.59     "Fee Claims Estimate" shall mean (i) with respect to each Professional, the Professional's good faith estimate of the amount of such Professional's accrued unpaid Fee Claims through the Effective Date, to be provided by each Professional in writing to the Debtors, or to be prepared by the Debtors, or the Creditors' Committee concerning their respective Professionals, not less than 5 days prior to the commencement of the Confirmation Hearing and (ii) with respect to all of the Professionals, collectively, the sum of all individual Fee Claims Estimates.  With respect to Professionals engaged by the Creditors' Committee, the Fee Claims Estimate will not exceed a total of $400,000 less amounts paid in accordance with the Interim Compensation Procedures Order.

1.60     "Fee Claims Reserve" shall mean the reserve established by this Plan and maintained by the Liquidating Trustee pursuant to Article IX hereof for purposes of satisfying Allowed Fee Claims.  The Fee Claims Reserve shall not exceed [$XXX,000].

1.61     "File," "Filed," or "Filing" shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

1.62     "Final Order" shall mean an order or judgment of the Court, as entered on the docket of the Court, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek review or rehearing or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending, or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the possibility that a motion under Section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules governing procedure in cases before the Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.63     "First Administrative Claim Bar Date" shall have the meaning ascribed to it in section 3.3(f).

1.64     "Final Administrative Claim Bar Date" means the date that is 30 days after the Effective Date, which shall be the deadline for filing requests for payment of Administrative Claims that arose after [●] through the Effective Date.

1.65    "First Day Declarations" shall mean the Declaration of Christian Richards in Support of First Day Relief [Docket No. 4] and the Declaration of Clifford A. Zucker in Support of First Day Relief [Docket No. 5].

1.66    "General Unsecured Claim" shall mean any Claim that is not (a) a DIP Facility Claim (b) an Administrative Claim, (c) a Tax Claim, (d) an Other Priority Claim; (e) a Prepetition Senior Obligation Claim; (f) a Second Lien Claim; (g) an Other Secured Claim; or (h) a Subordinated Claim.

1.67    "General Bar Date" shall have the meaning ascribed to it in section 3.3(f).

1.68    "Governmental Unit" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.69    "Governmental Bar Date" shall have the meaning ascribed to it in section 3.3(f).

1.70    "Holder" or "Holders" shall mean a Person or an Entity holding a Claim or Interest.

1.71     "Impaired" shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.72    "Impaired Class" shall mean a Class of Claims or Interests that is Impaired.

1.73    "Insider" shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

1.74    "Intercompany Claims" shall mean any Claim held by a Debtor against another Debtor or any Interest held by a Debtor in another Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Debtor with respect to another Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor.

1.75    "Intercreditor Agreement" shall mean that certain Intercreditor and Subordination Agreement, dated as of May 18, 2018, as amended, restated, supplemented, or otherwise modified from time to time, by and among certain of the Debtors (but not THG Holdings LLC), Riverside Strategic Capital Fund I, L.P., on behalf of itself as a Subordinated Creditor and as agent on behalf of the other Subordinated Creditors,  the Subordinated Creditors party thereto and Monroe Capital Management Advisors, LLC, as administrative agent for the Lenders (as defined in the Intercreditor Agreement).

1.76    "Interest" shall mean an equity security, within the meaning of Bankruptcy Code section 101(16), in the Debtors.

1.77    "Interim Approval and Procedures Order" shall mean that certain [Order Approving the Disclosure Statement; Approving the Solicitation and Voting Procedures; Scheduling the Plan Confirmation Process, and Granting Related Relief] [Docket No.    ].

1.78    "Lien" shall mean: (a) a judicial lien as defined in Bankruptcy Code section 101(36); (b) a lien as defined in Bankruptcy Code section 101(37); (c) a security interest as defined in Bankruptcy Code section 101(51); (d) a statutory lien as defined in Bankruptcy Code section 101(53); and (e) any other lien, interest, charge or encumbrance.

1.79    "Liquidating Trust" shall mean the grantor trust to be created on the Effective Date for the benefit of the Liquidating Trust Beneficiaries.

1.80    "Liquidating Trust Agreement" shall mean the trust agreement, in form and substance acceptable to the Debtors, the Required DIP Lenders, and the Creditors' Committee, to be filed as part of the Plan Supplement, which will, among other things: (a) establish and govern the Liquidating Trust; (b) set forth the respective powers, duties and responsibilities of the Liquidating Trustee and the Liquidating Trust Oversight Board; and (c) provide for Distribution of the Net Proceeds of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries in accordance with Article VI hereof.

1.81    "Liquidating Trust Assets" shall mean all property of the Estates as of the Effective Date, including, without limitation, the Residual Assets and the Litigation Assets and any other assets and property acquired by the Liquidating Trust on or after the Effective Date; provided, however, Liquidating Trust Assets shall only include Cash to the extent necessary to establish one or more Reserves to pay Allowed Claims as required by this Plan. The vesting of the Litigation Assets and Residual Assets in the Liquidating Trust shall be free and clear of all Liens, Claims and Interests; provided that the Liquidating Trust Assets shall be subject to the DIP Liens if the DIP Facility Claim is not paid in full on the Effective Date.

1.82    "Liquidating Trust Beneficiaries" shall mean the Holders of Allowed Class 3 Claims, Allowed Class 4 Claims, and Allowed Class 5 Claims each of which shall receive Liquidating Trust Interests in accordance with this Plan.

1.83    "Liquidating Trust Distributions" shall mean Distributions of Cash or other property pursuant to the Plan and Liquidating Trust Agreement as may be authorized from time to time by the Liquidating Trustee under the supervision of the Liquidating Trust Oversight Board.

1.84    "Liquidating Trust Interests" shall mean the beneficial interests in the Liquidating Trust that shall entitle the holder thereof to receive Distributions of Cash pursuant to the Liquidating Trust Agreement, which interests shall be issued in three (3) series (i.e. Series A, B and C) to Holders of Allowed Class 3 Claims, Class 4 Claims, and Class 5 Claims.

1.85    "Liquidating Trust Operating Reserve" shall mean the reserve established under the Liquidating Trust and maintained by the Liquidating Trustee pursuant to Article VI hereof for the purpose of satisfying the ongoing expenses of administering the Liquidating Trust.

1.86    "Liquidating Trust Oversight Board" shall mean the board to be created to oversee the activities of the Liquidating Trustee and to manage the affairs of the Liquidating Trust.  The Liquidating Trust Oversight Board shall consist of three (3) members, one (1) of which shall be appointed initially by Monroe Capital, and may be replaced at any time at the discretion of Monroe Capital, one (1) of which shall be appointed by Silver Point, and may be replaced at any time at the discretion of Silver Point, and one (1) of which shall be appointed initially by the Creditors' Committee, and thereafter by the holders of Series C Liquidating Trust Interests; provided, however, that in no event shall a Holder of a Claim or representative of a Holder of a Claim be permitted to serve on the Liquidating Trust Oversight Board unless such Holder is an Assigning Creditor.

1.87    "Liquidating Trustee" shall mean an individual, to be identified in the Plan Supplement, who will be appointed as of the Effective Date, as the employee or fiduciary responsible for managing the day-to-day affairs of the Liquidating Trust in accordance with the Liquidating Trust Agreement and subject to the supervision and direction of the Liquidating Trust Oversight Board.

1.88    "Liquidating Trustee Professionals" shall mean the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals retained by the Liquidating Trustee (in their capacities as such) with the approval of the Liquidating Trust Oversight Board.

1.89    "Litigation Assets" shall mean (a) all claims, rights, or other Causes of Action of any kind belonging to the Estates, but not claims to recover amounts owed to the Debtors by CMS, and (b) all Creditor Causes of Action with respect to which the Holder has affirmatively elected on its Ballot to assign or transfer such claims and Causes of Action to the Liquidating Trust, and/or within sixty (60) days after the Effective Date, or within such longer time period set forth in an order of the Court, executes an assignment agreement, in form and substance satisfactory to the Liquidating Trustee, assigning such claims and causes of action to the Liquidating Trustee; provided, further, that Litigation Assets shall not include preferential transfer claims that may be brought against any Entity that is not an Insider of the Debtors.  For the avoidance of doubt, Medicare Claims to recover amounts owed to one or more of the Debtors by CMS shall be Residual Assets not Litigation Assets.

1.90    "Local Rules" shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.91    "Medicare Administrative Appeal" shall mean the administrative appeal commenced by the Debtors to challenge CMS's overpayment determination, pursuant to the Medicare Statute and Regulations, and any subsequent or related actions, including an appeal to a federal court or those that involve or relate to the same facts.

1.92    "Medicare Claim" shall mean, all claims for payment on account of services rendered pursuant to the Medicare Statute and Regulations.

1.93    "Medicare Statute and Regulations" shall mean 42 U.S.C. § 1395-1395lll and 42 C.F.R. Chapter IV, respectively.

12

1.94    "Monroe Capital" shall mean Monroe Capital Management Advisors, LLC.

1.95    "Net Proceeds" shall mean the Cash consideration received from the sale, transfer, or other disposition of the Liquidating Trust Assets, including, without limitation, the liquidation or the conversion of such property to Cash, whether occurring prior to or from and after the Effective Date, less the reasonable, necessary and customary expenses attributable to such sale, transfer, or other disposition, including the costs of paying personal property or other taxes accruing in connection with such sale, transfer or conversion or such property, brokerage fees and commissions, collection costs, reasonable attorneys' fees and expenses and any applicable taxes or other claims of any governmental authority in connection with such property and any escrows or accounts established to hold funds for purchase price adjustments, indemnification claims, or other purposes in connection with such sale, transfer or collection, as applicable.

1.96    "Notice of Availability of Funds" shall have the meaning ascribed to it in section 12.4.

1.97    "Objection(s)" shall mean any objection, application, motion, complaint or any other legal action seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, establish the priority of, expunge, subordinate or estimate any Claim (including any objection or opposition to any request for allowance or payment of any Administrative Claim).

1.98    "Other Priority Claim" shall mean any Claim entitled to priority under Bankruptcy Code section 507(a), but which is not a Tax Claim.

1.99    "Other Secured Claim" shall mean a Claim, other than a Prepetition Senior Obligation Claim and a Second Lien Claim, that is: (a) secured by a valid and perfected Lien on property in which an Estate has an interest, but only to the extent of the value of the Holder's interest in the applicable Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) subject to setoff under section 553 of the Bankruptcy Code, but only to the extent of the amount subject to setoff, as determined pursuant to section 553 of the Bankruptcy Code.

1.100    "Person" shall mean any individual, corporation, partnership, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, the Creditors' Committee, Holders of Interests, Holders of Claims, current or former employees of the Debtors, or any other entity.

1.101    "Petition Date" shall mean July 30, 2019, the date that the Debtors commenced their Chapter 11 Cases in the Bankruptcy Court.

1.102    "Plan" shall mean this joint plan of liquidation under chapter 11 of the Bankruptcy Code, together with any amendments or modifications hereto as the Debtors may file hereafter in accordance with the terms of this Plan (such amendments or modifications only being effective upon compliance with section 14.2 of the Plan).

1.103   "Plan Consideration" shall mean, with respect to any Class of Claims or Interests entitled to a Distribution under this Plan, Cash and/or Liquidating Trust Interests, as applicable.

1.104   "Plan Documents" shall mean the documents, other than this Plan, to be executed, delivered, assumed and/or performed in connection with the consummation of this Plan, including, without limitation, the documents to be included in the Plan Supplement, and any and all exhibits to the Plan and the Disclosure Statement.

1.105   "Plan Supplement" shall mean the supplemental appendix to this Plan, filed with the Court not less than seven (7) calendar days prior to the Voting Deadline, which contains, among other things, draft forms or signed copies, as the case may be, of the Liquidating Trust Agreement, and any schedules, lists, or documents that supplement or clarify aspects of this Plan and are identified as part of the Plan Supplement.

1.106   "Prepetition Collateral" shall mean the Prepetition Senior Collateral and the Prepetition Second Lien Collateral.

1.107   "Prepetition Credit Facilities" shall mean the Revolver and the Term Loan together.

1.108   "Prepetition First Lien Credit Agreement" shall mean that certain Credit Agreement dated as of January 26, 2017 (as amended, restated, supplemented, and otherwise modified from time to time).

1.109   "Prepetition First Lien Administrative Agent" shall mean Monroe Capital Management Advisors, LLC, as administrative agent of the Prepetition First Lien Credit Agreement (together with its permitted sub-agents, delegates, attorneys-in-fact, successors and assigns, including Monroe Capital LLC.

1.110   "Prepetition Liens" shall mean the Prepetition Senior Liens and the Prepetition Second Liens.

1.111   "Prepetition Second Liens" shall mean the second priority liens upon and subordinated security interests in substantially all of the Debtors' property and assets as security for the Debtors' repayment obligations under the Prepetition Second Lien Promissory Note.

1.112   "Prepetition Second Lien Administrative Agent" shall mean Riverside Strategic Capital Funds I, L.P., as agent for the Prepetition Second Lien Promissory Note (together with its permitted sub-agents, delegates, attorneys-in-fact, and successors and assigns).

1.113   "Prepetition Second Lien Collateral" shall mean the Debtors' property and assets securing the Prepetition Second Liens.

1.114   "Prepetition Second Lien Lenders" shall mean the lenders party to the Prepetition Second Lien Promissory Note.

1.115    "Prepetition Second Lien Obligation" shall mean all of the Obligations (as such term is defined in the Prepetition Second Lien Promissory Note), as of the Petition Date, owing by each respective Debtor (as borrower or guarantor) to Riverside Strategic Capital Funds I, L.P. as agent for certain holders of the Prepetition Second Lien Promissory Note.

1.116    "Prepetition Second Lien Parties" shall mean the lenders party to the Prepetition Second Lien Promissory Note.

1.117    "Prepetition Second Lien Promissory Note" shall mean that certain Second Lien Promissory Note, dated May 18, 2018, by and among certain of the Debtors from time to time party thereto in favor of the Prepetition Second Lien Administrative Agent and the holders thereof, in the original principal amount of $14,081,469.66, as amended and restated by that certain Amended and Restated Second Lien Promissory Note, dated as of November 21, 2018, in the amount of $18,800,000.

1.118    "Prepetition Secured Parties" shall mean the Prepetition First Lien Agent and the various financial institutions from time to time party to the Prepetition First Lien Credit Agreement.

1.119    "Prepetition Senior Collateral" shall mean the Debtors' property and assets securing the Prepetition Senior Liens.

1.120    "Prepetition Senior Liens" shall mean the first priority liens upon and senior security interests in substantially all of the Debtors' property and assets as security for the Debtors' repayment obligations under the Prepetition First Lien Credit Agreement.

1.121    "Prepetition Senior Lien Obligation Claim" shall mean a Claim on account of the Prepetition Senior Obligations and the Prepetition Senior Loan Documents.

1.122    "Prepetition Senior Loan Documents" shall mean that certain Credit Agreement, dated as of January 26, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof), by and among the Debtors party thereto, the various financial institutions from time to time party thereto, as lenders, and Monroe Capital Management Advisors, LLC, as administrative agent, and the other "Loan Documents" as defined therein.

1.123    "Prepetition Senior Obligations" shall mean all of the Obligations (as such term is defined in the Prepetition Senior Loan Documents), as of the Petition Date, owed by each respective Debtor to Monroe Capital Management Advisors, LLC, as administrative agent for certain lenders under the Prepetition Senior Loan Documents.

1.124    "Professional" or collectively "Professionals," shall mean any professional Person or Entity employed in this Case by Court order pursuant to Bankruptcy Code sections 327, 328, 363, or 1103 or otherwise.

1.125    "Purchaser" shall mean Cleveland Heartlab, Inc. as "Purchaser" under that certain Asset Purchase Agreement, dated September 18, 2019.

1.126   "Ratable Share" shall mean a number (expressed as a percentage) equal to the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims plus Disputed Claims (in their aggregate Face Amount) in such Class as of the date of determination.

1.127   "Rejection Bar Date" shall have the meaning ascribed to it in section 3.3(f).

1.128   "Released Claims" shall mean any and all claims or causes of action, against the Released Parties, relating to any pre- or post-Petition Date acts or omissions, whether known or unknown, pertaining to the business activities and operations of the Debtors, the debts, liabilities, obligations and assets of the Debtors, the ownership, management, direction or control of the Debtors, the Sale, the Plan, or any transactions or communications among the Released Parties with respect to any of the foregoing.

1.129   "Released Parties" shall mean collectively, (a) the Prepetition Secured Parties; (b) DIP Agent and DIP Lenders; (c) the members of the Creditors' Committee, solely in their capacity as such; (d) Morris, Nichols, Arsht & Tunnell LLP, (e) Perskins Coie LLP, (f) Greenberg Traurig, LLP, (g) FTI Consulting, Inc., (h) Clifford A. Zucker, solely in his capacity as Chief Restructuring Officer of the Debtors, (i) Proskauer Rose LLP, (j) Landis Rath & Cobb LLP, (k) SSG Advisors, LLC, (l) Cooley LLP, (m) Elliott Greenleaf, P.C., and (n) GlassRatner Advisory & Capital Group LLC.

1.130   "Required DIP Lenders" shall mean, at any time, DIP Lenders whose Pro Rata Shares (as defined in the DIP Credit Agreement) exceed 50%; provided that (i) the Pro Rata Shares held or deemed held by any Defaulting DIP Lender (as defined in the DIP Credit Agreement) will be excluded for purposes of making a determination of Required DIP Lenders and (ii) at all times there are two or more DIP Lenders that are not "Affiliates" (as defined in the DIP Credit Agreement) of each other and are not Defaulted DIP Lenders, Required DIP Lenders will require two such DIP Lenders.

1.131   "Reserves" shall mean, collectively, the Fee Claims Reserve, the Administrative and Priority Claims Reserve, the Disputed General Unsecured Claims Reserve, the Liquidating Trust Operating Reserve, and such other reserves as may be deemed reasonable or necessary by the Liquidating Trustee pursuant to the Liquidating Trust Agreement.

1.132   "Residual Assets" shall mean all property of the Estates that have not been sold, transferred, assigned or disposed of as of the Effective Date, including without limitation equipment, inventory, prepaid expenses (including utility deposits, unearned insurance premiums, and tax and other refunds), intellectual property, accounts and accounts receivable (including the proceeds of the Medicare Administrative Appeal and all Medicare Claims that may be asserted by or on behalf of the Debtors or their Estates); provided, however, that Residual Assets shall not include (a) the Cash necessary to establish Reserves and make Distributions to Holders of Allowed Claims, in accordance with the terms of this Plan, or (b) the Litigation Assets.

1.133    "Revolver" shall mean the revolving loan facility in an aggregate amount not to exceed $15,000,000 pursuant to the Prepetition First Lien Credit Agreement.

1.134    "Sale" shall mean the sale of the Debtors' assets to the Purchaser pursuant to the Sale Order.

1.135    "Sale Motion" shall mean the Debtors' Motion for (I) An Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bidding Procedures and Bid Protections for the Sale of Substantially All Assets of Debtors; (B) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (C) Scheduling the Auction and Sale Hearing; (D) Approving Forms and Manner of Notice of Respective Dates, Times, and Places In Connection Therewith; and (E) Granting Related Relief; (II) An Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief [Docket No. 16], Filed on July 30, 2019.

1.136    "Sale Order" shall mean the Order (I) Approving Purchase Agreement Among Debtors and Purchaser, (II) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Authorizing Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (IV) Granting Related Relief [Docket No. 271], entered by the Bankruptcy Court on September 20, 2019.

1.137    "Sale Order" shall mean any sale order entered by the Court prior to the Effective Date that becomes a Final Order.

1.138    "Schedules" shall mean the schedules of assets and liabilities, schedules of Executory Contracts and unexpired leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

1.139    "Second Lien Claim" shall mean a Claim totaling $18,800,000 (plus all accrued but unpaid Prepetition interest, fees and expenses against each respective Debtor, either as a borrower or a guarantor, on account of:  the Prepetition Second Lien Obligations and the Prepetition Second Lien Promissory Note.

1.140    "Secured Claim" shall mean, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or nonbankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estate, to the extent of the value of the holder's interest in such property as of the relevant determination date, or (b) Allowed as such pursuant to the terms of this Plan (subject to the Confirmation Order becoming a Final Order). The defined term Secured Claim includes any Claim that is (i) subject to an offset right under applicable law as of the Petition

Date, and (ii) a secured claim against the Debtors pursuant to sections 506(a) and 553 of the Bankruptcy Code.

1.141    "Series A/B Sharing Arrangement" shall mean from and after the time when the Holders of Allowed Class 3 Claims and Series A Liquidating Trust Interests have received Distributions of Cash totaling $87.5 million on account of the Allowed Class 3 Claims plus (i) all accrued interest required to be paid in Cash (and for the avoidance of doubt, excluding accrued interest required to be paid in kind) on or prior to the date of such Distribution, and (ii) any unpaid fees and expenses owed under the Prepetition Senior Loan Documents, the Holders of Series A and B Liquidating Trust Interests will thereafter receive their Ratable Share of Net Proceeds generated from Litigation Assets (based upon their respective Allowed Prepetition Senior Obligation Claim and Allowed Second Lien Claim).

1.142    "Silver Point" shall mean Silver Point Finance, LLC, on behalf of its affiliated investment funds.

1.143    "Subordinated Claim" shall mean any Claim subject to subordination, whether pursuant to a Final Order of the Court under section 510 of the Bankruptcy Code or by written consent of the Holder of such Claim, whether such Final Order is entered or such consent is given prior to or following the Effective Date.

1.144    "Tax Claim" shall mean any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under Bankruptcy sections 502(i) and 507(a)(8).

1.145    "Term Loan" shall mean the term loan facility in an aggregate principal amount not to exceed $110,000,000 pursuant to the Prepetition First Lien Credit Agreement.

1.146    "Unclaimed Distributions" shall mean any Cash or other distributable property unclaimed on or after the Effective Date or the date on which an additional Distribution would have been made in respect of an Allowed Claim.  Unclaimed Distributions shall include (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address, (b) funds for uncashed checks, (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, and (d) any Distribution deemed to be an Unclaimed Distribution pursuant to Section 12.5 hereof.

1.147    "Unimpaired" shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.148    "U.S. Trustee Fees" shall mean fees payable pursuant to 28 U.S.C. § 1930, to the extent applicable to these Chapter 11 Cases.

1.149    "Voting Deadline" shall mean [●], at 4:00 p.m. (Prevailing Eastern Time), the date specified in the Disclosure Statement, the Ballots, the Voting Procedures Order or related solicitation documents approved by the Court as the last date for Holders of Claims

entitled to vote on this Plan to submit their ballots with respect to this Plan, as such date may be extended.

1.150 "Voting Procedures order" shall mean that certain order dated [   ], which sets forth the deadlines, procedures and instructions for voting to accept or reject this Plan.

**Rules of Interpretation**

1.1 Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein, unless the context requires otherwise. The words "include" and "including" shall mean "include, without limitation," or "including," as the case may be. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.2 Any reference in this Plan to a contract, instrument, release, indenture, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, release, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

1.3 The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any reference to any entity as a holder of a Claim or Interest includes that entity's successors and assigns.

**Appendices and Plan Documents**

1.4 All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Court pursuant to the Confirmation Order. Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Court during normal business hours, or at https://dm.epiq11.com/case/THG/info.

ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

2.1     **General Rules of Classification**. The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, confirmation of the Plan, and making distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan. Notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan of liquidation for each Debtor.  The Plan is not premised upon and will not cause the substantive consolidation of any of the Debtors; but the Debtors reserve the right to seek, in connection with confirmation of the Plan, substantive consolidation of debtors (other than THG Holdings, LLC) into and with True Heath Diagnostics, LLC.  Notwithstanding, a Holder of a Claim against more than one Debtor on a theory of joint and several liability shall only be entitled to a single recovery in distribution.  For brevity and convenience, the classification and treatment of Claims and Interests have been arranged into one chart. Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the claims reconciliation process. Actual recoveries may vary widely within these ranges, and without any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the combined Disclosure Statement and Plan, the Debtors emphasize that they make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests, except DIP Facility Claims, Administrative Claims, Tax Claims, and Other Priority Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, Tax Claims, and Other Priority Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below in Article VI of the Plan. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class/ Designation | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| **Class 1**: Other Priority Claims | Each Holder of a Class 1 Claim shall receive an amount of Cash equal to the unpaid portion of such Allowed Other Priority Claim. | Unimpaired<br><br>Not entitled to vote<br><br>Deemed to accept Plan | [100%] | [$165,000] |
| **Class 2**: Other Secured Claims | Each Holder of a Class 2 Claim shall receive, at the sole option of the Required DIP Lenders or Liquidating Trustee, as applicable: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim. | Unimpaired<br><br>Not entitled to vote<br><br>Deemed to accept Plan | [100%] | [$700,000] |
| **Class 3**: Prepetition Senior Obligation Claims | The Allowed Class 3 Claim shall be in the amount of $123,652,139. The Holder of an Allowed Class 3 Claim shall receive its Ratable Share, subject to the Series A/B Sharing Arrangement, of the following (a) all of the Debtors' Cash on hand after the payment of (or after reserving for) the full amount of the DIP Facility Claim, each Administrative Expense Claim, Tax Claim, and Other Priority Claim; and (b) the Series A beneficial interests in the Liquidation Trust. | Impaired<br>Entitled to vote | [5-10%] | [$123,652,139] |
| **Class 4**: Second Lien | The Holder of an Allowed Class 4 Claim shall receive its Ratable | Impaired<br>Entitled to vote | [<1%] | [$18,500,000] |

| Class/ Designation | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| Claims | Share of Series B beneficial interests in the Liquidation Trust (subject to the Series A/B Sharing Arrangement). | | | |
| **Class 5:** General Unsecured Claims | Each Holder of an Allowed Class 5 Claim shall receive its Ratable Share of its Series C beneficial interests in the Liquidation Trust. Series C Liquidating Trust Interests shall entitle the Holder to its Ratable Share of 10% of the Net Proceeds generated from Litigation Assets. | Impaired  Entitled to vote | [<1%] | [$40,000,000] |
| **Class 6**: Subordinated Claims | Each Holder of an Allowed Class 6 Claim shall receive no Distribution on account of their Subordinated Claims. | Impaired  Not entitled to vote  Deemed to reject Plan | [0%] | [$0] |
| **Class 7:** Equity Interests | On the Effective Date, all Equity Interests shall be deemed canceled, extinguished and discharged and of no further force or effect, and the Holders of Equity Interests shall not be entitled to receive or retain any property on account of such Interests. | Impaired  Not entitled to vote  Deemed to reject Plan | [0%] | [N/A] |

2.2     **Unimpaired Class of Claims**.

          **Class 1: Other Priority Claims.** Class 1 shall consist of Other Priority Claims against the Debtors. Class 1 Claims are Unimpaired by the Plan and the Holders of Allowed Class 1 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

          **Class 2: Other Secured Claims.** Class 2 shall consist of Other Secured Claims against the Debtors. Class 2 Claims are Unimpaired by the Plan and the Holders of Allowed Class 2 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

2.3     **Impaired Classes of Claims**.

**Class 3: Prepetition Senior Obligation Claims.** Class 3 shall consist of the Prepetition Senior Obligation Claims.  The Class 3 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

**Class 4: Second Lien Claim.**  Class 4 shall consist of the Second Lien Claims. The Class 4 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

**Class 5: General Unsecured Claims.** Class 5 shall consist of all Allowed General Unsecured Claims against the Debtors. The Class 5 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

**Class 6: Subordinated Claims.** Class 6 shall consist of all Subordinated Claims. Because Holders of Class 6 Subordinated Claims will receive no Distribution under the Plan, Holders of Class 6 Subordinated Claims are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.  For the avoidance of doubt, the Second Lien Claim shall be classified as a Class 4 Claim and shall not be deemed a Class 6 Subordinated Claim.

2.4     **Impaired Class of Equity Interests**.

**Class 7: Equity Interests.** Class 7 shall consist of all Equity Interests.  Because Holders of Class 7 Equity Interests will receive no Distribution under the Plan, Holders of Class 7 Equity Interests are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

ARTICLE III
**BACKGROUND AND DISCLOSURES**

3.1     **General Background.**[2]

(a)     *The Debtors' Business*.

Founded in 2014, the Debtors were one of the largest independent providers of laboratory management and diagnostic services in the United States.  As of the Petition Date, the Debtors operated accredited, full-service clinical laboratories that offered comprehensive testing for biomarkers that can indicate risk for cardiovascular disease, diabetes, autoimmune disorders, cancer, and other diseases and health testing services.  By utilizing the Debtors' services, physicians were able to offer patients a personalized overview of risk factors and assistance from clinical health consultants to promote healthy, longer-lasting lifestyles.

The Debtors offered what they believe may be the most comprehensive test of biomarkers for cardiovascular, diabetes, and related diseases currently available in the industry. The Debtors offered more than 400+ tests and have handled over 1,525,000 patient samples.  The Debtors ran about 1,370 samples daily through their two facilities.  The Debtors' maintained state of the art laboratory facilities strategically located to allow for rapid turnaround times and

---

[2]     Further information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in detail in the First Day Declarations, which are incorporated by reference herein.

strong customer base.  The Debtors' primary operations were located in Richmond, Virginia, which includes a 109,000 square foot leased facility built in 2013 consisting of 52,000 square feet for testing plus offices for billing, research and development, and other administrative functions.  The Debtors also maintained a second laboratory in Frisco, Texas, which is a 7,000 square foot leased facility that included 5,000 square feet for testing.  From these two facilities, the Debtors served approximately 1,250 physician offices located in 46 states plus the District of Columbia.  In addition, the Debtors offered an online patient portal that provided interactive reports, live coaching help, patient engagement videos, and lifestyle tracking tools.

On the Petition Date, the Debtors employed approximately 319 people in full-time and part-time positions. These employees included laboratory technicians, phlebotomists and other clinical professionals in addition to corporate support staff in finance, accounting, billing, human resources and information technology.  The Debtors also contracted with approximately 450 phlebotomist vendors who service and collected samples from patients at their residences or other locations convenient to patients.

(b)    <em>The Debtors' Prepetition Capital Structure</em>.

As of the Petition Date, the Debtors' debt obligations totaled over $174 million including long-term debt of $150 million, a revolving line of credit of $2.5 million and an accounts payable balance of approximately $14 million.

<strong><em>i.    Funded Debt Obligations</em></strong>

The Debtors are party to the Prepetition First Lien Credit Agreement, by and among True Health Diagnostics LLC, as a borrower, True Health Group, LLC, the other subsidiaries of True Health Group, LLC from time to time party thereto, and the Prepetition Secured Parties.  Pursuant to the Prepetition First Lien Credit Agreement, the Debtors obtained a senior secured financing facility as follows: (a) a revolving loan facility in an aggregate amount not to exceed $15,000,000 and (b) a term loan facility in an aggregate principal amount not to exceed $110,000,000.

As security for the Debtors' repayment obligations under the Prepetition First Lien Credit Agreement, the Debtors granted the Prepetition First Lien Administrative Agent for the benefit of the Prepetition Secured Parties, the Prepetition Senior Liens substantially all of the Debtors' property and assets as more particularly set forth in certain security documents and instruments, including but not limited to the (a) Guaranty and Collateral Agreement, dated as of January 26, 2017, by and among True Health Diagnostics LLC, and each other person signatory such agreement as a grantor, in favor of the Prepetition First Lien Administrative Agent; (b) Trademark Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (c) Patent Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (d) Copyright Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (e) Limited Guaranty and Pledge Agreement, dated as of May 18, 2018, by THG Holdings LLC in favor of the Prepetition First Lien Administrative Agent; and (f) each Control Agreement (as defined in the Prepetition First Lien Credit Agreement).  On May 18, 2018, the Prepetition Secured Parties agreed, subject to

24

certain conditions set forth in the Intercreditor Agreement (as defined below), that a portion of the debt under the Prepetition Credit Facilities would share *pari passu* with the Prepetition Second Lien Obligations.

As of the Petition Date, the principal amounts outstanding under the Revolver and Term Loan are $2,786,744.81 and $118,805,633.48, respectively. Moreover, there is approximately $24,471.51 and $1,043,407.24 in accrued and unpaid interest under the Revolver and Term Loan, respectively.

Additionally, True Health Diagnostics LLC and True Health Group LLC are borrowers, and Outreach Management Solutions LLC, Health Core Financial LLC, True Health Clinical LLC, and True Health IP LLC are guarantors under the Prepetition Second Lien Promissory Note. On May 18, 2018, the Prepetition Second Lien Promissory Note was made by the borrowers in favor of the Prepetition Second Lien Administrative Agent and the holders of the Prepetition Second Lien Promissory in the outstanding principal amount of $14,081,469.66 and, on November 21, 2018, was amended and restated in the outstanding principal amount of $18,800,000. As described above, on May 18, 2018, the Prepetition Secured Parties agreed to subordinate, subject to certain conditions set forth in the Intercreditor Agreement (as defined below), that a portion of the debt under the Prepetition Credit Facilities would share *pari passu* with the Prepetition Second Lien Obligations. Between mid-December 2018 and the Petition Date, affiliates of the Prepetition Second Lien Administrative Agent funded an additional $15,530,000 to support the Debtors' operations, but the Prepetition Second Lien Promissory Note was never amended to reflect the additional advances. The Prepetition Second Lien Lenders assert that the additional advances made by affiliates of the Prepetition Second Lien Administrative Agent to the Debtors are unsecured obligations.

As security for the repayment obligations under the Prepetition Second Lien Promissory Note, the borrowers and guarantors thereto granted the Prepetition Second Lien Administrative Agent, the Prepetition Second Liens on the Prepetition Second Lien Collateral.

Prepetition, the Debtors defaulted under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Promissory Note. Following this default, the Debtors, the Prepetition Secured Parties, the Prepetition Second Lien Lenders and the Prepetition Second Lien Administrative Agent entered into two forbearance agreements and extensions to the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Promissory Note, including most recently that certain Fifth Extension of Second Forbearance Agreement dated as of May 10, 2019, which expired on May 31, 2019.

### ii.    *Intercreditor Agreement*

Certain of the Debtors (excluding THG Holdings, LLC.) are party to the Intercreditor and Subordination Agreement by and among such Debtors, Riverside Strategic Capital Fund I, L.P., the Subordinated Creditors (as defined in the Intercreditor Agreement), and Monroe Capital Management Advisors, LLC. The Intercreditor Agreement was the result of efforts to restructure or sell the Debtors' business in fall 2017. It is pursuant to the Intercreditor Agreement that the Prepetition Secured Parties agreed, subject to certain conditions set forth

25

therein, that a portion of the debt under the Prepetition Credit Facilities would share *pari passu* with the Prepetition Second Lien Obligations.

### iii.     Other Debt

The Debtors estimate that as of the Petition Date claims of other trade and miscellaneous unsecured Creditors total approximately $14 million.

### 3.2     Events Leading to Chapter 11.

Several factors negatively impacted the Debtors' financial position and caused liquidity issues, thereby leading to these Chapter 11 Cases.  Medicare payments account for a significant portion of the Debtors' total cash receipts. On or around May 25, 2017, the Centers for Medicare and Medicaid Services ("CMS") instituted a 100 percent hold on all Medicare payments to THD without notice, limiting the Debtors' ability to fund their retail lab business. THD provided a rebuttal statement to CMS on or around June 5, 2017.

Approximately one month later, on or around June 23, 2017, CMS reduced its holdback from 100 percent to 35 percent of all Medicare payments.  Even with the reduced suspension, however, the Debtors were forced to seek outside funding to sustain their operations. The Debtors estimate that, as of the Petition Date, approximately $23 million in receivables have been held back by Medicare since May 2017.

Between June 23, 2017 and the end of May 2019, the Debtors took substantial steps to address the claims asserted and the concerns raised by CMS and the United States Department of Justice.  Among other things, the Debtors engaged expert regulatory counsel and financial advisors to cooperate and interact with CMS and DOJ.  By the end of June, the Debtors negotiated a comprehensive settlement with DOJ to resolve all claims against True Health Diagnostics LLC in exchange for full CMS Medicare reimbursement going forward. The settlement was on the verge of being consummated when CMS and DOJ advised the Debtors of a second investigation.

On or about June 13, 2019, CMS imposed a second 100 percent hold on all Medicare payments to THD.  The conduct complained of and the claims asserted by CMS and DOJ in support of this most recent suspension is based on facts occurring prior to 2018.  Indeed, the Debtors believe that this most recent suspension is based on the very same conduct that supported the 2017 suspension.

Following the Petition Date, True Health Diagnostics LLC continued its participation in Medicare, performed current medically essential services for Medicare patients, and timely submitted claims for reimbursement.  CMS continued to withhold all reimbursement payments to the Debtors, however, as a result of alleged overpayments occurring prior to 2018.

In response to the June 13, 2019 suspension, THD sought emergency injunctive relief against CMS in the United States District Court for the Eastern District of Texas. Although THD initially was successful in obtaining a temporary restraining order against CMS to preclude CMS from imposing the 100 percent holdback, on July 22, 2019 the District Court denied THD a preliminary injunction and dismissed the action for lack of subject matter

jurisdiction.  The continued suspension of all Medicare payments to THD resulted in irreparable damage to the Debtors' liquidity and their businesses.  Consequently, the Debtors were forced to file for Chapter 11 bankruptcy protection before this Court.

### 3.3    **The Chapter 11 Cases**.

#### (a)    *Generally*.

As set forth above, on the Petition Date the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The commencement of a chapter 11 case created an estate that is composed of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors and debtors in possession. By order entered July 31, 2019 [Docket No. 44], the Chapter 11 Cases are being jointly administered for procedural purposes only. No trustee or examiner has been appointed in the Chapter 11 Cases.  On August 8, 2019, the Office of the United States Trustee appointed the Creditors' Committee in the Chapter 11 Cases.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by Creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan.

#### (b)    *"First Day" Motions and Related Applications*.

On the Petition Date, the Debtors filed a number of "first-day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets and minimize the effects of the commencement of the Chapter 11 Cases. On January 31, 2019, the Bankruptcy Court entered orders providing various first-day relief, including interim or final orders approving:

- *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Wages, Benefits and Other Compensation Obligations, (II) Authorizing Payments Under Non-Insider Incentive Programs, and (III) Authorizing Financial Institutions to Honor All Obligations Related Thereto, and (IV) Granting Related Relief*;

- *Debtors' Motion for Entry of an Order Authorizing the Payment of Certain Claims of Possessory Claimants and Granting Related Relief*;

27

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts, Account Control Agreements, and Payment Methods, (III) Authorizing Use of Existing Business Forms, (IV) Authorizing Continuation of Ordinary Course Intercompany Transactions, (V) Granting Administrative Priority to Postpetition Intercompany Claims, (VI) Extending Time to Comply with the Requirements of 11 U.S.C. § 345(b), (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto, and (III) Granting Related Relief*;

- *Debtors' Motion Pursuant to Sections 105(a), 363(b), 363(c) and 1107(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for an Order Authorizing Debtors to (A) Continue Insurance Policies and Agreements Relating Thereto, (B) Honor Certain Prepetition Obligations in Respect Thereof, (C) Renew, Revise, Extend, Supplement, Change or Enter Into New Insurance Coverage and Insurance Premium Financing as Needed in Their Business Judgment, and (D) Continue to Honor Insurance Premium Financing Obligations*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Approving Proposed Adequate Assurance of Payment to Utility Providers and Authorizing Debtors to Provide Additional Assurances, (III) Establishing Procedures to Resolve Requests for Additional Assurance; and (IV) Granting Related Relief*;

- *Debtors Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364, 503(b)(9), 507(a), 1107(a) and 1108 and Fed. R. Bankr. P. 6003 and 6004; and (II) Granting Related Relief*;

- *Debtors Application for Entry of an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent,* Nunc Pro Tunc *to the Petition Date*; and

- *Debtors' Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (IV) Scheduling and Final Hearing Pursuant to Bankruptcy Rule 4001(c).*

(c)    *Retention of Professional Advisors.*

Pursuant to orders entered on August 26, 2019, and December 14, 2018, the Bankruptcy Court authorized the Debtors to retain and employ (a) Morris, Nichols, Arsht & Tunnell LLP as their bankruptcy counsel [Docket No. 189], (b) Epiq Corporate Restructuring, LLC as their administrative advisor [Docket No. 192], (c) Perkins Coie LLP, as special counsel [Docket No.198], (d) SSG Advisors, LLC, as investment banker [Docket No. 199], and (e) FTI Consulting, Inc. and Clifford A. Zucker as Chief Restructuring Officer [Docket No. 200].

Pursuant to orders entered on September 17, 2019, the Bankruptcy Court authorized the Creditors' Committee to retain and employ (a) Cooley LLP as their lead bankruptcy counsel [Docket No. 253]; (b) Elliott Greenleaf, P.C. as their Delaware co-counsel [Docket No. 255]; and (c) GlassRatner Advisory & Capital Group LLC as their financial advisor [Docket No. 254].

(d)    *True Health Diagnostics, LLC v. Azar et al.*, Case No. 19-50280 (JTD) (Bankr. D. Del. 2019).

On the Petition Date, the Debtors commenced an adversary proceeding against CMS seeking: (a) a declaration that CMS's suspending, escrowing, recouping, setting-off or otherwise withholding Medicare payments to the Debtors on and after the Petition Date constitutes a violation of the automatic stay; (b) damages for CMS's willful violation of the automatic stay; and (c) injunctive relief enjoining CMS from suspending, escrowing, recouping, setting-off or otherwise withholding Medicare payments to the Debtors on and after the Petition Date. In connection therewith, the Debtors also filed a motion for a preliminary injunction seeking relief pursuant to sections 105(a) and 362(a) of the Bankruptcy Code to enforce the automatic stay and prohibit CMS from withholding postpetition Medicare payments due to the Debtors.

On August 22, 2019, the Court held a hearing to consider the Debtors' preliminary injunction motion, and on August 29, 2019, entered an order granting the relief requested. Specifically, the Court found that CMS's withholding of postpetition Medicare payments due to the Debtors violated the automatic stay, and ordered that (a) CMS is restrained and enjoined from withholding any postpetition Medicare payments due to the Debtors, and (b) requiring CMS to deliver to the Debtors one-hundred percent of all Medicare funds that had been withheld after the Petition Date.

CMS has since appealed of the Court's order to the District Court for the District of Delaware. The appeal remains pending.

As described above, the Debtors' commenced the adversary proceeding to enforce the automatic stay with respect to postpetition Medicare reimbursements due to the Debtors. With respect to the prepetition Medicare amounts withheld by CMS (as detailed in section 3.2 *supra*), the Debtors are currently challenging CMS's overpayment determination through the administrative appeals process outlined in the Medicare statute.

(e)    *The Sale of Substantially All of the Debtors' Assets*

The Debtors filed the Chapter 11 Cases in order to pursue a sale of all or substantially all of their assets with the goal of maximizing the recovery for their estates and creditors. The Debtors and SSG marketed the Debtors' assets, seeking to solicit and secure the highest and best offers to maximize recoveries for the stakeholders of the Estates. To that end, on July 30, 2019, the Debtors filed the Sale Motion.

On August 22, 2019, the Bankruptcy Court entered the Bidding Procedures Order by which the Court approved procedures to conduct a sale of certain assets free and clear of all liens, claims, encumbrances and other interests (other than Assumed Liabilities, as defined in the Bidding Procedures Order) and conduct the Auction (as defined in the Bidding Procedures Order) pursuant to section 363 of the Bankruptcy Code. Among other things, the Bidding Procedures Order set September 13, 2019, as the deadline for Qualifying Bids (as defined therein), and September 17, 2019, as the date for the Auction of the Debtors' assets pursuant to the procedures set forth therein.

Pursuant to the Bidding Procedures Order, Cleveland Heartlab, Inc., a wholly owned subsidiary of Quest Diagnostics Incorporated, submitted a bid for certain of the Debtors' assets by the Bid Deadline. The Debtors determined in consultation with the Consultation Parties (as defined in the Bidding Procedures Order) that the Purchaser's bid, as subsequently improved, was the highest and best bid for the assets and designated the Purchaser as the Successful Bidder (as defined in the Bidding Procedures Order) for the assets. On September 20, 2019, the Court entered the Sale Order.

On October 1, 2019, the sale approved by the Sale Order closed.

(f)    *Bar Dates Pursuant to the Bar Date Order*

On September 23, 2019, the Debtors' filed the Bar Date Motion and on [  ], the Court entered the Bar Date Order. Pursuant to the Bar Date Order, the Court established the following Bar Dates:

(1)    General Bar Date: _____, 2019 at 5:00 p.m. (prevailing Eastern Time) as the deadline for each person or entity (including individuals, partnerships, corporations, joint ventures, trusts, but not including Governmental Units, to file a Proof of Claim in respect of a prepetition claim (as defined in section 101(5) of the Bankruptcy Code), including, for the avoidance of doubt, secured claims, unsecured priority claims, and unsecured non-priority claims;

(2)    503(b)(9) Claims Bar Date: _____, 2019 at 5:00 p.m. (prevailing Eastern Time) as the deadline for each person or entity to file a Proof of Claim in respect of any claims arising under section 503(b)(9) of the Bankruptcy Code against the Debtors;

(3)    Governmental Bar Date: January 26, 2020 at 5:00 p.m. (prevailing Eastern Time) as the deadline for Governmental Units to file a Proof of Claim in respect of a prepetition claim against the Debtors;

(4)    First Administrative Claims Bar Date: _____, 2019 at 5:00 p.m. (prevailing Eastern Time) is the statutory deadline for each person or entity that asserts a request for payment of Administrative Claims arising between the Petition Date and _____, 2019, excluding (i) claims for professional fees and expenses in these cases, and (ii) claims asserting administrative priority and arising in the ordinary course of business after the Petition Date, to file a request for payment of such Administrative Claims.

(5)    Amended Schedules Bar Date: the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, or (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is 30 days from the date on which the Debtors provide notice of a previously unfiled Schedule or an amendment or supplement to the Schedules as the deadline by which claimants holding claims affected by such filing, amendment or supplement must file Proofs of Claim with respect to such claim; and

(6)    Rejection Damages Bar Date: the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, or (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is 30 days following service of an order approving rejection of any executory contract or unexpired lease of the Debtors as the deadline by which claimants asserting claims resulting from the Debtors' rejection of an executory contract or unexpired lease must file Proofs of Claim for damages arising from such rejection.

(g)    *The Wind-Down of the Estates*

Following the sale of certain of the Debtors' assets to the Purchaser, the Debtors are focused principally on winding down their businesses and preserving cash held in the Estates. The Debtors' Residual Assets currently consist of, among other things, unsold equipment, inventory, intellectual property, accounts and accounts receivable including all Medicare Claims that may be asserted by or on behalf of the Debtors (including Medicare Claims that will be pursued through the Medicare Administrative Appeal). This Plan provides for the Debtors' Residual Assets already liquidated or to be liquidated over time and the proceeds thereof to be distributed to holders of Allowed Claims in accordance with the terms of the Plan. The Liquidating Trustee will effect such liquidation and distribution.

ARTICLE IV
**CONFIRMATION AND VOTING PROCEDURES**

4.1    **Confirmation Procedure.** On _____, 2019, the Bankruptcy Court entered the Interim Approval and Procedures Order conditionally approving the combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled for

31

_____, 2019 at (prevailing Eastern Time) at the Bankruptcy Court, 824 North Market Street, [●]th Floor, Courtroom [●], Wilmington, Delaware 19801 to consider (a) final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

4.2     **Procedure for Objections.** Any objection to final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (a) counsel for the Debtors, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, DE 19899, Attn: Derek C. Abbott, dabbott@mnat.com and Curtis S. Miller, cmiller@mnat.com; (b) co-counsel for the Official Committee of Unsecured Creditors, (i) Cooley LLP, 55 Hudson Yards , New York, NY 10001, Attn: Richard S. Kanowitz , rkanowitz@cooley.com; and (ii) [●]; (c) counsel to the Debtors' debtor-in-possession lender, (i) Proskauer Rose LLP, One International Place, Boston, MA 02110-2600 (Attn: Charles A. Dale, Esq. (cdale@proskauer.com)); and (ii) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, DE 19801 (Attn: Matthew B. McGuire, Esq. (mcguire@lrclaw.com)); and (d) the United States Trustee for the District of Delaware, Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jane M. Leamy, Jane.M.Leamy@usdoj.gov in each case, by no later than [●], 2019, at [●] (prevailing Eastern Time).   Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

4.3     **Requirements for Confirmation.**  The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

4.4     **Classification of Claims and Interests**.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with

such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If this occurs, the Debtors intend, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including contractual subordination, if any) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect

the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 4.5    **Impaired Claims or Interests**.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are Impaired under a plan may vote to accept or reject such plan. Generally, a claim or interest is Impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an Impaired Class do not receive or retain any property under a plan on account of such claims or interests, such Impaired Class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, only holders of Claims in Classes 3, 4 and 5 are Impaired and are entitled to vote on the Plan. Under the Plan, holders of Claims or Interests in Classes 6 and 7 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and deemed to reject the Plan. Under the Plan, holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

### 4.6    **Confirmation Without Necessary Acceptances; Cramdown**

In the event that any Impaired Class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting Impaired Class of claims or interests. Here, because holders of Claims and Interests in Classes 4, 5 and 6 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Classes will receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a)    Secured Creditors. Either (i) each Impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each Impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)    Unsecured Creditors. Either (i) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)    Equity Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

### 4.7    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Debtors' assets have principally been liquidated and the Plan provides for the distribution of all of the Cash proceeds of the Debtors' assets to holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Liquidating Trustee to meet its obligations under the Plan. Based on the Debtors' analysis, the Liquidating Trustee will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 4.8    Best Interests Test and Liquidation Analysis

35

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are Impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an Impaired Class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each Impaired Class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any Impaired Class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such Impaired Class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimately distribution of the Residual Assets. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases. Ultimately, Monroe Capital Management Advisors, LLC would need to consent to the use of its cash collateral to fund such a chapter 7 process, and there is no guarantee that it would do so. Without such consent, conversion to chapter 7 would serve only to increase the amount of claims against the Debtors that would not be paid—both in terms of currently incurred and unpaid administrative and priority claims, as well as any costs incurred in administering the chapter 7 case.

Accordingly, the Debtors believe that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code. Attached hereto as **Exhibit A** is a hypothetical chapter 7 liquidation analysis.

4.9     **Acceptance of the Plan**

        The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Interim Approval and Procedures Order.

        In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT VIA EMAIL AT [TABULATION@EPIQGLOBAL.COM](mailto:TABULATION@EPIQGLOBAL.COM) WITH A REFERENCE TO "THG HOLDINGS" IN THE SUBJECT LINE; OR BY PHONE AT 866-897-6433 (DOMESTIC) OR (646) 282-2500 (INTERNATIONAL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.

ARTICLE V
**CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

5.1     **The Plan May Not Be Accepted**.

        The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the Creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

5.2     **The Plan May Not Be Confirmed**.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determined that the combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

5.3    **Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections**.

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

5.4    **Objections to Classification of Claims**.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

5.5     **Failure to Consummate the Plan**.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

5.6     **Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan**.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Class 5 General Unsecured Claims under the Plan.

5.7     **Plan Releases May Not Be Approved.**

There can be no assurance that the releases, as provided in Article X of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

5.8     **Certain Tax Considerations**.

There are a number of material income tax considerations, risks and uncertainties associated with the plan of liquidation of the Debtors described in this combined Disclosure Statement and Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VI
## **TREATMENT OF UNCLASSIFIED CLAIMS**

Pursuant to Bankruptcy Code section 1126(f), Holders of Unimpaired Claims are conclusively presumed to have accepted this Plan. The Holders of DIP Facility Claims, Administrative Claims, Tax Claims, Other Priority Claims, and Other Secured Claims are not Impaired under this Plan.

6.1    **DIP Facility Claims**. On the Effective Date, unless otherwise agreed to by the Holder of a DIP Facility Claim, each Holder will receive in full and final satisfaction of its DIP Facility Claim an amount of Cash equal to the amount of such Holder's Allowed DIP Facility Claim; provided; however, that if the DIP Facility Claim is not paid in full, in cash, on the Effective Date, then (a) from and after the Effective Date, the liens securing the DIP Obligations shall be fully secured by perfected liens and security interests on all Liquidating Trust Assets, and (b) the Allowed DIP Facility Claim shall be paid, in full, in Cash, pursuant to the Liquidating Trust Agreement. The DIP Facility Claim shall be paid, in full, from first proceeds generated by the sale, liquidation or other disposition of the Residual Assets or Litigation Assets.

6.2    **Administrative Claims.** Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim (other than Holders of Fee Claims and Claims for U.S. Trustee Fees) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the Allowed amount of such Administrative Claim either: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim; (d) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder, the Debtors, the Required DIP Lenders, and the Creditors' Committee or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (e) at such time and upon such terms as set forth in an order of the Court.

Holders of Administrative Claims accruing from [  ] through the Effective Date, other than Holders of Fee Claims and Claims for U.S. Trustee Fees, must file with the Claims Agent and serve on the Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to be actually received on or before the Final Administrative Claim Bar Date. Any Person or Entity required to timely file such Claim, but fails to do so shall not be treated as a creditor with respect to such Claim for the purpose of voting and distribution in these Chapter 11 Cases on account of such Claim. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Final Administrative Claim Bar Date and shall constitute notice of such Bar Date.

With respect to U.S. Trustee Fees, all U.S. Trustee Fees payable on or before the Effective Date shall be paid by the Debtors on or before the Effective Date. From and after the Effective Date, the Liquidating Trustee shall pay the fees assessed against the Debtors' Estates until such time as a particular Debtor's Chapter 11 Case is closed, dismissed or converted. Notwithstanding anything to the contrary in this Plan, the U.S. Trustee shall not be required to file a proof of claim for administrative expenses.

6.3     **Fee Claims**. All requests for payment of Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed and served in accordance with the Interim Compensation Procedures Order by the date that is thirty (30) days after the Effective Date. The Court shall determine the Allowed amounts of such Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.

The Liquidating Trustee shall pay Fee Claims in Cash in the amount allowed by the Court. Allowed Fee Claims shall be paid from the Fee Claims Reserve, which the Liquidating Trustee will establish on the Effective Date in accordance with Section 9.2 of this Plan. Any funds remaining in the Fee Claims Reserve after payment of all Allowed Fee Claims shall be paid in Ratable Shares to the Holders of Allowed Class 3 Claims. Notwithstanding the foregoing, the Holder of an Allowed Fee Claim may receive such other, less favorable treatment as may be agreed upon by such Holder and the Debtors.

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Liquidating Trustee, subject to approval of the Liquidating Trust Oversight Board, may employ and pay any Professional, in accordance with the Liquidating Trust Agreement, in the ordinary course of business without any further notice to or action, order, or approval of the Court.

6.4     **Tax Claims**. Unless otherwise agreed to by the Holder of an Allowed Tax Claim, each Holder of an Allowed Tax Claim will receive in full and final satisfaction of such Allowed Tax Claim an amount of Cash equal to the unpaid portion of such Allowed Tax Claim either: (a) if a Tax Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter; (b) if such Tax Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Tax Claim becomes a Final Order; (c) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder, the Debtors, the Required DIP Lenders, and the Creditors' Committee or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (d) at such time and upon such terms as set forth in an order of the Court; provided, however, that all Allowed Tax Claims that are not due and payable on or before the Effective Date shall be paid by the Liquidating Trustee in the ordinary course of business as they become due. Any Claim or demand for any penalty (a) will be subject to treatment as a General Unsecured Claim, if and to the extent it is an Allowed Claim, and (b) the Holder of an Allowed Tax Claim shall not assess or attempt to collect such amounts from the Debtors, the Estates, the Liquidating Trustee, or the Liquidating Trust except as a General Unsecured Claim, if and to the extent it is an Allowed Claim.

ARTICLE VII
**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

The Claims in Classes 1 and 2 are Unimpaired, conclusively deemed to accept the Plan and are not entitled to vote on the Plan. The Claims in Classes 3, 4 and 5 are Impaired and entitled to vote to accept or reject this Plan. Holders of Claims in Classes 6 and Interests in Class 7 are conclusively deemed to reject the Plan and, therefore, are not entitled to vote on the Plan.

7.1     **Class 1: Other Priority Claims**. Unless otherwise agreed to by the Holder of an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim will receive in full and final satisfaction of such Allowed Other Priority Claim an amount of Cash equal to the unpaid portion of such Allowed Other Priority Claim either: (a) if an Other Priority Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter; (b) if such Other Priority Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Other Priority Claim becomes a Final Order; (c) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder, the Debtors, the Required DIP Lenders, and the Creditors' Committee or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (d) at such time and upon such terms as set forth in an order of the Court.

7.2     **Class 2: Other Secured Claims.** Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole discretion of the Required DIP Lenders or Liquidating Trustee, as applicable: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such Holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

7.3     **Class 3: Prepetition Senior Obligation Claim**. On the Effective Date, the Prepetition Senior Obligation Claim shall become an Allowed Class 3 Claim in the aggregate amount of $123,652,139. Except to the extent that the Holder of an Allowed Claim in Class 3 agrees to less favorable treatment, each holder of an Allowed Claim in Class 3 shall receive, on the Effective Date, its Ratable Share of the following: (a) all of the Debtors' Cash on hand after the payment in full of the DIP Facility Claim and after establishing the Reserves provided for in Section 9.2; and (b) Series A Liquidation Trust Interests, subject to payment in full of the DIP Facility Claim. Series A Liquidating Trust Interests shall entitle the Holder to its Ratable Share of (i) 100% of Net Proceeds generated from Residual Assets and (ii) 90% of Net Proceeds generated by Litigation Assets, subject to the Series A/B Sharing Arrangement.

7.4     **Class 4: Second Lien Claim.** Except to the extent that the Holder of an Allowed Claim in Class 4 agrees to less favorable treatment, each holder of an Allowed Claim in Class 4 shall receive, on the Effective Date, in full and final satisfaction of its Second Lien Claim its Ratable Share of Series B Liquidation Trust Interests. Series B Liquidating Trust Interests shall entitle the Holder, together with the Holders of Series A Liquidating Trust Interests, to

receive Net Proceeds of Litigation Assets subject to and in accordance with the Series A/B Sharing Arrangement.

       7.5    **Class 5: General Unsecured Claims**. Except to the extent that the Holder of an Allowed Claim in Class 5 agrees to less favorable treatment, each holder of an Allowed Claim in Class 5 shall receive, on the Effective Date, in full and final satisfaction of its General Unsecured Claim its Ratable Share of Series C Liquidation Trust Interests, subject to payment in full of the DIP Facility Claim.  Series C Liquidating Trust Interests shall entitle the Holder to its Ratable Share of 10% of the Net Proceeds generated from Litigation Assets. Holders of Series C Liquidating Trust Interests shall not be entitled to Net Proceeds generated from Residual Assets.

       In addition, Holders of Class 5 Claims that elect to become an Assigning Creditor will be entitled to a twenty-five percent (25%) increase to the Allowed Amount of such Claim. Such twenty-five percent (25%) increase will be added only upon Allowance of the Assigning Creditor's Claim.

       7.6    **Class 6: Subordinated Claims.** Holders of Subordinated Claims shall receive no Distribution on account of their Subordinated Claims pursuant to the Plan.

       7.7    **Class 7: Equity Interests**. On the Effective Date, all Equity Interests shall be canceled and each Holder of an Equity Interest in any Debtor shall receive no Distributions pursuant to the Plan.

       7.8    **Reservation of Rights Regarding Claims and Interests**. Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

ARTICLE VIII<br>**<u>ACCEPTANCE OR REJECTION OF THE PLAN</u>**

       8.1    **Class Entitled to Vote**. Because Claims in Classes 3, 4 and 5 are Impaired and Holders thereof will receive or retain property or an interest in property under the Plan, only the Holders of Class 3, 4 or 5 Claims shall be entitled to vote to accept or reject the Plan.

       8.2    **Acceptance by Impaired Classes of Claims or Interests**. In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan. In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if such Plan is accepted by Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Plan.

8.3 **Presumed Acceptance by Unimpaired Classes**. Because Claims in Classes 1 and 2 are Unimpaired pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are deemed to have accepted the Plan and, therefore, Holders of such Claims are not entitled to vote to accept or reject the Plan.

8.4 **Presumed Rejections by Impaired Classes**. Because Holders of Subordinated Claims in Class 6 and Holders of Interests in Class 7 are not entitled to receive or retain any property under the Plan, pursuant to section 1126(g) of the Bankruptcy Code, Holders of Subordinated Claims in Class 6 and Holders of Interests in Class 7 are presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

8.5 **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

8.6 **Controversy Concerning Impairment**. If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall determine such controversy on or before the Confirmation Date.

8.7 **Elimination of Vacant Classes**. Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance.

ARTICLE IX
**MEANS OF IMPLEMENTING THE PLAN**

In addition to the provisions set forth elsewhere in this Plan, the following shall constitute the means of execution and implementation of this Plan.

9.1 **Corporate Action**.

(a) **Vesting of Liquidating Trust Assets**. Upon the occurrence of the Effective Date, (a) the members of each Debtor's board of directors or managers, as the case may be, shall be deemed to have resigned; and (b) the Liquidating Trust Assets shall be transferred to the Liquidating Trust in accordance with this Plan. The Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, claims, and interests; provided, however, that the Assets shall be subject to the DIP Liens if the DIP Facility Claim is not paid in full on the Effective Date.

Upon transfer of the Liquidating Trust Assets, the Debtors shall have no further duties or responsibilities in connection with the implementation of this Plan.

(b)     **Dissolution of the Debtors.** At any time after the Effective Date, the Liquidating Trustee shall be authorized, subject to approval by the Liquidating Trust Oversight Board, to dissolve the Debtors upon filing a notice of such dissolution with the Court, notwithstanding any requirements of applicable state law, without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith.

As soon as practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall provide for the retention and storage of the books, records, and files that shall have been delivered to the Liquidating Trust until such time as all such books, records, and files are no longer required to be retained under applicable law, and file a certificate informing the Court of the location at which such books, records, and files are being stored.

(c)     **Legal Representation of the Debtors and the Creditors' Committee After the Effective Date.** Upon the Effective Date, the attorney-client relationship between the Debtors and their current and former counsel, including Perkins Coie, LLP and Greenberg Traurig LLP, and between the Creditors' Committee and its current counsel, Cooley LLP and Elliott Greenleaf, P.C., shall be transferred to the Liquidating Trustee, who shall succeed to the rights and claims of, and hold the attorney-client privilege for the Debtors and the Creditors' Committee, including, without limitation, any common interest privilege. For the avoidance of doubt, nothing in the Plan shall affect the rights of any non-Debtor third parties to assert their own attorney-client and other applicable privileges.

(d)     **Cancellation of Existing Securities and Agreements.** Except as otherwise provided in this Plan, and in any contract, instrument or other agreement or document created in connection with this Plan, on the Effective Date, the Interests and any other promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, and commitments, including, without limitation, any agreements purporting to relate to deferred compensation that relate to Interests or options, shall be deemed cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be released; provided, however, that the cancellation, release, and discharge of the foregoing shall not affect whether a timely Claim made on account of such obligation may become an Allowed Claim; provided, further, however, that certain instruments, documents, and credit agreement related to Claims shall continue in effect solely for the purpose of allowing the Liquidating Trustee to make Distributions in accordance with this Plan. The Holders of or parties to such cancelled notes, share certificates, and other agreements and instruments shall have no rights against the Debtors, the Estates, and the Liquidating Trust, or the Liquidating Trustee arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to this Plan.

45

9.2     **Reserves**.

(a)     **Administrative and Priority Claims Reserve.** On the Effective Date, the Liquidating Trustee shall fund the Administrative and Priority Claims Reserve in the amount of the aggregate Administrative Claims Estimate or such other Amount as the Court may direct as a condition of confirmation. The Liquidating Trustee shall, subject to the terms and conditions of the Liquidating Trust Agreement and this Plan, pay each Allowed Administrative Claim, each Allowed Tax Claim and Allowed Other Priority Claim as provided for in Article IV of this Plan. In the event that excess Cash remains in the Administrative and Priority Claims Reserve after payment of all Allowed Claims to be paid therefrom, or at such time as the Cash in the Administrative and Priority Claims Reserve exceeds the Face Amount of the unpaid Administrative Claims as periodically determined by the Liquidating Trustee, such Cash shall be paid in Ratable Shares to the Holders of Allowed Class 3 Claims.

(b)     **Liquidating Trust Operating Reserve.** On the Effective Date, the Liquidating Trustee shall fund the Liquidating Trust Operating Reserve in the initial sum of $2,000,000.00 in Cash (i) to maintain the value of the Liquidating Trust Assets during liquidation; (ii) to pay reasonable and necessary administrative expenses of the Liquidating Trust, including, but not limited to, (a) the reasonable costs and expenses incurred or anticipated to be incurred by the Liquidating Trustee (including reasonable fees, costs and expenses incurred or anticipated to be incurred by professionals retained by the Liquidating Trustee), (b) the reasonable costs and expenses incurred or anticipated to be incurred by the Liquidating Trust Oversight Board and its members (including reasonable fees, costs and expenses incurred or anticipated to be incurred by professionals retained by the Liquidating Trust Oversight Board but excluding the fees, costs and expenses of professionals retained by Liquidating Trust Oversight Board members individually), (c) any taxes imposed on the Liquidating Trust in respect of the Liquidating Trust Assets, (d) the reasonable fees and expenses incurred or anticipated to be incurred in connection with, arising out of or related to the Liquidating Trust Assets and litigation associated therewith), and (e) other costs and expenses contemplated by the Liquidating Trust Agreement. Absent approval of the Liquidating Trust Oversight Board, the Liquidating Trust Operating Reserve shall not be used to fund the costs and expenses incurred by the Liquidating Trustee (including fees and expenses of Liquidating Trustee Professionals) with respect to claims resolution for Claims in Classes 3, 4 and 5.

Following the Effective Date, The Liquidating Trust Operating Reserve shall be increased by an additional $1,000,000.00 from the first proceeds realized by the sale, liquidation, prosecution, resolution, or other disposition of either the Residual Assets or the Litigation Assets, subject to the payment in full of DIP Facility Claims from first proceeds generated by such disposition of the Residual Assets or Litigation Assets. Thereafter, the Liquidating Trust Oversight Board shall determine the appropriate amount of the Liquidating Trust Operating Reserve, provided, however, that if the Liquidating Trust Operating Reserve has already

46

been increased to $3.0 million from proceeds realized from Residual Assets or the Litigation Assets, then no distribution shall be made to the Liquidation Trust for purposes of increasing the Liquidation Trust Operating Reserve.  Notwithstanding anything to the contrary herein, at any time following the Effective Date, the Liquidating Trustee, after consultation with the Liquidating Trust Oversight Board, may fund or replenish the Liquidating Trust Operating Reserve in accordance with section 9.4(d)(v) of this Plan and on terms approved by the Liquidating Trust Oversight Board.

(c)     **Fee Claims Reserve.** On the Effective Date, the Liquidating Trustee shall fund the Fee Claims Reserve using funds from the Liquidating Trust Assets in the amount of the aggregate Fee Claims Estimate or such other Amount as the Court may direct as a condition to confirmation.  The Liquidating Trustee shall, subject to the terms and conditions of the Plan and Confirmation Order, pay each Fee Claim as soon as practicable after a Fee Claim is Allowed under the Interim Compensation Procedures Order and any remaining amounts once such amounts are Allowed in accordance with this Plan. Notwithstanding the foregoing, all Professionals shall apply (i) any retainers and (ii) all funds escrowed by the Debtors for payment of Professionals before any funds are disbursed from the Fee Claims Reserve. In the event that excess Cash remains in the Fee Claims Reserve after payment of all Allowed Fee Claims, such Cash shall be distributed to Holders of Allowed Class 3 Claims.

(d)     **Disputed General Unsecured Claims Reserve.** Prior to the first Distribution Date, the Liquidating Trustee shall withhold from property that would otherwise be distributed on account of Class 5 General Unsecured Claims entitled to Distributions under this Plan, in the Disputed Unsecured Claims Reserve, such property as may be necessary to equal one hundred percent (100%) of Distributions to which Holders of Disputed General Unsecured Claims would be entitled under this Plan if such Disputed Unsecured Claims were Allowed in their Disputed Claim Amount.  The Liquidating Trustee may request from the Court, if necessary, estimation for any Disputed Claim that is contingent or unliquidated, or for which the Liquidating Trustee determines to reserve less than the Face Amount. The Liquidating Trustee shall withhold the applicable portion of the Disputed General Unsecured Claims Reserve with respect to such Claims based upon the estimated amount of each such Claim is either estimated or by the Court.

The Liquidating Trustee shall, subject to the terms and conditions of the Liquidating Trust Agreement and this Plan, make Distributions from the Disputed General Unsecured Claims Reserve on account of any Disputed General Unsecured Claim that has become an Allowed General Unsecured Claim since the preceding Distribution Date pursuant to the provisions of this Plan governing Distributions to Class 5 General Unsecured Claims.

After a Final Order has been entered, or other final resolution has been reached with respect to all Disputed General Unsecured Claims, any remaining property held in

the Disputed General Unsecured Claims Reserve, shall be distributed pro rata to the Holders Allowed Class 5 Claims.

(e)    **Investment of Reserves.** If practicable, the Liquidating Trustee will invest any Cash that is withheld in any of the Reserves created under this Plan in accordance with the investment and deposit guidelines set forth in the Liquidating Trust Agreement; provided, however, that, except to the extent expressly set forth in this Plan, nothing in this Plan, the Disclosure Statement, or the Liquidating Trust Agreement shall be deemed to entitle the Holder of a Claim to interest on such Claim.

(f)    **Reserve Satisfies Security or Bond Requirements.** In the event of an appeal of an order of the Court with respect to a Claim, the Debtors or the Liquidating Trust, as the case may be, shall be deemed to have satisfied any bond or other security requirement in connection with such appeal by reserving for the Face Amount of the Claim in the appropriate Reserve.

9.3    **Liquidating Trust**.

(a)    **Establishment of the Liquidating Trust**.  The Liquidating Trust shall be established and shall become effective on the Effective Date.

(b)    **Liquidating Trust Assets**. All Distributions to the Holders of Allowed Claims shall be from the Liquidating Trust.  The Liquidating Trust shall among other things (i) hold and administer the Reserves (and make Distributions therefrom) and (ii) administer the Liquidating Trust Assets.

(c)    **Trust Distributions**. Following the funding of the Reserves in accordance with this Plan, the Liquidating Trustee shall liquidate the Liquidating Trust Assets and distribute the Net Proceeds of such liquidation in accordance with the Plan and the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee shall make Distributions of Net Proceeds at least annually in accordance with the Plan.

(d)    **Duration of the Trust**. The Liquidating Trust shall have an initial term of five (5) years; provided, however that, if warranted by the facts and circumstances, and if the Liquidating Trust Oversight Board determines that an extension of the term of the Liquidating Trust is necessary to accomplish the purposes of the Liquidating Trust, then the Liquidating Trustee shall be authorized to extend the Liquidating Trust for up to three (3) additional terms of two (2) years each (for a total of six (6) additional years), provided further, that each such extension of the term shall be subject to the provision of a tax opinion from a nationally recognized law firm to the effect that such extension shall not result in material adverse tax consequences to any of the Liquidating Trust Beneficiaries and that such extension shall not subject the Liquidating Trust to materially different tax treatment than it otherwise would have been subject to.  The Liquidating Trust may be terminated earlier than its scheduled termination if the Liquidating Trustee has

administered all of the Liquidating Trust Assets and performed all other duties required by this Plan and the Liquidating Trust Agreement. As soon as practicable after the final Distribution Date, the Liquidating Trustee shall seek entry of a Final Order closing the Case pursuant to Bankruptcy Code section 350(a).

(e) **Liquidation the Litigation Assets; Initial Investigation**. Subject to the limitations set forth in the Liquidating Trust Agreement, on and after the Effective Date, the Liquidating Trustee shall have sole authority and responsibility for investigating, analyzing, commencing, prosecuting, litigating, compromising, collecting, and otherwise administering all Litigation Assets. Attached hereto as **<u>Exhibit B</u>** are actual or potential Causes of Action currently known to the Debtors.

On the Effective Date, or as soon as practicable thereafter, the Liquidating Trustee shall engage Cooley LLP and such other Professionals formerly employed by the Creditors' Committee as may be necessary or appropriate for the purpose of investigating the nature, scope and merit of all Causes of Action and Creditor Causes of Action comprising the Litigation Assets. At the conclusion of its investigation, Cooley LLP shall meet with and present its findings and recommendations to the Liquidating Trustee and Liquidating Trust Oversight Board. Cooley shall cap its fees for the performance of this investigation at $300,000. After the conclusion of its investigation, Cooley LLP and other Professionals formerly employed by the Creditors' Committee will be engaged by the Liquidating Trustee to perform such additional services as the firm, as the Liquidating Trustee and the Liquidating Trust Oversight Board may agree.

9.4 **Liquidating Trustee**.

(a) **Appointment**. The initial Liquidating Trustee shall be appointed by the Required DIP Lenders and shall be reasonably acceptable to the Creditors' Committee. The appointment of the Liquidating Trustee shall be effective as of the Effective Date. Successor Liquidating Trustee(s) shall be appointed by the Liquidating Trust Oversight Board as set forth in the Liquidating Trust Agreement.

(b) **Term**. The Liquidating Trustee's term, including without limitation the term of any Successor Liquidating Trustee(s), shall expire upon termination of the Liquidating Trust pursuant to this Plan and/or the Liquidating Trust Agreement.

(c) **Removal.** The Oversight Board shall supervise, direct and have the power to remove and replace the Liquidating Trustee.

(d) **Powers and Duties**. The Liquidating Trustee shall be the exclusive representative of the Debtors' Estates and shall have the rights and powers set forth in the Liquidating Trust Agreement including, but not limited to, the rights and powers of a trustee under the Bankruptcy Code. The Liquidating

49

Trustee shall be governed in all things by the terms of the Liquidating Trust Agreement and this Plan.  The Liquidating Trustee shall administer the Liquidating Trust, and the Liquidating Trust Assets, and make Distributions from the Net Proceeds of the Liquidating Trust in accordance with this Plan and the Liquidating Trust Agreement.  In addition, the Liquidating Trustee shall, in accordance with the terms of this Plan, take all actions necessary to wind down the affairs of the Debtors consistent with this Plan and applicable non-bankruptcy law.  Subject to the terms of the Liquidating Trust Agreement, which includes, among other things, limitations on the Liquidating Trustee's discretion to take certain action without consultation or approval of the Liquidating Trust Oversight Board, the Liquidating Trustee shall be authorized, empowered and directed to take all actions necessary to comply with this Plan and exercise and fulfill the duties and obligations arising hereunder, including, without limitation, to:

> (i)     To exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by the Debtors with like effect as, if authorized, exercised and taken by unanimous action of the Debtors partners, members, officers, directors and shareholders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor, the dissolution of any Debtor and the assertion or waiver of any Debtors' attorney/client privilege;

> (ii)    To open and maintain bank and other deposit accounts, escrows and other accounts, calculate and implement Distributions to Holders of Allowed Claims as provided for or contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate Reserves in accordance with this Plan and the Liquidating Trust Agreement, in the name of the Debtors or the Liquidating Trustee, even in the event of the dissolution of the Debtors;

> (iii)   To make a good faith valuation of the Liquidating Trust Assets, as soon as possible after the Effective Date;

> (iv)    Subject to the applicable provisions of the Plan, to collect and liquidate all Residual Assets pursuant to the Plan, to make Distributions of Net Proceeds generated by the sale or disposition of Residual Assets and to administer the winding-up of the affairs of the Debtors;

> (v)     To borrow funds and replenish the Reserves, subject to approval of the Liquidating Trust Oversight Board, and take all actions necessary to preserve and maximize the value of the Liquidating Trust Assets;

(vi)   To object to any Claims (Disputed or otherwise), and to defend, compromise and/or settle Claims prior to or following objection without the necessity of approval of the Court;

(vii)   To make decisions after consultation with and approval by the Liquidating Trust Oversight Board, without further Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidating Trust and to pay, from the Liquidating Trust Operating Reserve, (i) the charges incurred by the Liquidating Trust on or after the Effective Date for services of professionals after approval of the Liquidating Trust Oversight Board, without application to the Court, and (ii) disbursements, expenses or related support services relating to the winding down of the Debtors and implementation of the Plan, without application to the Court;

(viii)   To cause, on behalf of the Liquidating Trust, the Debtors, and their Estates all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely, in accordance with the Plan;

(ix)   To invest Cash in accordance with section 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Court and as deemed appropriate by the Liquidating Trustee in accordance with the investment and deposit guidelines set forth in the Liquidating Trust Agreement;

(x)   To enter into any agreement or execute any document required by or consistent with the Plan and perform all of the obligations of the Debtors or the Liquidating Trustee hereunder;

(xi)   To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization approved by the Liquidating Trust Oversight Board, any assets that the Liquidating Trustee determines, at the conclusion of the Case, are of no benefit to creditors of the Debtors or too impractical to distribute, provided, however, that Court approval, upon notice and a hearing, shall be required for any abandonment or donation of assets with a value of ten thousand dollars ($10,000) or more;

(xii)   Subject to approval of the Liquidating Trust Oversight Board, to investigate (including pursuant to Bankruptcy Rule 2004), prosecute and/or settle any Litigation Assets not expressly released or waived under the Plan, participate in or initiate any proceeding before the Court or any other court of appropriate jurisdiction, participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, litigate or settle such Litigation Assets on behalf of the Liquidating Trust and pursue to settlement or judgment such actions;

51

(xiii)   To approve, without Court approval, and subject to approval of the Liquidating Trust Oversight Board, the settlement of one or more Litigation Assets for which the amount claimed by the Liquidating Trust against a defendant is equal to or less than two million five hundred thousand dollars ($2,500,000) and to seek Court approval, upon notice and a hearing, of the settlement of any Litigation Asset for which the amount claimed by the Liquidating Trust is unliquidated or exceeds two million five hundred thousand dollars ($2,500,000), unless, upon notice and a hearing, the Court enters a subsequent order that becomes a Final Order increasing such amount;

(xiv)   To use Liquidating Trust Assets to purchase or create and carry all appropriate insurance policies, bonds or other means of assurance and protection of the Liquidating Trust Assets and pay all insurance premiums and other costs he or she deems necessary or advisable to insure the acts and omissions of the Liquidating Trustee, and if appropriate, the Liquidating Trust Oversight Board;

(xv)    To implement and/or enforce all provisions of this Plan;

(xvi)   To maintain appropriate books and records (including financial books and records) to govern the liquidation and distribution of the Liquidating Trust Assets, provided, however, that any abandonment or destruction of books and records shall require Court approval, upon notice and a hearing;

(xvii)  To pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Court and serve on the United States Trustee quarterly post-confirmation financial reports for each of the Debtors until such time as such reports are no longer required, or the Court orders otherwise, a final decree is entered closing this Case or the Case is converted or dismissed;

(xviii) Subject to approval of the Liquidating Trust Oversight Board, to dissolve the Liquidating Trust if the Liquidating Trustee determines, in reliance on such professionals as it may retain, that the expense of administering the Liquidating Trust so as to make a final distribution to Trust Beneficiaries is likely to exceed the value of the remaining Liquidating Trust Assets;

(xix)   To seek one or more final decrees closing the Debtors' Cases;

(xx)    To do all other acts or things consistent with the provisions of this Plan that the Liquidating Trustee deems reasonably necessary or desirable with respect to implementing this Plan;

(xxi)   To be the Estate representative and successor of the Debtors and the Creditors' Committee for all purposes, and to be the successor of the Assigning Creditors with respect to the Creditor Causes of Action; and

(xxii)   To continue, subject to directions from the Oversight Board, the Medicare Administrative Appeal.

(e)   **Oversight Board Authority**. Matters requiring a vote of the Oversight Board shall be decided by a simple majority of its members (i.e., 2 out of 3).

(f)   **Limitation of Liability; Exculpation of Liquidating Trustee and Liquidating Trust Oversight Board**. To the greatest extent permitted by law, the Liquidating Trust will provide for the exculpation and indemnity of the Liquidating Trustee and each member of the Liquidating Trust Oversight Board.

9.5   **Fees and Expenses**. Except as otherwise provided in this Plan, compensation of the Liquidating Trustee and the actual costs and expenses of the Liquidating Trustee and the Liquidating Trust (including, without limitation, the actual fees and expenses of the Liquidating Trustee Professionals) shall be paid from the Liquidating Trust Operating Reserve.   The Liquidating Trustee shall pay the actual reasonable fees and expenses of the Liquidating Trustee Professionals, as necessary to discharge the Liquidating Trustee's duties under this Plan and the Liquidating Trust Agreement.   Payments to the Liquidating Trustee shall not require notice to any party, or an order of the Court approving such payments; <u>provided</u>, <u>however</u>, that prior to making any payments to the Liquidating Trustee or any Liquidating Trustee professionals for fees and expenses incurred after the Effective Date, the Liquidating Trustee shall obtain approval from the Liquidating Trust Oversight Board.

9.6   **Liquidating Trustee as Estate Representative and Successor**. Pursuant to Bankruptcy Code section 1123(a)(5)(B), section 1123(b)(3), and section 1123(b)(6), the Liquidating Trustee shall be the representative of the Debtors' Estates and successor to the Debtors for all purposes.   The Liquidating Trustee shall have all rights and powers of a trustee under the Bankruptcy Code.   The Liquidating Trustee also shall be the successor to the Creditors' Committee for all purposes.   In addition, the Liquidating Trustee shall be the assignee and successor to the Assigning Creditors with respect to the Creditor Causes of Action.

9.7   **Investment Powers**. The powers of the Liquidating Trustee to invest any Cash that is held by the Liquidating Trust in any of the Reserves created by this Plan, other than those powers reasonably necessary to maintain the value of the Liquidating Trust Assets and to further the Liquidating Trust's liquidating purposes, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in federally insured banks, or other government-backed liquid investments, such treasury bills.   The Liquidating Trustee is prohibited from continuing or engaging in the conduct of a trade or business, except to the extent necessary to liquidate or otherwise dispose of the Liquidating Trust Assets include existing membership interests and as reasonably necessary to and consistent with the liquidating purpose of the Liquidating Trust.

9.8     **Distributions**. Except as otherwise provided in this Plan, the Liquidating Trustee shall make Distributions of Cash or other property to the Liquidating Trust Beneficiaries qualifying to receive Distributions from the Liquidating Trust in accordance with the Liquidating Trust Agreement, which Distributions shall be made at least annually; provided, however, that the Liquidating Trustee may postpone any Distribution if the Liquidating Trustee determines, with the consent of the Liquidating Oversight Board, that the amount of such Distribution would be too small to justify the administrative costs associated with making it. The Liquidating Trustee shall make continuing efforts to dispose of the Liquidating Trust Assets, make timely Distributions, and not unduly prolong the duration of the Liquidating Trust.

9.9     **Vesting of Assets**. On the Effective Date, all Liquidating Trust Assets, including any minutes and general corporate records of the Debtors, any minutes and books and records of the Creditors' Committee, and any books and records relating to the foregoing not otherwise treated by this Plan, (a) shall vest in the Liquidating Trust free and clear of all Liens, Claims, encumbrances, and other interests; provided, however, that the Liquidating Trust Assets shall be subject to the DIP Liens if the DIP Facility Claim is not paid in full on the Effective Date; and (b) shall thereafter be administered, liquidated by sale, collection, recovery, or other disposition and distributed by the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement and this Plan.

9.10     **Tax Treatment of Holders of Liquidating Trust Interests**. The Debtors and the Liquidating Trustee shall treat the Liquidating Trust Beneficiaries as grantors of the Liquidating Trust and the Liquidating Trustee will file tax returns for the Liquidating Trust as a "grantor trust" pursuant to section 1.671-4(a) of the U.S. Treasury Regulations. Items of income, gain, loss, expense, and other tax items will be allocated to those Liquidating Trust Beneficiaries that would be entitled to receive such items if they constituted cash distributions or reductions therefrom, and such Liquidating Trust Beneficiaries shall be responsible for the payment of taxes on a current basis that result from such allocations.

For all U.S. federal income tax purposes, all parties generally will be required to treat the transfer of Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of the Liquidating Trust Assets (other than the Creditor Causes of Action) to the beneficiaries of the Liquidating Trust followed by (ii) a deemed transfer of the Liquidating Trust Assets (other than the Creditor Causes of Action), and an actual transfer of the Creditor Causes of Action, by such beneficiaries to the Liquidating Trust, with the beneficiaries being treated as the grantors and owners of the Liquidating Trust. Each Holder that is a beneficiary of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the fair market value of the Liquidating Trust Assets deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim. A Holder that is deemed to receive for U.S. federal income tax purposes the Liquidating Trust  Assets under the Plan in respect of its Claim should generally have a tax basis in such Assets in an amount equal to the fair market value of such Liquidating Trust Assets on the date of receipt.  For the avoidance of doubt Holders of Claims in Classes 2, 4 and 5 will only be deemed to have received Litigation Assets, not Residual Assets.

9.11    **Nature of Liquidating Trust Interests**. The Liquidating Trust Interests issued pursuant to the Plan shall be in the nature of equity interests, and not in the nature of notes, bonds, debentures or evidence of indebtedness. As such, all of the Liquidating Trust Interests shall be junior in right of payment to all liabilities and obligations of the Liquidating Trust and payments with respect to Liquidating Trust Interests shall be contingent upon recoveries of Net Proceeds from the liquidation of the Liquidating Trust Assets.

The Liquidating Trust Beneficiaries shall have beneficial interests in the Liquidating Trust Assets as provided herein. The Liquidating Trust Beneficiaries' proportionate interests in the Liquidating Trust Assets as thus determined shall not be transferable, except upon the death of the Liquidating Trust Beneficiary or by operation of law. The ownership of Liquidating Trust Interest shall not entitle a holder of any Liquidating Trust Interest to any title in or to the Liquidating Trust Assets (title to which shall be vested solely in the Liquidating Trustee) or to any right to call for a partition or division of the Liquidating Trust Assets or to require an accounting

9.12    **Treatment of Reserves**. The Liquidating Trustee may file a tax election to treat any of the Reserves established for Disputed Claims (such as the Disputed Unsecured Claims Reserve) as a Disputed Ownership Fund ("DOF") within the meaning of section 1.468B-9 of the U.S. Treasury Regulations rather than tax such Reserve as a part of the grantor Liquidating Trust. If the election is made, the Liquidating Trust shall comply with all U.S. federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate U.S. federal income tax return for the DOF and the payment of U.S. federal and/or state income tax due.

9.13    **No Revesting of Assets.** Liquidation Trust Assets shall not be vested in the Debtors on or following the Effective Date, but shall be vested in the Liquidating Trust, and continue to be subject to the jurisdiction of the Court following confirmation of this Plan until such property is distributed to Holders of Allowed Claims or abandoned in accordance with the provisions of this Plan, the Liquidating Trust Agreement and the Confirmation Order.

9.14    **Creditors' Committee**. On the Effective Date, the Creditors' Committee will be deemed dissolved and cease to exist. The dissolution of the Creditors' Committee under this Section shall not prevent any Professional from filing a Fee Claim for service provided to the Creditors' Committee.

9.15    **Release of Liens**. Except as otherwise provided in this Plan, the Confirmation Order, or in any document, instrument, or other agreement created in connection with this Plan, on the Effective Date, all mortgages, deeds of trust, Liens, or other security interests against the property of the Estates shall be released; provided, however, that if the DIP Facility Claim is not paid in full, in cash, on the Effective Date, from and after the Effective Date, the Liens securing the DIP Obligations and other obligations of the Debtors under the DIP Facility shall continue to be fully perfected by Liens and security interests on all Liquidation Trust Assets. The Liquidating Trustee shall have the authority to file lien releases in connection with the foregoing.

9.16 **Exemption from Certain Transfer Taxes**. Pursuant to Bankruptcy Code section 1146(a), any transfers from any of the Debtors to the Liquidating Trust or by the Debtors to any other Entity pursuant to this Plan shall not be subject to any stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any applicable instruments or documents without the payment of any such tax or governmental assessment.

9.17 **Preservation of Litigation Assets**. Unless a Litigation Asset against any Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order, the DIP Order and the Sale Order), the Debtors and their Estates, the DIP Agent, and the Creditors' Committee, expressly reserve such Litigation Assets to be vested in or in the case of Creditor Causes of Action, assigned to the Liquidating Trust pursuant to the Plan, for possible prosecution by the Liquidating Trustee, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Litigation Assets upon or after the entry of the Confirmation Order or Effective Date based on the Plan or the Confirmation Order, except where such Litigation Assets have been released in the Plan or any Final Order (including the Confirmation Order and the Sale Orders). In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust may enforce all rights to commence and pursue, as appropriate, any and all such Litigation Assets, whether arising prior to or after the Petition Date, and the Liquidating Trust's rights to commence, prosecute, or settle any such Litigation Assets shall be preserved notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date.

The failure of the Debtors to list a claim, right, cause of action, suit or proceeding shall not constitute a waiver or release by the Debtors or their Estates of such claim, right of action, suit or proceeding. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Litigation Asset against them as any indication that the Liquidating Trustee will not pursue any and all available Litigation Asset against them.**

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Litigation Assets that a Debtor may hold against any Entity shall vest in the Liquidating Trust and the Liquidating Trustee on behalf of the Liquidating Trust. In addition, the Liquidation Trust reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

Notwithstanding the foregoing or anything else in this Plan or the Confirmation Order, nothing herein or in the Confirmation Order shall affect the rights, claims, or defenses of any Person concerning whether any Creditor Causes of Action are assignable by an Assigning Creditor.

9.18 **Setoffs**. Except for Claims in Class 3 which are expressly allowed hereunder, on or after the Effective Date, the Liquidating Trustee, may, pursuant to applicable law (including Bankruptcy Code section 553), offset against any Claim, including an

Administrative Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that the Debtors or the Liquidating Trustee may hold against the Holder of such Claim.

9.19   **Withdrawal of Plan**. The Debtors reserve the right, subject to the prior written consent of the Required DIP Lenders and the Creditors' Committee, to revoke and withdraw or modify this Plan at any time prior to the Confirmation Date or, if the Debtors are for any reason unable to consummate this Plan after the Confirmation Date, at any time up to the Effective Date.  If the Debtors revoke or withdraw this Plan, (a) nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Entity in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, this Plan was not filed and the Effective Date did not occur.

9.20   **D&O Claims**.

(a)   Nothing in this Plan shall prejudice (i) the rights of the Liquidating Trust or the Liquidating Trustee to seek subordination of any D&O Claim on or prior to the Claims Objection Deadline, either in connection with, or following, the final adjudication or other final resolution of the Litigation Asset against such D&O, whether such Litigation Asset is against such D&O in his or her capacity as such or is against such D&O in his or her individual capacity, or (ii) the right of such D&O to oppose such subordination.

(b)   Nothing in this Plan shall prejudice the rights of (i) the Liquidating Trust or the Liquidating Trustee, or any other party in interest, to object to the allowance of any D&O Claim, or (ii) any D&O to oppose such objection.

(c)   Nothing in this Plan shall preclude (i) any D&O from asserting setoff, recoupment, or any other defenses in any litigation, including concerning the Litigation Asset, against such D&O, whether such Litigation Asset is against such D&O in his or her capacity as such or is against such D&O in his or her individual capacity, or (ii) the Liquidating Trust or the Liquidating Trustee, or any other party in interest, from objecting to the exercise or effect of such right to setoff, recoupment, or other affirmative defenses on any and all grounds, including but not limited to, subordination of the D&O Claims of such D&O.

9.21   **Insurance Preservation**. Nothing in this Plan shall diminish or impair the enforceability of any insurance policies and related agreements that may cover Claims and Causes of Action against the Debtors, the D&O's or any other Entity.  Without limiting the foregoing, and notwithstanding anything else in this Plan, (i) nothing in this Plan shall limit any insured from obtaining coverage under any of the Debtors' insurance policies and related agreements, underlined provided, underlined however, that other orders of the Court, whether entered before or after the Effective Date, may limit insureds from obtaining the proceeds of such coverage for reasons other than this Plan and shall not be affected by this Plan; and (ii) nothing in this Plan (including, without limitation, any provision that purports to be preemptory or supervening or grants an injunction, discharge, or a release) shall in any way operate to impair, diminish, or waive, or

have the effect of impairing, diminishing or waiving, the legal or contractual rights, claims, defenses, liabilities or obligations of any Entity, including, without limitation, the Debtors, the Creditors' Committee, the Liquidating Trust, the Liquidating Trustee, the D&Os and any insurers, pursuant to any insurance policies and related agreements, including, without limitation, the terms, conditions, limitations, exclusions, and endorsements thereof, that may cover Claims or Causes of Action against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trustee, the D&Os, any insurers or any other Entity.

        9.22    **Assignment of Creditor Causes of Action**.

        (a)    On the Effective Date, and without further order of the Bankruptcy Court, the Creditor Causes of Action owned by Assigning Creditors shall be assigned or otherwise transferred to the Liquidating Trust for the purpose of commencing, prosecuting, settling, releasing, and/or liquidating the Creditor Causes of Action for the benefit of Liquidating Trust Beneficiaries. All such Creditor Causes of Action of Assigning Creditors shall be treated as Litigation Claims.

        (b)    Holders of Class 5 Claims that elect to become an Assigning Creditor will automatically become entitled to a twenty-five present (25%) increase of the allowed amount of such Claim. Such twenty-five percent (25%) increase will be added only upon Allowance of the Assigning Creditor's Claim.

        (c)    Notwithstanding anything to the contrary in the Plan, it shall be a condition to any effective transfer of a Creditor Cause of Action by a Holder of a General Unsecured Claim, and therefore a condition to benefiting from this Section 9.22, that such Holder execute an assignment agreement, the form of which will be included in the Ballot or Plan Supplement.

ARTICLE X
**EFFECT OF PLAN ON CLAIMS AND INTERESTS**

        10.1    **Binding Effect**. This Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Liquidating Trust and the Liquidating Trustee.

        10.2    **Compromise and Settlement**. Notwithstanding anything contained in this Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective Distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and the Interests in each Class with due regard to any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(b) and (c) of the Bankruptcy Code or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled and compromised pursuant to this Plan. The Confirmation Order will constitute the Court's finding and determination that the settlements reflected in this Plan are (1) in the best interests of the Debtors, their Estates and all Holders of Claims, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Court pursuant to Bankruptcy Rule

58

9019. Notwithstanding anything contained in this Plan or the Confirmation Order, no Litigation Asset is being settled, compromised, released, or otherwise affected by this Plan.

Provided such compromise and settlement is effected in accordance with the provisions of the Plan, the Liquidating Trust Agreement and pursuant to Bankruptcy Rule 9019(b), as applicable, without any further notice to or action, order or approval of the Court, after the Effective Date the Liquidating Trustee may compromise and settle all Claims and Causes of Action against other Entities.

10.3    **No Discharge of the Debtors**. Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors; provided, however, that no Holder of any Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, any of the Estates, the Liquidating Trust, the Liquidating Trustee and/or their respective successors, assigns and/or property, except as expressly provided in this Plan.

10.4    **Injunction**.

(a)    **The Confirmation Order shall provide, among other things, that all Entities who have held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from taking any of the following actions (other than actions to enforce any rights or obligations under this Plan): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against the Debtors, the Liquidating Trust, the Liquidating Trustee or any of their property; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Liquidating Trust, the Liquidating Trustee or any of their property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Liquidating Trust, the Liquidating Trustee or any of their property; (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the Liquidating Trust, the Liquidating Trustee or any of their property, except as contemplated or allowed by this Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan; and (vi) prosecuting or otherwise asserting any right, claim or cause of action released pursuant to this Plan, including, without limitation, any right, claim or cause of action against an Exculpated Party that has been exculpated pursuant to Section 10.5 of this Plan; provided, however, that the injunction provided in this section shall neither bar any Entity from asserting any defense in an action commenced by or on behalf of any of the Debtors or the Liquidating Trust, nor prohibit any Entity from asserting any right expressly preserved or contemplated by this**

**Plan.  The injunction provided for in this section shall be limited in all respects to the breadth of the releases and exculpations granted in this Plan.**

(b)  **By accepting distributions pursuant to this Plan, each holder of an Allowed Claim will be deemed to have specifically consented to the Injunctions set forth in this Section.**

10.5  **Exculpation**. **Notwithstanding anything contained in this Plan to the contrary, the Exculpated Parties, and any property of any of the foregoing Persons, shall not have or incur any liability to any Entity for any postpetition act taken or omitted to be taken in connection with, related to or arising from the formulation, negotiation, preparation, dissemination, implementation, administration of this Plan, the Plan Exhibits, the Disclosure Statement, or any contract, instrument, or other agreement or document created or entered into in connection with this Plan, or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the Case, or the confirmation or consummation of this Plan, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating this Plan (including soliciting acceptances or rejections thereof if necessary); (ii) the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into or any action taken or not taken in connection with this Plan; or (iii) any Distributions made pursuant to this Plan, except for acts constituting willful misconduct, bad faith, or gross negligence, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.  Notwithstanding the foregoing, for the avoidance of doubt, this Section of the Plan shall not (i) exculpate or release the Exculpated Parties from anything other than as expressly identified in the first sentence of this Section, (ii) prevent or limit the ability of the Debtors or the Liquidating Trustee to object to a Claim of an Exculpated Party on any basis other than matters exculpated or released in this Section, (iii) prevent or limit the ability of the Debtors or the Liquidating Trustee to object to, or defend against, on any basis, (a) any Administrative Claim of an Exculpated Party for substantial contribution, or (b) any Administrative Claim of an Exculpated Party arising solely from the Exculpated Party's capacity as a director, provided, however, that nothing in this (iii)(b) shall prevent any Exculpated Party from recovering on a claim under the Debtors' post-petition director and officer insurance policy, or (iv) exculpate or release the Liquidating Trustee, the Liquidating Trust Professionals, or the Liquidating Trust Oversight Board and its members, with respect to any act taken or omitted to be taken after the Effective Date that would result in liability under the terms of the Liquidating Trust Agreement.**

10.6  **Releases by the Debtors. Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors, and the Liquidating Trustee, on their own behalf and as a representative of their respective Estates, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed**

60

or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective assets, property and Estates or the Chapter 11 Cases, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Released Parties.  The foregoing releases shall not extend to acts constituting willful misconduct, bad faith, or gross negligence.

10.7    **Extinguishment of Intercompany Claims**. Following the Effective Date, any Claims that any of the Debtors may have against another Debtor shall be forever waived, released and extinguished for all purposes and no Debtor shall have a Claim or Administrative Claim Allowed against the Estate of any other Debtor

10.8    **Extinguishment of Preferential Transfer Claims**. On the Effective Date, any Claim or Cause of Action that any Debtor may assert against a Person or Entity that is not an Insider to avoid, recover and preserve a preferential transfer under Sections 547, 550 and 551 of the Bankruptcy Code, shall be forever waived, released and extinguished for all purposes.

10.9    **Indemnification Obligations**. Except as otherwise provided in a previously entered Order of this Court, this Plan or any contract, instrument, release, or other agreement or document entered into in connection with this Plan, including sections 9.21 and 11.1 of this Plan, any and all indemnification obligations that the Debtors have pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document, or applicable law, shall be rejected as of the Effective Date, to the extent executory; provided, however, that (i) all rights, if any, of the D&Os, the Debtors, the Estates, the Creditors' Committee, the Liquidating Trust, and the Liquidating Trustee in and to any of the Debtors' insurance policies hereby are expressly reserved and are not limited in any way by this Plan; and (ii) nothing in this Plan shall be deemed to modify any indemnification obligations of the Debtors pursuant to an Order of this Court concerning the retention or employment of a professional, including the Chief Restructuring Officer, Clifford A. Zucker. Nothing in this Plan shall be deemed to release the Debtors' insurers from, or limit the obligations of any of the Debtors' insurers concerning any claims that might be asserted by insureds, additional insureds, or counter-parties to contracts or agreements providing for the indemnification by and of the Debtors, to the extent of available coverage.  To the extent that this section 10.9 alters, affects, impairs, limits or otherwise modifies any insurance coverage of any person, this section 10.9 shall be of no force and effect as to the insurance coverage of such person.

10.10   **Terms of Injunctions or Stays.** Unless otherwise provided in this Plan, all injunctions or stays provided for in the Case pursuant to Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Cases are closed.

## ARTICLE XI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.1    **Rejection of Executory Contracts and Unexpired Leases**. Except as otherwise provided in the Confirmation Order, this Plan, the Sale Order, any other Plan Document or the Bar Date Order, the Confirmation Order shall constitute an order under Bankruptcy Code section 365 rejecting all pre-petition Executory Contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are Executory Contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) is expressly assumed hereunder or previously shall have been assumed or assumed and assigned by the Debtors, or (b) is the subject of a pending motion to assume or reject on the Confirmation Date; provided, however, that all policies and agreements giving rise to insurance in favor of the Debtors or their Estates, the Debtors believe that the insurance agreements of the Debtors are not Executory Contracts and therefore are not subject to assumption or rejection.  To the extent that an insurance policy or agreement is determined to be an Executory Contract subject to assumption by the Debtors, such executory insurance policy or agreement, as the case may be, is hereby assumed and assigned to, and shall vest with, the Liquidating Trust. For the avoidance of doubt, all insurance policies and agreements of the Debtors and the D&Os, and all obligations of any of the Debtors and the other counterparties thereto, shall be unaffected by the Plan and shall remain enforceable according to their terms and applicable law.

Notwithstanding the foregoing and anything contrary in this Plan, the Confirmation Order shall not constitute an order under Bankruptcy Code section 365 rejecting any agreement of the Debtors with CMS, including the Debtors' Medicare Physician or Supplier Agreement, which shall remain enforceable notwithstanding the entry of the Confirmation Order and occurrence of the Effective Date.

11.2    **Supplemental Bar Date for Rejection Damages**. If the rejection of any Executory Contract or unexpired lease under this Plan gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 5; provided, however, that the General Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtors, the Liquidating Trust, their successors or properties, unless a proof of such Claim is filed and served on the Liquidating Trustee within thirty (30) days after the date of notice of the entry of the order of the Court rejecting the Executory Contract or unexpired lease which may include, if applicable, the Confirmation Order.

ARTICLE XII
**DISTRIBUTIONS**

12.1    **Distributions for Claims Allowed as of the Effective Date**. Except as otherwise provided herein, and only after the funding of the Reserves, or as ordered by the Court, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on a Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to the terms and conditions of this Plan.  Notwithstanding any other provision of this Plan to the contrary, no Distribution shall be made on account of any Claim or portion thereof that (i) has been satisfied after the Petition Date pursuant to an order of the Court; (ii) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a Proof of Claim has not been timely filed; or (iii) is

evidenced by a Proof of Claim that has been amended by a subsequently filed Proof of Claim that purports to amend the prior Proof of Claim.

12.2    **No Distributions on Disputed Claims**. No Distribution shall be made by the Liquidating Trustee with respect to a Disputed Claim until the same, or some portion thereof, becomes an Allowed Claim.

12.3    **Distributions on Claims Allowed After the Effective Date**. Payments and Distributions from the Liquidating Trust to each respective Holder on account of a Disputed Claim, to the extent that such Disputed Claim ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern Distributions to such Holders of Allowed Claims.  Except as otherwise provided in this Plan, within ninety (90) days after such Disputed Claim becomes an Allowed Claim, the Liquidating Trustee shall distribute to such Holder any property from the applicable Reserve or the Liquidating Trust that would have been distributed on the dates Distributions were previously made to Holders of Allowed Claims if such Disputed Claim had been an Allowed Claim on such dates.

All Distributions made under this Article on account of an Allowed Claim will be made together with any dividends, payments, or other Distributions made on account of, as well as any obligations arising from, the distributed property as if such Disputed Claim had been an Allowed Claim on the dates Distributions were previously made to Holders of Allowed Claims included in the applicable Class

12.4    **Objections to and Estimation of Claims**. Unless otherwise provided in this Plan, from the Effective Date through the Claims Objection Deadline, the Liquidating Trustee shall have sole and exclusive standing to object to Claims in order to have the Court determine the amount and treatment of any Claim. Subject to the terms of the Liquidating Trust Agreement, from and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Court.  Except as otherwise provided in this Plan, if a party files a Proof of Claim and (i) the Debtors, or the Liquidating Trustee, as applicable, file an objection to that Claim or otherwise formally challenge the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim shall be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in this Plan.  Except as otherwise provided in this Plan, all Proofs of Claim filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtors, the Estates or the Liquidating Trust, without the need for any objection by the Liquidating Trustee or any further notice to or action, order, or approval of the Court.

Except as set forth in this Plan with respect to Administrative Claims, all objections to Claims must be filed and served on the Holders of such Claims by the applicable Claims Objection Deadline, as the same may be extended by the Court.  If an objection has not been filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (i) was Scheduled by the Debtors but (ii) was not Scheduled as contingent, unliquidated, and/or disputed, by the applicable Claims Objection Deadline, as the same may be extended by order of the Court, the Claim to which the Proof of Claim or Scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier.  Notice of any motion

for an order extending the Claims Objection Deadline shall be required to be given only to those Entities that have requested notice in the Case, or to such Entities as the Court shall order.

Costs and expenses incurred by the Liquidating Trustee (including fees and expenses of Liquidating Trustee Professionals) with respect to claims resolution for Claims in Classes 3, 4 and 5 shall be recouped from Distributions otherwise payable to Holders of Series A, Series B and Series C Liquidating Trust Interests.  For example, costs associated with objections to and litigation involving Claims in Class 5 will be deducted from Cash or other property otherwise distributable to Holders of Series C Liquidating Trust Interests.  The Liquidating Trustee shall file a notice in the Chapter 11 Cases that Distributions are available to Holders of Series A, Series B, or Series C Liquidating Trust Interests, as applicable, if and when the applicable Distributions are available (each, a "Notice of Availability of Funds").

12.5    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

(a)     **Delivery of Distributions in General**. Distributions to Holders of Allowed Claims shall be made (a) at the addresses set forth on the Proofs of Claim filed by such Holders, (b) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Liquidating Trustee has not received a written notice of a change of address, (d) at the addresses set forth in the other records of the Debtors or the Liquidating Trustee at the time of the Distribution, or (e) any change of address as reflected on the Bankruptcy Court docket.

Distributions shall be made from the Liquidating Trust, as applicable, in accordance with the terms of this Plan and, if applicable, the Liquidating Trust Agreement.

In making Distributions under this Plan, the Liquidating Trustee may rely upon the accuracy of the claims register maintained by the Claims Agent in the Case, as modified by any Final Order of the Court disallowing Claims in whole or in part.

(b)     **Undeliverable and Unclaimed Distributions**. If the Distribution to any Holder of an Allowed Claim is returned to the Liquidating Trustee as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  If a Distribution is returned as undeliverable, the Liquidating Trustee shall use reasonable efforts to determine such Creditor's then-current address.  Unclaimed Distributions shall be returned to the Liquidating Trust until such Distributions are claimed.

(c)     **Treatment of Unclaimed Distributions**. Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Unclaimed Distribution within three (3) months after the final Distribution Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution

64

and shall be forever barred and enjoined from asserting any such Claim for an Unclaimed Distribution against the Debtors and their Estates, the Liquidating Trustee, the Liquidating Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property.  In such cases, any Cash otherwise reserved for Unclaimed Distributions shall become the property of the Liquidating Trust free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan and the Liquidating Trust Agreement.  Nothing contained in this Plan or the Liquidating Trust Agreement shall require the Debtors or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim; provided, however, that in his sole discretion, the Liquidating Trustee may periodically publish notice of Unclaimed Distributions.

12.6    **Interest on Claims**.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

12.7    **Withholding and Reporting Requirements**.  In connection with this Plan and all Distributions under this Plan, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding, payment, and reporting requirements.  The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.    All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

All Entities holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes.  No Distribution shall be made to or on behalf of such Entity pursuant to this Plan unless and until such Entity has furnished such information.  Any property to be distributed pursuant to this Plan shall be deemed: (i) pending the receipt of such information in the manner established by the Liquidating Trustee, an Undeliverable Distribution pursuant to section 12.512.5(b) of this Plan; or (ii) if such information is not received by the deadline established by the Liquidating Trustee and approved by the Court upon notice and a hearing, forfeited and treated in accordance with section 12.5(c) of this Plan.

Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this

Plan unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidating Trustee in connection with such Distribution. Any property to be distributed pursuant to this Plan shall be deemed: (i) pending the implementation of such arrangements, an Undeliverable Distribution pursuant to section 12.512.5(b) of this Plan; or (ii) if such arrangements are not implemented by the deadline established by the Liquidating Trustee and approved by the Court upon notice and a hearing, forfeited and treated in accordance with section 12.5(c) of this Plan.

12.8    **Miscellaneous Distribution Provisions**.

(a)    **Method of Cash Distributions**. Any Cash payment to be made by the Liquidating Trustee pursuant to this Plan will be in U.S. dollars and may be made, at the sole discretion of the Liquidating Trustee, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law. In the case of foreign creditors, Cash payments may be made, at the option of the Liquidating Trustee, in such funds and by such means as are necessary or customary in a particular jurisdiction.

(b)    **Distributions on Non-Business Days**. Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

12.9    *De Minimis* **Distribution Provisions**. No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $50.00, or unless such Distribution is the final Distribution to such Holder pursuant to this Plan. Any such Distribution not made in accordance with the provisions of this Article IX shall be retained by the Liquidating Trustee and invested as provided in this Plan. Any Distribution not made in accordance with this Article IX to such Holder, shall be held in trust for the relevant Holder until the earlier of (x) the date the next Distribution is scheduled to be made to such Holder; provided, however, that such subsequent Distribution, taken together with amounts retained hereby, equals at least $50.00, or (y) is the final Distribution to such Holder.

12.10    **Distribution Record Date**. As of the close of business on the Distribution Record Date, the various lists of Holders of Claims and Interests in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record Holders of any of the Claims or Interests. Neither the Liquidating Trustee nor the Debtors will have any obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on a Distribution Record Date, and will be entitled for all purposes herein to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, as stated on the official claims register.

ARTICLE XIII
**CONFIRMATION AND CONSUMMATION OF THE PLAN**

66

13.1 **Conditions to Confirmation**. The following are conditions precedent to the occurrence of the Confirmation Date.

(a) A Final Order finding that the Disclosure Statement contains adequate information pursuant to Bankruptcy Code section 1125 shall have been entered by the Court;

(b) A proposed Confirmation Order that is reasonably acceptable to the Debtors, the Required DIP Lenders, and the Creditors' Committee;

(c) All documents contained in the exhibits and the Plan Supplement are in form and substance reasonably satisfactory to the Debtors, the Required DIP Lenders, and the Creditors' Committee; and

(d) Approval of all provisions, terms, and conditions hereof shall be contained in the Confirmation Order.

13.2 **Conditions to Effective Date**. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing:

(a) The Confirmation Order shall have been entered and shall provide that the Debtors, the Liquidating Trust, and the Liquidating Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with this Plan and effectuate, advance, or further the purposes thereof;

(b) The Confirmation Order, the Plan, and all Plan Exhibits shall be, in form and substance, reasonably acceptable to the Debtors, the Required DIP Lenders, and the Creditors' Committee, and shall have been executed and delivered by all parties signatory thereto;

(c) All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed;

(d) The Liquidating Trustee shall have sufficient Cash or other resources to fund the Reserves in accordance with the Plan;

(e) The Confirmation Order shall have become a Final Order; and

(f) The Debtors shall have filed a Notice of Effective Date.

13.3 **Consequences of Non-Occurrence of Effective Date**. If the Effective Date does not timely occur, the Debtors reserve all rights to seek an order form the Court directing that the Confirmation Order be vacated and that this Plan be null and void in all respects. If the Court shall have entered an order vacating the Confirmation Order, the time within which the Debtors may assume and assign or reject all Executory Contracts and unexpired

leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

## ARTICLE XIV
## ADMINISTRATIVE PROVISIONS

14.1    **Retention of Jurisdiction**. Notwithstanding confirmation of this Plan or occurrence of the Effective Date, and except as otherwise provided by applicable law, the Court shall retain such jurisdiction as is legally permissible, including for the following purposes:

(a)    To determine the allowability, classification, or priority of Claims upon objection the Liquidating Trustee or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual liens and other encumbrances;

(b)    To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Court in the Case on or before the Effective Date with respect to any Entity;

(c)    To protect the property of the Estates, including Liquidation Trust Assets, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens on property of the Estates or Liquidation Trust Assets;

(d)    To determine any and all applications for allowance of Fee Claims;

(e)    To determine any Other Priority Claim, Administrative Claims or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

(f)    To resolve any disputes arising under or related to the implementation, execution, consummation or interpretation of this Plan and the making of Distributions hereunder;

(g)    To determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or unexpired leases, or to determine any motion to reject an Executory Contract or unexpired lease pursuant to section 11.1 of this Plan;

68

    (h) To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Case, including any remands;

    (i) To enter one or more Final Orders closing the Debtors' Cases;

    (j) To modify this Plan under section 1127 of the Bankruptcy Code, to remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order so as to carry out its intent and purposes;

    (k) To issue such orders in aid of consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

    (l) To enable the Liquidating Trustee to prosecute any and all proceedings to set aside Liens and to recover any transfers, assets, properties or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be expressly waived pursuant to this Plan;

    (m) To determine any tax liability of the Debtors or the Liquidating Trust pursuant to section 505 of the Bankruptcy Code, and to address any request by the Liquidating Trustee or the Liquidating Trust for a prompt audit pursuant to section 505(b) of the Bankruptcy Code;

    (n) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

    (o) To resolve any disputes concerning whether an Entity had sufficient notice of the Case, [the Bar Date Order] or the otherwise applicable Claims bar date, the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing;

    (p) To resolve any dispute or matter arising under or in connection with any order of the Court entered in the Case;

    (q) To authorize sales of assets as necessary or desirable and resolve objections, if any, to such sales;

    (r) To hear and resolve Claims and Causes of the Action constituting Litigation Assets;

    (s) To resolve any disputes concerning any exculpation of a non-debtor hereunder or the injunction against acts, employment of process or actions against such non-debtor arising hereunder;

(t)     To approve any Distributions, or objections thereto, under this Plan;

(u)     To approve any Claims settlement entered into or offset exercised by the Liquidating Trustee; and

(v)     To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

14.2    **Amendments**.

(a)     **Preconfirmation Amendment.**  The Debtors, subject to the written consent of the Required DIP Lenders and the Creditors' Committee, may modify this Plan at any time prior to the entry of the Confirmation Order, provided that this Plan, as modified, and the disclosure statement pertaining thereto meet applicable Bankruptcy Code requirements.

(b)     **Postconfirmation   Amendment   Not   Requiring Resolicitation.**  After the entry of the Confirmation Order, the Debtors, subject to the written consent of the Required DIP Lenders and the Creditors' Committee, may modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided that: (i) the Debtors, with the written consent of the Required DIP Lenders and the Creditors' Committee, obtain approval of the Court for such modification, after notice and a hearing; and (ii) such modification shall not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under this Plan.

(c)     **Postconfirmation and Pre-consummation Amendment Requiring Resolicitation.**   After the Confirmation Date and before substantial consummation of this Plan, the Debtors, subject to the written consent of the Required DIP Lenders and the Creditors' Committee, may modify this Plan in a way that materially or adversely affects the interests, rights, treatment, or Distributions of a Class of Claims or Interests, provided that:  (i) this Plan, as modified, meets applicable Bankruptcy Code requirements; (ii) the Debtors, with the written consent of the Required DIP Lenders and the Creditors' Committee, obtain Court approval for such modification, after notice and a hearing; (iii) such modification is accepted by at least two-thirds in amount, and more than one-half in number, of Allowed Claims or Interests voting in each Class materially or adversely affected by such modification; and (iv) the Debtors comply with section 1125 of the Bankruptcy Code with respect to this Plan as modified.

14.3    **Successors and Assigns**.  The rights, benefits and obligations of any person or entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person or entity.

70

14.4    **Governing Law**. Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal laws apply, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

14.5    **Corporate Action**. Any matters provided for under this Plan involving the corporate structure of the Debtors or corporate action, as the case may be, to be taken by or required of the Debtors shall be deemed to have occurred and be effective as of the Effective Date and shall be authorized and approved in all respects, without any requirement of further action by the Debtors or the Liquidating Trustee, as the case may be

14.6    **Effectuating Documents and Further Transactions**. The Debtors and the Liquidating Trustee shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other actions as may be necessary to effectuate and further evidence the terms and conditions of this Plan.

14.7    **Confirmation Order and Plan Control**. To the extent this Plan is inconsistent with the Disclosure Statement or the Liquidating Trust Agreement, this Plan controls the Disclosure Statement and the Liquidating Trust Agreement.   To the extent the Confirmation Order is inconsistent with this Plan, the Disclosure Statement or the Liquidating Trust Agreement, the Confirmation Order (and any other orders of this Court) controls this Plan, the Disclosure Statement and the Liquidating Trust Agreement; provided, however, that to the extent a subsequent order of the Court authorizes the amendment of the Liquidating Trust Agreement and becomes a Final Order, such Final Order and amended Liquidating Trust Agreement shall control.

14.8    **Rules of Construction**.

(a)    **Undefined Terms.**  Any term used herein that is not defined herein shall have the meaning ascribed to any such term used in the Bankruptcy Code and/or the Bankruptcy Rules, if used therein.

(b)    **Miscellaneous Rules.**  This Combined Plan and Disclosure Statement is subject to the following miscellaneous rules: (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order; (ii) any reference in this Plan to an existing document or Exhibit means such document or Exhibit as it may have been amended, restated, modified or supplemented as of the Effective Date; (iii) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; and (iv) whenever this Plan provides that a payment or Distribution shall occur "on" any date, it shall mean "on, or as soon as reasonably practicable after", such date.

14.9    **Notices**. All notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

**Liquidating Trustee:**
[___]

71

**Debtors:**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott
Curtis S. Miller
Daniel B. Butz
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: (302) 658-9200
Email: dabbott@mnat.com
        cmiller@mnat.com
        dbutz@mnat.com

**DIP Agent:**

LANDIS RATH & COBB LLP
Matthew B. McGuire
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Tel: (302) 467-4400
Email: mcguire@lrclaw.com

-and-

PROSKAUER ROSE LLP
Charles A. Dale
One International Place
Boston, MA 02110-2600
Tel: (617) 526-9600
Email: CDale@proskauer.com

Steve Y. Ma
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Tel: (310) 557-2900
Email: sma@proskauer.com

**Creditors' Committee:**

COOLEY LLP
Richard S. Kanowitz
Cullen D. Speckhart
Evan M. Lazerowitz
55 Hudson Yards
New York, NY 10001-2157

Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: rkanowitz@cooley.com
cspeckhart@cooley.com
elazerowitz@cooley.com

14.10  **No Admissions or Waiver**. Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including liability on any Claim or the propriety of a Claim's classification.